**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY COWAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO.:  2:07-cv-779-MHT** |
| | § | |
| **JACKSON HOSPITAL & CLINIC, INC.,** | § | |
| **a domestic corporation, conducting** | § | |
| **business in the State of Alabama,** | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| **Defendant.** | § | |

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT**
**JACKSON HOSPITAL & CLINIC, INC.**

COMES NOW the Defendant, Jackson Hospital & Clinic, Inc. ("Jackson"), and pursuant to Fed. R. Civ. P. 56 and the applicable scheduling order, hereby moves this Honorable Court for summary judgment.  As grounds for this Motion, Jackson states that there is no genuine issue of material fact upon which to submit the Plaintiff's claims to a jury and that it is therefore entitled to judgment as a matter of law.  Jackson therefore respectfully moves this Court to enter an Order granting this Motion and dismissing all of the Plaintiff's claims with prejudice.  In support of this Motion, Jackson submits and relies upon the following materials:

1. Complaint and all subsequent pleadings of record;

2. Deposition of Dorothy Cowan, excerpts attached hereto as Exhibit A;

3. Affidavit of Sandra Sperry, attached hereto as Exhibit B;

4. Deposition of David Jones, excerpts attached hereto as Exhibit C;

5. E-mails from Dorothy Cowan to Gilbert Darrington, attached hereto as Exhibits D and E;

6.  Affidavit of Terri Lowery, attached hereto as Exhibit F;

7.  EEOC Charge, attached hereto as Exhibit G;

8.  Jackson Hospital & Clinic's Response to EEOC Charge attached hereto as Exhibits H and I;

9.  FMLA Leave Memorandum, attached hereto as Exhibit J;

10. Memorandum regarding Guidelines and Expectations for House Office, attached hereto as Exhibit K;

11. Cowan Letter of Resignation, attached hereto as Exhibit L; and

12. Brief in support of Motion for Summary Judgment, filed herewith.

WHEREFORE, Defendant Jackson Hospital & Clinic, Inc. respectfully moves this Court to enter an Order granting this Motion for Summary Judgment and dismissing all claims with prejudice.

/s/ Benjamin C. Wilson
**BENJAMIN C. WILSON**
**Ala. Bar No.: asb-1649-i54b**
**Attorney for Defendant**
**Jackson Hospital & Clinic, Inc.**

**OF COUNSEL:**
**RUSHTON, STAKELY, JOHNSTON**
**& GARRETT, P.A.**
**P.O. Box 270**
**Montgomery, Alabama  36101-0270**
**Phone:  (334) 206-3194**
**Fax:  (334) 481-0831**
**bcw@rsjg.com**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that I have electronically filed above and foregoing document with the Court via CM-ECF, on this the 12th day of May 2008, and that service will be made electronically by CM-ECF on the following counsel of record:

Dwayne L. Brown, Esq.
Law Office of Dwayne L. Brown, P.C.
Post Office Box 230205
Montgomery, Alabama 36123-0205


                    /s/ Benjamin C. Wilson_____
                    OF COUNSEL

FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    CIVIL ACTION NO.:  2:07-cv-779

6    DOROTHY COWAN,

7              Plaintiff,

8              vs.

9    JACKSON HOSPITAL & CLINIC, INC.,

10   a domestic corporation, conduction

11   business in the State of Alabama,

12             Defendant.

13

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16   between the parties through their respective

17   counsel, that the deposition of Dorothy

18   Cowan may be taken before Angela Smith

19   McGalliard, RPR, CRR, at the offices of

20   Rushton, Stakely, Johnston & Garrett, at 184

21   Commerce Street, Montgomery, Alabama 36104,

22   on the 17th day of April, 2008.

23             DEPOSITION OF DOROTHY COWAN



EXHIBIT
A.

Page 18

```
1          A.      I'm still there.

2          Q.      Okay.  What is your job there?

3          A.      Front-end registration.  I'm

4     the scheduler.  He let's me run the front

5     end.

6          Q.      He is who?

7          A.      Dr. Peter Shashy, I'm sorry.

8          Q.      Was there any -- Strike that.

9                  Did you go straight from your

10    employment at Jackson to the Shashys?

11         A.      Yes.

12         Q.      Was there any time frame in

13    which you were unemployed?

14         A.      Maybe a week or two after I

15    left Jackson, then I went to the Shashys.

16    And I've been there a year.

17         Q.      And there have been no breaks

18    in your employment with the Shashys?

19         A.      No, it hasn't.

20         Q.      Okay.  What led you to move to

21    Montgomery?

22         A.      Work.  Small town, work.

23         Q.      Do you still have family in
```

FREEDOM COURT REPORTING

Page 30

```
 1    in the front -- Well, strike that.
 2              Is it fair to say you work in
 3    his front office?
 4         A.    Right.
 5         Q.    All right.  How many other
 6    employees work in the front office with you?
 7         A.    About seven.
 8         Q.    Do you have any supervisory
 9    role over any of those seven?
10         A.    Over four of them, four of the
11    people.
12         Q.    And the four that you have in
13    mind, what are their job positions?
14         A.    They work under me as
15    scheduling clerks.
16         Q.    Okay.  Meaning that they
17    schedule patients for office visits?
18         A.    Right.
19         Q.    All right.  When you resigned
20    from Jackson in 2007, what was your last
21    rate of pay?
22         A.    Thirteen twenty-three.
23         Q.    So am I correct then that the
```

Page 31

```
 1     Shashys pay you two cents an hour more than
 2     your final rate of pay at Jackson?
 3          A.     Right.
 4          Q.     Since leaving the hospital,
 5     have you had any other sources of income
 6     other than the Shashys?
 7          A.     No.
 8          Q.     While you were at Jackson
 9     Hospital, did you have any sources of income
10     other than your employment in Jackson
11     Hospital?
12          A.     When my fiance passed away, I
13     was his beneficiary.
14          Q.     Okay.  When did your fiance
15     pass away?
16          A.     In 1998.
17          Q.     Okay.  And if I might ask,
18     what was his name?
19          A.     Mark Watts.
20          Q.     Did you ever -- You never
21     married Mr. Watts?
22          A.     No, I didn't.
23          Q.     You were a beneficiary on
```

Page 47

1        Q.      Yeah.   Okay.   Anything other

2    than that?

3        A.      No.

4        Q.      Has anyone ever treated you

5    for posttraumatic stress, other than

6    Dr. McLeod?

7        A.      Dr. Hutto.

8        Q.      Okay.   Is he still in practice

9    down there in Thomasville?

10       A.      He's in Selma.

11       Q.      Selma?

12       A.      Uh-huh.

13       Q.      Okay.   Am I correct, though,

14   that you haven't seen Dr. Hutto in a number

15   of years?

16       A.      Oh, Lord.   Probably thirty

17   years.

18       Q.      Yeah.   When did you start

19   working at Jackson initially?

20       A.      I started October 24, of '98

21   -- '88.   I'm sorry, 1988.

22       Q.      What was your first position?

23       A.      I worked in central supply.

Page 48

```
1          Q.     All right.  And what were your
2     duties there?
3          A.     Stocking the hospital.
4          Q.     Okay.  Is central supply the
5     unit that --
6          A.     All the hospital supplies.
7          Q.     Okay.  And who was your
8     supervisor?
9          A.     Mary Bell Jackson.
10         Q.     Can you spell her first name?
11         A.     M-A-R-Y, B-E-L-L, Jackson.
12         Q.     Okay.  What was your first --
13    Were you hourly?
14         A.     Yes.
15         Q.     What was your first hourly
16    rate of pay?
17         A.     Way back in '88, probably
18    about -- I'm just going to say roughly about
19    six dollars.
20         Q.     Okay.  You were full-time?
21         A.     Full time.
22         Q.     Okay.  At that point was there
23    an office for central distribution?  Well,
```

FREEDOM COURT REPORTING

Page 49

1    that's a bad question.

2                    Where was central distribution

3    based?

4         A.     In the hospital, in the

5    basement of the hospital.

6         Q.     Now, this would have been

7    obviously years before they did the

8    renovation and the --

9         A.     Uh-huh.

10        Q.     Okay.  Was it in the basement

11   of --

12        A.     Jackson Hospital, yes.

13        Q.     Okay.  And how long did you

14   work in central distribution?

15        A.     Probably about three or four

16   years.  Long enough to get a promotion to

17   registration.

18        Q.     You went then to registration?

19        A.     Yes.

20        Q.     I'm going to get to that in

21   just a second.

22        A.     Uh-huh.

23        Q.     Let me ask you a few things

Page 57

1    training other people?

2        A.        Right.

3        Q.        Okay.  At that point, did you

4    have any involvement in bed control?

5        A.        Yes.

6        Q.        Tell me about that.

7        A.        My job in registration was

8    short -- was short-term because they started

9    me working with a nurse, which nurses used

10   to do bed control at Jackson.

11       Q.        Uh-huh.

12       A.        And once I became up under

13   nursing, the registration nurse, I became a

14   training coordinator for the other

15   registration clerks.

16       Q.        Okay.  When did you move into

17   bed control -- the bed control unit?

18       A.        Before I left the old

19   hospital, but I couldn't give you an exact

20   year.

21       Q.        Okay.  Again, I've seen some

22   documentation in the personnel file that

23   suggests you moved into bed control around

FREEDOM COURT REPORTING

1     1996, does that sound accurate to you?

2          A.     If I was still in the old

3     hospital it would be.

4          Q.     When you began working in bed

5     control, what was your title?

6          A.     Training coordinator, bed

7     control training coordinator.

8          Q.     When you took that title, did

9     it mean any additional -- did it result in

10    any pay increase?

11         A.     Yes, it did.

12         Q.     Do you recall how much?

13         A.     I would say a dollar, from

14    whatever I was making.

15         Q.     All right.  And when you took

16    the position of bed control training

17    coordinator, who was your supervisor?

18         A.     Carmen Bowe, B-O-W-E.

19         Q.     And what was her title?

20         A.     Patient registration manager.

21         Q.     And at that point, was bed

22    control in what department?

23         A.     Still under registration.

FREEDOM COURT REPORTING

Page 59

1          Q.      Where was your office -- Or

2    where was the bed control located when you

3    became the bed control training coordinator?

4          A.      In the -- In registration, in

5    the registration area.

6          Q.      And where was that?  Help me

7    with that.

8          A.      You want me to give you the

9    location?

10         Q.      Uh-huh.

11         A.      Okay.  Whenever you coming

12   into registration, it would be the second

13   door on the left.

14         Q.      In the main hospital?

15         A.      In the main hospital.

16         Q.      On the first floor?

17         A.      First floor.

18         Q.      When you became bed control

19   training coordinator, how many other

20   employees were assigned to bed control?

21         A.      About four.

22         Q.      Do you recall their names, any

23   of their names?

Page 60

```
 1          A.      Dee Smith, Terri Herring,

 2     that's about the only two that I can recall

 3     right off.

 4          Q.      Dee Smith?

 5          A.      Dee, D-E-E, Smith.

 6          Q.      Okay.  So at that -- Initially

 7     did you have any supervisory authority over

 8     Dee Smith, Terri Herring, or any of these

 9     other employees?

10          A.      Right.

11          Q.      You did?

12          A.      I did.

13          Q.      Give me -- Tell me about the

14     nature of that authority, what was it?

15          A.      I would train them how to do

16     the bed assignments for the hospital.  We'd

17     take reservations from doctors' offices,

18     other hospitals --

19          Q.      Uh-huh.

20          A.      -- administration, or whoever

21     was calling us, recovery room.

22          Q.      When you were the bed control

23     training coordinator, was all your time
```

Page 61

```
 1    devoted to training other people?

 2         A.     No.

 3         Q.     Okay.  Did you actually do the

 4    bed control assignments too?

 5         A.     I did the assignments, yes.

 6         Q.     All right.  And was Carmen

 7    Bowe, being patient registration manager,

 8    was she over more than just bed control at

 9    that time?

10         A.     Yes, she was.

11         Q.     She was over what else?

12         A.     Central registration and the

13    ER.

14         Q.     Okay.  And all of these units

15    at that time, to your recollection, were

16    under registration?

17         A.     Right.

18         Q.     When you first came into bed

19    control, was it under registration?

20         A.     Yes.

21         Q.     Who was --

22         A.     Strike that.  If I'm not

23    mistaken, bed control, when I first came
```

FREEDOM COURT REPORTING

Page 62

1    under it in the old hospital, it was up

2    under nursing.

3          Q.    Okay.  When you became the

4    training coordinator, you told me that

5    Carmen Bowe was your supervisor.  Who was

6    the director of registration or the

7    registration department?

8          A.    Rick Mann.

9          Q.    At that time?

10         A.    Yes.

11         Q.    This position of bed control

12   training coordinator, were you the first one

13   to occupy it?

14         A.    Yes.

15         Q.    So it was a new position you

16   took?

17         A.    It was a new position.

18         Q.    Okay.  Had someone been doing

19   anything akin to that before you took it

20   over?

21         A.    Yes.  Nursing had it before.

22         Q.    Ms. Cowan, do you mind if we

23   take a quick break?

Page 63

1        A.      We can.

2                MR. WILSON:   Are you okay with

3    that?

4                MR. BROWN:   Yes.

5                (Recess taken.)

6        Q.      Ms. Cowan, when you were in

7    the position of bed control training

8    coordinator, did you have your own office?

9        A.      Yes, I did.

10       Q.      All right.  And was it in the

11   base -- the first floor, I think you said,

12   of the hospital?

13       A.      Yes, the first floor.

14       Q.      Can you describe the office

15   that you were in -- the characteristics of

16   the office you were in at that time?

17       A.      It was like a triangle.  It

18   didn't have a door on it.

19       Q.      It didn't have a door, what do

20   you mean?

21       A.      A door.  I mean, we left the

22   door off of it because the office --

23   Whenever we moved into that building, none

FREEDOM COURT REPORTING

Page 64

1    of the offices had doors on them whenever we

2    first moved over there.

3         Q.    Was it an interior office?

4         A.    Yes, it was.

5         Q.    All right.  So did it have any

6    windows?

7         A.    No.

8         Q.    But just a space for a door

9    that was left off?

10        A.    Right.  Left open.  It was an

11   open room.

12        Q.    Okay.  And had you been in

13   that particular office ever since you

14   initially arrived in bed control?

15        A.    Yes.  For a period of time.

16        Q.    Okay.  How long?  You say a

17   period of time, help me with that.

18        A.    Okay, I would -- My period of

19   time, I started off in that office until

20   they moved me to an office around by the

21   cafeteria.

22        Q.    What point did you move to the

23   office near the cafeteria?

FREEDOM COURT REPORTING

Page 65

```
1          A.     It was still in the

2     registration area, it was just giving the

3     registration clerks more availability to the

4     office.  And they moved me closer, you know,

5     on the outside.  So I was in front of the

6     patio when they moved me to that office.

7          Q.     Okay.  Now, you're talking

8     about prebed control days?

9          A.     Right.  All of this is bed

10    control days, yes.

11         Q.     Prebed control.  Let's start

12    over.

13               When you were in

14    registration --

15         A.     Right.

16         Q.     -- before you ever went into

17    bed control.  Okay?

18         A.     Right.

19         Q.     Where was your office?

20         A.     In registration.  We had a big

21    office in registration.  The old building

22    had an office big enough for two desks in

23    it, the nurse's desk and the bed control
```

FREEDOM COURT REPORTING

1    clerk's desk.

2         Q.    All right.

3         A.    In the old hospital.

4         Q.    All right.  This was when you

5    were in registration?

6         A.    Right.

7         Q.    When you began to work in bed

8    control.

9         A.    Right.

10        Q.    Okay.  Where was your -- Where

11   were you initially placed?  Where was your

12   initial office?

13        A.    In the new hospital, I was

14   placed right outside the entrance of

15   registration, the second door on the left.

16        Q.    Okay.  Is this the triangular

17   room you're talking about?

18        A.    Yes.

19        Q.    Okay.  Now, y'all bear with me

20   for a second.

21        A.    Okay.

22        Q.    But the office across from the

23   cafeteria you were talking about, were you

FREEDOM COURT REPORTING

```
 1    in there before?
 2           A.     No.   I was in there after the
 3    move.   They moved me to that office after --
 4    I was in the triangular office at first --
 5           Q.     Uh-huh.
 6           A.     -- then they moved me into the
 7    office across from the cafeteria, which is
 8    in front of the patio.
 9           Q.     Okay.   When you were in the
10    office across from the cafeteria, from the
11    patio, were you in bed control at that time?
12           A.     Right.
13           Q.     Did that office have windows?
14           A.     It had a small window and a
15    door.   But the door was open.
16           Q.     Was the door an interior
17    doorway or an exterior doorway?   I mean, did
18    it lead to another room in the hospital or
19    did it go outside?
20           A.     No.   Just leads from my
21    office, straight out of the office.
22           Q.     Okay.
23           A.     If you walk out of the office
```

Page 68

1    that was across from the patio, you would be

2    going straight from the cafeteria, or to the

3    patio, or around in the hospital.  It was an

4    office.

5              Q.     All right.  I guess what I'm

6    getting at is, in that office, was the only

7    -- there were no windows, but a door?

8              A.     A door with a window.

9              Q.     Okay.  All right.  And would

10   y'all typically keep that door open or

11   closed?

12             A.     We would keep it open, and

13   during lunchtime we would close it.

14             Q.     All right.  Was there anyone

15   in that office, assigned to work in that

16   office, other than bed control people?

17             A.     No.

18             Q.     Okay.  And how long did you

19   stay in this office across from the

20   cafeteria?

21             A.     Until they moved me into the

22   office across the street in nursing

23   administration, which was a big office, like

Page 69

1    a suite.  I had big windows over there, the

2    third floor.

3         Q.    Do you recall when that move

4    occurred?

5         A.    July.  I'd say late July, I'm

6    not sure about the exact date.

7         Q.    Of what date?

8         A.    2006.

9         Q.    Okay.  So would it be

10   accurate, and I'm just trying to understand,

11   because I don't -- I'm not sure I do.

12              Would it be accurate to say

13   that you spent several years in this office

14   you've described that was across from the

15   cafeteria?

16        A.    Yes.

17        Q.    Okay.  I've got a few

18   documents that I'm going to show you,

19   Ms. Cowan.  I think it will kind of help set

20   up a good chronology.

21        A.    Uh-huh.

22        Q.    Well, after the new hospital

23   was completed, did you go from the office

FREEDOM COURT REPORTING

Page 75

1           Q.      Is that it?

2           A.      This is it.

3           Q.      All right.  Did you, in fact,

4     take that position?

5           A.      Yes.

6           Q.      Okay.  And do you see up on

7     the top of the page under job title it says:

8     Department, nursing service?  At the very

9     top.

10          A.      I'm looking at it, yes.

11          Q.      Okay.  You agree when you

12    became bed control training coordinator, you

13    were part of the nursing service department?

14          A.      Right.

15          Q.      Okay.  And that bed control,

16    as a unit, was within the nursing department

17    at that time?

18          A.      Yes.

19          Q.      Okay.  Is it your

20    recollection, then, that it was in

21    approximately December 1998 that you first

22    came -- technically came into the bed

23    control unit?

FREEDOM COURT REPORTING

Page 76

1          A.      No.   I came in in the old

2     hospital.   I don't know what year that was.

3          Q.      Well, that's what's confusing

4     me, because my --

5          A.      I would have to know when we

6     was in the old hospital, then I can give you

7     that.

8          Q.      Okay.

9          A.      I don't want to give you a

10    year and it's the wrong year.

11         Q.      All right.   Well, let's do

12    this, maybe this will help us.

13         A.      See, bed control started off

14    with a nurse in bed control.   The only way

15    you can do bed control, you have to have a

16    nurse with you.   Nursing and bed control

17    works in one with that job.

18               So the nurse would do --

19    started off doing nurse's orders, but all of

20    that was faded out, so it became where I

21    could do it from registration.

22         Q.      Right.

23         A.      And they gave me the title of

Page 77

| | |
|---|---|
| 1 | bed control training coordinator, which the |
| 2 | nurse was moved out of bed control, and I |
| 3 | was moved under registration because we was |
| 4 | in registration's area anyway. |
| 5 | Q.     Right.  Well, according to |
| 6 | Defendant's Exhibit 1, the nurse was |
| 7 | apparently moved out of bed control at the |
| 8 | end of 1998? |
| 9 | A.     Right. |
| 10 | Q.     And they created this |
| 11 | position, bed control training coordinator, |
| 12 | at the end of '98, you see that? |
| 13 | A.     Right. |
| 14 | Q.     You agree with that? |
| 15 | A.     Right.  I agree with that. |
| 16 | Q.     The memorandum accomplishing |
| 17 | this was apparently drafted on December 29, |
| 18 | 1998; right? |
| 19 | A.     Right. |
| 20 | Q.     You agree? |
| 21 | A.     Right. |
| 22 | (Whereupon, Defendant's |
| 23 | Exhibit No. 3 was marked |

FREEDOM COURT REPORTING

Page 78

1                        for identification.)

2          Q.      Let me show you Defendant's

3    Exhibit 3.

4          A.      Okay.

5          Q.      What is this document?   I

6    mean, what type of document is this?

7          A.      This is a pay raise.  I'm

8    moving from a bed control clerk to a bed

9    control training coordinator.

10         Q.      Right.  And the date of this

11   is January 4, 1999; right?

12         A.      Right.

13         Q.      So if you compare this with

14   Defendant's Exhibit 1, this change from bed

15   control clerk to training coordinator, was

16   accomplished within a week of the

17   recommendation to create the position.

18         A.      Right.

19         Q.      So as you say, you became the

20   first occupant of the training coordinator

21   position?

22         A.      Right.

23         Q.      And I think we all agree, at

Page 79

```
 1    that point bed control training coordinator

 2    was within the department of nursing?

 3            A.    Right.

 4                        (Whereupon, Defendant's

 5                        Exhibit No. 4 was marked

 6                        for identification.)

 7            Q.    Okay.  Let me show you what

 8    I've marked as Defendant's Exhibit Number 4.

 9    I'll let you read that briefly.

10            A.    Okay.

11            Q.    All right.  Can you tell us

12    what Defendant's Exhibit 4 is -- what the

13    document is?

14            A.    This is the first time I've

15    seen this one.

16            Q.    Okay.  And I'm not suggesting

17    you've seen this.

18            A.    Okay.  Okay.

19                  MR. BROWN:  He just wants you

20    to identify the document.

21            Q.    Yeah.  It's been produced in

22    the lawsuit, but I'm not suggesting --

23            A.    Right.
```

FREEDOM COURT REPORTING

Page 82

1    director of registration?

2         A.     Right.

3         Q.     The first two sentences is

4    really what I wanted to ask you about.  It

5    says:  A general discussion was held

6    transferring the bed control to the

7    registration department.  The duties for

8    Ms. Cowan will remain unchanged until her

9    job description has been updated.

10                Did I read that correct?

11        A.     Right.

12        Q.     All right.  Do you recall

13   hospital administration deciding to move bed

14   control out of nursing and back to the

15   registration department in roughly November

16   of 2003?

17        A.     It was moved, but I can't give

18   you an exact date.

19        Q.     That's fair.

20        A.     Okay.

21        Q.     So when you came into bed

22   control, it was in nursing?

23        A.     Right.

FREEDOM COURT REPORTING

Page 83

1        Q.      And then at some point
2    thereafter, it was apparently --
3        A.      -- moved to registration.
4        Q.      The unit as a whole was moved
5    back to the registration department?
6        A.      Right.
7        Q.      All right.  At the time, did
8    you have any objections to your unit being
9    moved from nursing back to registration?
10       A.      No.
11       Q.      Or to registration?
12       A.      No.
13       Q.      Okay.  When this move from
14   nursing back to registration was
15   accomplished, did your office location
16   change?
17       A.      I'm not sure about that.  Not
18   -- I can't give you the exact year it
19   changed, but it changed.  But whenever --
20   possibly 2003 I was still in the triangle
21   office.
22       Q.      And you're just -- You're just
23   uncertain as to whether a change in location

Page 94

1          A.      No.

2          Q.      I mean, obviously, certain

3    types of patients need to go to certain

4    units?

5          A.      To certain floors.  And you

6    would always try to keep the physician's

7    patients on the floor -- on the unit their

8    patients need to be on.  You wouldn't put

9    orthopedic patients on maternity floor.

10         Q.      I completely agree with you.

11                 Setting aside those issues of

12   certain patients needing to go to certain

13   floors because of their condition --

14         A.      Right.

15         Q.      -- setting all that aside, did

16   you ever give any particular doctor

17   preference or priority based on your

18   relationship with that doctor?

19         A.      No.

20         Q.      All right.  As we've already

21   discussed, bed control was moved from

22   nursing to registration at the end of 2003?

23         A.      Right.

Page 95

```
 1          Q.     All right.  When it moved back
 2    to registration -- to registration, who was
 3    your immediate supervisor?
 4          A.     Rick Mann.
 5          Q.     Okay.
 6          A.     Carmen Bowe was my supervisor,
 7    Rick Mann was the director.
 8          Q.     All right.  I asked you a
 9    moment ago if you had any role in the
10    decision to move bed control from nursing to
11    registration, and you told me no.
12          A.     No.
13          Q.     All right.  Did that move
14    affect your day-to-day duties and functions
15    at all?
16          A.     No.
17          Q.     It did change, though, who you
18    reported to, I think?
19          A.     Right.  That's what it
20    changed, the bosses.
21          Q.     Okay.  And I guess -- Okay.
22    Strike that.
23                 Ms. Cowan, you don't dispute
```

Page 96

1    the notion that the hospital, from time to

2    time, will restructure its units or its

3    departments, you've seen that in your tenure

4    at Jackson?

5         A.    Uh-huh.

6         Q.    Yes?

7         A.    Yes.

8         Q.    All right.  And that's part of

9    improvement of procedures and functions at

10   the hospital?

11                MR. BROWN:  Object to the

12   form.

13        A.    Right.

14        Q.    And before mid-2006, your

15   department had been reorganized and moved --

16   your unit had been reorganized and moved on

17   occasion?

18        A.    Right.

19        Q.    When bed control went to

20   registration, it was one of several

21   departments under the umbrella of

22   registration?

23        A.    Yes.

FREEDOM COURT REPORTING

1        Q.      What other departments were in

2   registration?

3        A.      Registration itself, the reg

4   clerks.

5        Q.      Okay.

6        A.      ER registration.

7        Q.      Okay.

8        A.      And central scheduling.

9        Q.      Okay.  Registration itself

10  would be, what, everything but ER?

11       A.      ER is under registration.

12       Q.      Yeah.  I might have

13  misunderstood.

14       A.      Okay.

15       Q.      I mean, you've got

16  registration?

17       A.      Right.

18       Q.      Then under it you've got

19  emergency registration?

20       A.      Right.

21       Q.      And then central scheduling,

22  which is what?

23       A.      The patients that's being

Page 98

1    preadmitted to come in for surgery.

2         Q.    All right.  And the ER

3    registration has its assigned employees?

4         A.    Yes.

5         Q.    And central registration had

6    its assigned employees?

7         A.    Yes.

8         Q.    And bed control had you and I

9    think you said approximately four others?

10        A.    Right.

11        Q.    Was there any overlap between

12   these departments in terms of employee

13   staffing?

14        A.    Meaning?

15        Q.    Would people that worked in

16   your unit in bed control work in central

17   scheduling, for example?

18        A.    No.

19        Q.    Okay.  Would the people that

20   worked in bed control work in ER

21   registration?

22        A.    Over time, yes.

23        Q.    All right.  Was it kind of a

FREEDOM COURT REPORTING

Page 157

1          Q.      Three monkeys and one gorilla?

2          A.      Right.  There was a total of

3    six monkeys, but the meeting I was in had

4    the three monkeys, then he had monkeys for

5    the second set.

6          Q.      Well, the meeting you were in

7    had three monkeys?

8          A.      Three monkeys and one gorilla

9    and a stun gun.

10         Q.      All right.  Okay.  Now, back

11   up a little bit.  He started talking about

12   being in areas what now?

13         A.      The way he wanted us to be in

14   our area.

15         Q.      The way he wanted you to be?

16         A.      Right.  Or the way you

17   appeared to him.

18         Q.      Okay.

19         A.      That's the part, whenever he

20   said:  This is the way you appear to me.

21   Like he gave Martine a monkey with

22   "friendly" on it, I think.

23         Q.      Okay.

FREEDOM COURT REPORTING

Page 158

1        A.      He said just looking at her,

2     being around her, she was a friendly

3     employee.  So he hung this monkey around her

4     neck.

5              The "fabulous" gorilla -- I

6     mean the "fabulous" monkey, I'm not sure

7     which girl he really hung that monkey around

8     her neck.

9        Q.      The one he hung around

10    Martine's neck, first of all, did he

11    actually hang it around her neck?

12       A.      Yes.

13       Q.      When we say monkey, are we

14    talking about --

15       A.      They had writing on it.  The

16    monkeys had like friendly, fabulous, and one

17    monkey I can't remember the name on the

18    third monkey.

19       Q.      All right.  Let's kind of back

20    up.

21       A.      Okay.

22       Q.      All these monkeys were stuffed

23    animals?

FREEDOM COURT REPORTING

Page 159

| | | |
|---|---|---|
| 1 | A. | Right. |

1          A.       Right.

2          Q.       They were toys?

3          A.       Right.

4          Q.       They had labels on them?

5          A.       Right.

6          Q.       Friendly?

7          A.       Yes.

8          Q.       Fabulous?

9          A.       Right.

10         Q.       And something else on the

11    third one.

12         A.       And then the gorilla was the

13    big one.

14         Q.       How large were the stuffed

15    monkeys?

16         A.       About -- They were about like

17    this (indicating).

18         Q.       Eighteen inches?

19         A.       Right.  Long enough to hang

20    around your neck.

21         Q.       And then how -- How big was

22    the gorilla, how big was that?

23         A.       The gorilla was about so high

FREEDOM COURT REPORTING

Page 160

1    (indicating).

2          Q.      About a foot high?

3          A.      Yeah.  A little black gorilla.

4          Q.      Did the gorilla have any label

5    or language on it?

6          A.      No.

7          Q.      Did it have anything on it?

8          A.      No.

9          Q.      Was it -- What color was the

10   gorilla?

11         A.      It was black.

12         Q.      What color were the other

13   monkeys?

14         A.      One of them was a bright

15   yellow, one of them was green.

16         Q.      Okay.

17         A.      And I think one of them was a

18   hot pink or purple, I'm not sure.

19         Q.      Okay.  All right.  So he was

20   using the three monkeys to illustrate

21   positive attitude or demeanor?

22         A.      For the department.

23         Q.      All right.  So to that end,

Page 161

1    tell me if I'm wrong, I don't want -- you're

2    the one that needs to do the testifying, not

3    me.

4         A.    Right.

5         Q.    But he hung a monkey with a

6    positive statement on it around Martine

7    Bettis's neck?

8              MR. BROWN:   Object to the

9    form.

10        A.    Yes.

11        Q.    Is that true?

12        A.    Yes.

13        Q.    What about the other two?

14        A.    He hung them around the other

15   girls' necks.

16        Q.    Do you know which two girls?

17        A.    I'm not sure to be exact what

18   the names are now.

19        Q.    All right.

20        A.    I think one of them was Jackie

21   Singleton, but I'm not sure.

22        Q.    Okay.

23        A.    So I'd rather not --

FREEDOM COURT REPORTING

Page 162

1         Q.      But to that point, he was --

2    was he attempting to illustrate positive

3    behavior?

4                 MR. BROWN:  Object to the

5    form.

6         Q.      I mean, was he trying to

7    compliment these employees who he gave the

8    monkeys to?

9                 MR. BROWN:  Same objection.

10        A.      I suppose -- I don't know what

11   he was trying to do.  I mean --

12        Q.      I mean, he's got a monkey that

13   has "fabulous" on it.

14        A.      Right.

15        Q.      And he gives it to an

16   employee?

17        A.      Yes.

18        Q.      Why did he give the monkey

19   named fabulous to an employee?

20        A.      He was trying to let her see

21   that she was a fabulous employee.

22        Q.      Okay.  That's all I'm saying.

23        A.      Right.  I understand where

FREEDOM COURT REPORTING

Page 163

1    you're going.

2         Q.    Was he trying to convey

3    positive statements about how this employee

4    behaved?

5         A.    Right.

6         Q.    Okay.  Was that your

7    perception at the time?

8         A.    Not really.  Because I'm

9    wondering why he's in this meeting with

10   these monkeys, you know.

11        Q.    Well, did you understand at

12   the time that he was trying --

13        A.    I tried to, yes.  I really

14   did.

15        Q.    Let me finish, just so it's

16   clear.

17        A.    Okay.

18        Q.    Did you understand at the

19   time, that with at least the three monkeys,

20   he was trying to illustrate demeanor that he

21   felt to be positive or warm or favorable?

22             MR. BROWN:  Object to the

23   form.

FREEDOM COURT REPORTING

Page 164

```
 1          A.      I just wasn't looking at it
 2     like that.
 3          Q.      Okay.
 4          A.      Okay.  That's the only way I
 5     can say that.
 6          Q.      All right.  What -- Keep
 7     walking me through what you can recall.
 8          A.      Okay.
 9          Q.      He had three monkeys, he gave
10     one to each employee.
11          A.      Right.  Then he gave -- He
12     pushed the gorilla down the table about this
13     long (indicating) to Charlotte Gillis.
14          Q.      Okay.
15          A.      And she pushed it back to him.
16     And that's what really started --
17                  MR. BROWN:  It's about an
18     eleven or twelve-feet table?
19                  THE WITNESS:  Right.  Right.
20                  MR. WILSON:  That's about
21     right.
22          Q.      Did he say anything?
23          A.      He said:  This is a bully.
```

FREEDOM COURT REPORTING

Page 165

```
1    This is what I have for the bully of the

2    group.

3         Q.     Okay.  Did he explain what he

4    meant by the bully?

5         A.     I -- He was saying that she

6    would always have little -- I guess keep

7    little negative things going in the

8    department.

9         Q.     Okay.  Had you ever seen any

10   evidence of that?

11        A.     Yes.

12        Q.     Like what?

13        A.     Charlotte was real -- she was

14   real headstrong, I would say.

15        Q.     Okay.  Are you aware of any

16   particular disputes that David and Charlotte

17   had had at any point before this meeting on

18   the 21st of June?

19        A.     No, I'm not.  Because I didn't

20   work the same area Charlotte worked.

21   Charlotte worked ER registration.

22        Q.     Okay.  When he passed the

23   gorilla down, did he say anything other than
```

Page 166

1    what you've just shared with me?

2           A.      That's what he said.

3           Q.      Okay.  At the time did you

4    understand that he was attempting to use

5    that gorilla to illustrate a negative

6    attitude?

7           A.      Yes, I did.

8           Q.      Okay.  And setting aside the

9    appropriateness of the stuffed animal, the

10   gorilla, you agreed at that time that

11   Charlotte did display, from time to time, a

12   negative attitude?

13          A.      From time to time, she did.

14          Q.      Okay.  So while his choice of

15   prop may have been inappropriate in some

16   people's eyes, you understood at the time

17   what he was trying to convey?

18                  MR. BROWN:  Object to the form

19   of the question.

20          A.      Not in my eyesight.  I mean,

21   because after Charlotte and him started with

22   the gorilla, I already had -- was looking at

23   him with the other animals.  But once I saw

FREEDOM COURT REPORTING

Page 167

1    he was bothering somebody else with the

2    monkey and gorilla thing, then it just went

3    to another level.

4         Q.    He didn't -- He slid the

5    gorilla down the table towards Charlotte?

6         A.    And she pushed it back to him,

7    and he slid it back to her, and this went on

8    a couple of minutes.

9         Q.    Did he say anything when he

10   slid it to her?

11        A.    He said:  This is for you.

12   You're the bully of the class.

13        Q.    And she said what?

14        A.    She was telling him she didn't

15   want it, you know, and she would push it

16   back down.

17        Q.    Okay.  Before the gorilla was

18   introduced and you're seeing these three

19   monkeys that were given to these other three

20   employees, did anybody object to the use of

21   those three monkeys?

22        A.    I can't recollect, no.

23             MR. BROWN:  You mean at the

FREEDOM COURT REPORTING

Page 168

```
 1    time or after?

 2                    MR. WILSON:   Yeah.   At the

 3    time.

 4         A.     I can't recall.

 5         Q.     Did Martine, in fact, want --

 6    she was given the monkey, fabulous, for her

 7    perceived good demeanor, good attitude?

 8                    MR. BROWN:   Happy.   I think

 9    she was given, happy.

10         A.     Happy.

11         Q.     Was that a good assessment of

12    Martine Bettis's personality?

13         A.     I would say yes.

14         Q.     Another one of the monkeys,

15    apparently, I think had gone to Jackie

16    Singleton?

17         A.     Right.

18         Q.     Was she a -- What was your

19    perception of her demeanor and attitude as

20    an employee?

21         A.     She was -- She was a good

22    employee.

23         Q.     And as we sit here today,
```

FREEDOM COURT REPORTING

Page 169

```
 1    you're not sure who the third monkey went
 2    to?
 3            A.      I'm not sure.  No, I wouldn't
 4    put a name down because I'm not sure.
 5            Q.      So, he then passes this
 6    gorilla to Charlotte, she passes it back, he
 7    passes it back, what happened after that?
 8            A.      After -- Shortly after that,
 9    the meeting was adjourned because everybody
10    was upset because of the way he was doing
11    her with the gorilla.
12            Q.      Did he do anything else with
13    the gorilla to Charlotte, other than push it
14    down the table to her to tell her she was
15    the bully?
16            A.      He finally set it down in
17    front of her and said it was for her.  But
18    she left it on the table and got up.  Then
19    he got up with the stun gun and said if we
20    don't start -- when the patients walk up out
21    there to registration, this is what he
22    expect us to -- I guess if a patient come
23    up, he wants you to go out there and get
```

Page 170

1    them immediately.  He said if you didn't

2    start getting them, then he would zap you

3    one, he would start zapping you.  And he

4    waived a stun gun around.

5           Q.      If you didn't go retrieve a

6    patient to be registered?

7           A.      Right.  In a timely manner.

8    And he came by your door and you didn't have

9    a patient in there, that he would zap you.

10          Q.      Describe the stun gun for me.

11   First of all, was it a toy?

12          A.      I have no idea.  I went blank

13   with David whenever he -- After the gorilla

14   and by the time he was standing down there

15   with the stun gun, I was just -- he had just

16   -- I was just dumbfounded.

17          Q.      All right.  Well, you didn't

18   think he had a real stun gun, did you?

19                  MR. BROWN:  Object to the form

20   of the question.

21          Q.      Or did you?

22          A.      I have no idea.

23          Q.      Okay.  The use of the stun gun

Page 171

1   was to illustrate timeliness for patients at

2   registration?

3           A.      Right.   That's what he said.

4           Q.      All right.  And he waved it

5   around, you say?

6           A.      Yeah, he waved it around.

7           Q.      Did he aim it or point it at

8   any particular employee?

9           A.      No.

10          Q.      Did he single out any employee

11  in the room when he was using the stun gun

12  as a prop?

13                  MR. BROWN:  Object to the form

14  of the question.

15          A.      No.  He was just standing up

16  waving the stun gun.

17          Q.      Did he threaten to, quote, zap

18  any particular employee?

19          A.      No.

20          Q.      Did anybody other than

21  Charlotte, object to the gorilla at the

22  time?  I mean, did anybody verbalize an

23  objection?

FREEDOM COURT REPORTING

Page 172

```
 1          A.     Yes.  Terri Herring.

 2          Q.     What did she say?

 3          A.     She came to me after the

 4    meeting, and she --

 5          Q.     Wait, wait, wait.  During the

 6    meeting, did anybody during that staff

 7    meeting --

 8          A.     No.  Not during the meeting.

 9    No one said anything during the meeting.

10    You know, he had the meeting.

11          Q.     All right.  Did anybody

12    verbalize an objection to the stun gun

13    during the meeting?

14          A.     No.

15          Q.     Okay.  And then you say that

16    the meeting adjourned, broke up, within a

17    few moments of the stun gun usage?

18          A.     Right.

19          Q.     Okay.  Tell me exactly how it

20    broke up.  I mean --

21          A.     I kind of -- David, to me,

22    probably felt that he shouldn't have used

23    those monkeys and that gorilla after -- and
```

Page 175

```
 1        A.       They did.
 2        Q.       Did anybody else from the
 3   hospital, outside the registration
 4   department, ever attend meetings,
 5   departmental meetings?
 6        A.       No.  Not that I can recall.
 7        Q.       How long do you think this
 8   entire meeting lasted?
 9        A.       Probably about fifteen
10   minutes, maybe twenty.
11        Q.       Was there a discussion of any
12   other topic other than demeanor, employee
13   attitudes, things of that nature?
14        A.       That's all it was about.
15        Q.       What happened to the monkeys
16   after the meeting?
17        A.       The girls, they kept them.
18        Q.       All of them?
19        A.       All of them except the
20   gorilla.
21        Q.       What happened to the gorilla?
22        A.       It was left on the table.  I
23   don't know what happened to the gorilla.
```

Page 177

1    session you attended?

2         A.    Probably around three o'clock.

3         Q.    Okay.  What did you do after

4    the meeting?

5         A.    It was almost time for me to

6    get off of work.

7         Q.    Uh-huh.

8         A.    I went back to my office and

9    finished my day.

10        Q.    You got off what time that

11   day?

12        A.    Probably about five or

13   five-thirty.

14        Q.    Did you have any discussions

15   that day with any of the other participants

16   about what had transpired?

17        A.    No.

18        Q.    Not at all?

19        A.    No.

20        Q.    What -- How did his use of

21   those -- let's just limit it to the stuffed

22   animals for a second, how did that make you

23   feel?

Page 184

1          A.     I do.  I feel like that's why

2     he chose those.

3          Q.     You told me a moment ago that

4     you -- Well, let me strike that and ask you

5     this.

6                 A minute ago you made

7     reference to prior problems that kind of, in

8     your mind, made it rational to conclude that

9     he was presenting these stuffed animals and

10    stun guns towards some racial end?

11         A.     Right.

12         Q.     What did you have in mind?

13         A.     That's the way we came across

14    to him.

15         Q.     I know.  But what had gone on

16    before that meeting that kind of solidified

17    in your mind that the use of these

18    particular props was racially motivated?

19         A.     It was the way that David had

20    been treating us in the past.

21         Q.     Like what?

22         A.     The meetings, like the raise,

23    the parking meters -- the parking pass.

FREEDOM COURT REPORTING

Page 185

```
 1        Q.     Angela Griffin?

 2        A.     Right, Angela Griffin.

 3        Q.     Uh-huh.

 4        A.     I had to go through so many

 5   chain of command to get my raise, changing

 6   up --

 7        Q.     Wait a minute.  Your raise

 8   that you got when Angela Griffin was hired?

 9        A.     Right.

10        Q.     Okay.  Go ahead.

11        A.     Putting us in uniforms.

12        Q.     But, see, the uniforms would

13   have applied to all the employees, white or

14   black, wouldn't they, or African-American?

15        A.     They would have.

16        Q.     I mean, that's not something

17   that -- I understand y'all might not have

18   wanted uniforms, I get it.

19        A.     Right.

20        Q.     But agree with me, will you,

21   that implementing uniforms is going to

22   affect all employees regardless of their

23   race?
```

Page 186

```
 1        A.      Right.

 2        Q.      All right.  What else?  What

 3   else had he done before the meeting that had

 4   created an environment in your mind that he

 5   was doing whatever he did in the meeting for

 6   a racial purpose?

 7        A.      It was just the way he came

 8   across.  I mean, to walk by me and you're

 9   the director of my department, and you

10   hadn't seen me all day, and you just walk

11   straight by me and not even say good

12   morning.  You don't have to make

13   conversation or small talk, or turn your

14   head to keep from speaking, or drop your

15   head to keep from speaking, he did all those

16   things.

17        Q.      But are you -- Is it your

18   perception when he would pass you in the

19   hall and wouldn't speak to you and things --

20        A.      He didn't speak to anybody.

21        Q.      That's what I was getting at.

22   Is it your perception that that was

23   motivated by racial hostility versus him
```

Page 187

```
1    just being that way, possibly?

2         A.    Versus him after he bought the

3    monkeys and gorilla and stun gun, that just

4    really made it racist to me.

5         Q.    So you're saying that the

6    meeting with the monkeys, gorilla, and stun

7    gun just kind of solidified it --

8         A.    Right.

9         Q.    -- in your mind?

10        A.    Yes.

11        Q.    Okay.  Anything else he did

12   beforehand, before that meeting that

13   contributed to your view that he was being

14   racial in the meeting?

15        A.    That's all.  That's it.

16        Q.    Okay.  Now, you didn't talk to

17   any of your coworkers that day about what

18   happened in the meeting?

19        A.    No.

20        Q.    Did you make any effort to

21   talk to David that day?

22        A.    No, I didn't.

23        Q.    Did you make any effort to
```

Page 196

1       A.      Yes.

2       Q.      All right.  In the e-mail you

3  say:  Our director, David Jones, offended

4  quite a few employees, and me personally.

5               At that time, who did you know

6  for a fact was offended?

7       A.      Several other employees was --

8  Do you want me to give names?

9       Q.      Yeah.

10      A.      Terri Herring, Charlotte

11  Gillis, they were going around, and other

12  employees in the hospital knew about the

13  meeting.  I mean, the meeting had been

14  recognized to everybody in the hospital at

15  that time.

16      Q.      Did you talk to any of these

17  employees or anyone else before you sent

18  this e-mail?

19      A.      No, I didn't.  I didn't talk

20  to anyone before I sent it.  This was

21  shortly after I got to work.

22      Q.      The e-mail goes on to say:

23  This department is ninety-five percent

FREEDOM COURT REPORTING

Page 197

1    African-American, and he referred to his

2    employees as monkeys.  He named them

3    fabulous, friendly, and gorilla.

4                    Now, to be precise, there

5    would have been a third monkey; right?

6         A.    Right.  But I couldn't think

7    of the name.

8         Q.    He made the ludicrous comment

9    waving a stun gun that if he didn't have

10   cooperation from his staff, they would be

11   stunned; true?

12        A.    True.

13        Q.    Now, just to be clear, there

14   were Caucasian employees in there?

15        A.    Yes.  A few.

16        Q.    A few.  And at least with

17   respect to the stun gun, that was a general

18   statement that ostensibly applied to them as

19   well; is that fair?

20                    MR. BROWN:  Object to the

21   form.

22        Q.    I mean, you've already

23   testified the stun gun wasn't aimed at any

Page 198

1    particular employee; right?

2         A.    Yes.

3         Q.    I mean, so is it fair -- Is it

4    fair to say that the stun gun was a prop

5    or -- you know, that was used with reference

6    to everyone in the room, regardless of their

7    race?

8         A.    Yes.

9         Q.    I'm reading now:  I would like

10   for there to be a mandatory meeting

11   immediately demanding an apology.

12              Did I read that correctly?

13        A.    Yes.

14        Q.    That last sentence:  This is

15   insubstantial wording, and I must say lack

16   of professionalism.  Is that the -- And you

17   signed it:  Thanks, Dorothy.

18              Was there any other language

19   in this e-mail when it was sent to

20   Darrington?

21        A.    No.

22        Q.    Did you talk to anyone else

23   after you sent this, other than Chris

Page 205

1    Charlotte and said she was the big bully of

2    the group.  He further went on to grab the

3    gun, waving it in the air and stating if we

4    didn't begin acting right he would shoot us

5    with the gun.

6              I hope this e-mail better

7    describes the events as they took place.  I

8    would like to speak to you both as soon as

9    possible about yesterday's events and how we

10   should proceed.

11             Was there any other language

12   in this e-mail at the time it was sent?

13        A.    No.

14        Q.    Did you get -- Did you hear

15   from Mr. Darrington or Mr. Scholl between

16   the time you sent the first e-mail and the

17   time you sent the second e-mail?

18        A.    No.

19        Q.    Did you ever hear from either

20   one of them?

21        A.    Yes, I did.

22        Q.    Who?

23        A.    From Mr. Darrington and

Page 206

1    Mr. Scholl, when they had a meeting with us

2    to apologize what David had did.

3         Q.    When was that meeting?

4         A.    Probably about -- I'm not sure

5    of the exact time, but I would say about two

6    or three weeks later.

7         Q.    Did you hear from

8    Mr. Darrington before that two- to

9    three-week time frame expired?

10        A.    No, I didn't.

11        Q.    Did you hear from Mr. Scholl

12   before that two- or three-week time frame

13   expired?

14        A.    No, I didn't.  Let me rephrase

15   Mr. Darrington.  Mr. Darrington did have a

16   meeting with David asking David to apologize

17   to us before we had the meeting with

18   Mr. Scholl.

19        Q.    When was that meeting?

20        A.    That meeting was probably two

21   weeks after it happened, maybe a week.  I'm

22   not sure about the time.

23        Q.    All right.  So you, yourself,

FREEDOM COURT REPORTING

Page 207

1     did not hear from Gilbert Darrington

2     until --

3          A.     Until the meeting.

4          Q.     Until the meeting?

5          A.     Right.

6          Q.     Do you, as we sit here today,

7     know whether Mr. Darrington looked into this

8     event before he sat down with David?

9          A.     No, I don't.

10          Q.     Did you make any other efforts

11     to communicate with Mr. Darrington and

12     Mr. Scholl before the meeting in which the

13     apology was issued, the first meeting?

14          A.     I can't recall.  I don't think

15     I did.

16          Q.     Did you send either of them or

17     anyone else in hospital administration any

18     more written communications or electronic

19     communications about the events surrounding

20     that meeting?

21          A.     No, I didn't.  I think I --

22     I'm not sure, but I think I gave Cynthia

23     Dixon, the director of nurses, a copy of it.

Page 211

```
 1    was bed control ever moved back under

 2    nursing services?

 3            A.      It was.

 4            Q.      When?

 5            A.      About a month after.

 6            Q.      About when?

 7            A.      Maybe two weeks after.  I'm

 8    not sure about the exact date but it was

 9    shortly after this meeting, nursing took

10    back over bed control completely.  They

11    moved me from under David Jones, back under

12    nursing administration.

13            Q.      All right.  About how long?

14    I'm sorry.

15            A.      I can't put an exact date on

16    it, but I would say about a month.

17            Q.      About a month after this

18    meeting?

19            A.      Right.

20            Q.      So mid-July?

21            A.      Yes.

22            Q.      Bed control moved back under

23    control of nursing services?
```

Page 212

```
 1          A.      Right.

 2          Q.      And as you say, being out from

 3   under --

 4          A.      The direction of David Jones.

 5          Q.      -- registration, and hence,

 6   the directorship of David Jones?

 7          A.      Right.

 8          Q.      So as of July of '06, mid-July

 9   of '06, David Jones was no longer your

10   director?

11          A.      Right.

12          Q.      Your director from July of '06

13   on would have been?

14          A.      Cynthia Dixon.

15          Q.      And nursing?

16          A.      Nursing administration.

17          Q.      All right.  Did David Jones

18   retain any directorship authority over you

19   after you were moved back under nursing in

20   July of '06?

21          A.      No.

22          Q.      By the time you had moved back

23   under the control of nursing services, you
```

Page 218

1    really felt.

2        Q.     This first meeting wherein

3    David apologized was how long after the

4    meeting, the 21st meeting, June 21?

5        A.     I'd say probably about a week,

6    maybe two weeks.

7        Q.     All right.  And where was the

8    meeting?

9        A.     It was on the third floor in

10   the south building.

11       Q.     Same room y'all normally met?

12       A.     Uh-huh.

13       Q.     All right.  Was there one

14   session or two?

15       A.     I believe it was two sessions,

16   I'm not sure.

17       Q.     And this first meeting, was

18   Gilbert Darrington there?

19       A.     Yes.

20       Q.     Was Mr. Scholl there?

21       A.     No, he was not in the first

22   meeting.

23       Q.     Was any other director or

Page 219

```
1    member of management there?

2         A.      No.

3         Q.      Who all do you remember being

4    in that first meeting where David

5    apologized?

6         A.      Sharon Venable, Mary Zeigler,

7    Martine Bettis, Jackie Singleton, Janice

8    Hathcock, Terri Herring.  That's all I can

9    recall.  I can't --

10        Q.      Presumably there were more

11   people?

12        A.      Right.  It was more.  Because

13   they would send half and half.  If our

14   department had thirty people, they would

15   send fifteen to this meeting and fifteen to

16   the next meeting.

17        Q.      Was this a mandatory meeting?

18        A.      They all mandatory meetings.

19        Q.      Was this meeting recorded

20   audio?

21        A.      Yes.

22        Q.      Are you assuming that or do

23   you know that?
```

Page 220

1      A.      He recorded all of our

2   meetings.

3      Q.      Were there notes taken?

4      A.      Sharon Venable took them.

5      Q.      Okay.  Tell me what you

6   remember about that meeting.  I mean, you

7   touched on it a moment ago.

8      A.      The first meeting?

9      Q.      Yeah.

10     A.      We -- David e-mailed all of us

11  and asked us to meet him back on the -- it

12  was the second floor, I'm sorry.  Nursing

13  services on third floor, the conference room

14  was on the second floor.

15     Q.      Uh-huh.

16     A.      To meet him in the conference

17  room, I'll say 1:30 or two o'clock for a

18  meeting.

19             So we went to the meeting.

20  And when we got in the meeting, he got up,

21  and he proceeded to start apologizing.  And

22  he had something wrote on a piece of paper,

23  but he didn't even read that.  He just

1     started -- He told us:  For those of you who

2     I offended in the first meeting, I didn't

3     mean to.

4          Q.     Uh-huh.

5          A.     And the meeting was kind of

6     short.  But the second meeting was with

7     Gilbert Darrington and Mr. Scholl, and they

8     let us -- each one of us express ourself.

9          Q.     Before we get away from the

10    first meeting, do you recall anything else

11    that David said in the course of rendering

12    that apology?

13               MR. BROWN:  Object to the form

14    of the question.

15         A.     No.

16         Q.     And it was after that meeting

17    that you learned that he had prepared text

18    that he did not use?

19         A.     Yes.

20         Q.     And Mr. Darrington shared that

21    with you?

22         A.     Yes.

23         Q.     Did you have a chance to talk

Page 222

1    to Mr. Darrington after that first meeting?

2         A.    Yes.  After the meeting was

3    over, I spoke with him.

4         Q.    What did you say?

5         A.    I told him, I said:  David

6    still didn't apologize to us.

7         Q.    What did Gilbert say?

8         A.    He said that's not what I had

9    wrote down for David to repeat -- you know,

10   for him to recite to y'all in the meeting.

11   And that's when I learned that David had

12   something scribbled down that he didn't

13   recite to us.

14        Q.    Did Gilbert give you any

15   specific information about what had been

16   written that had not been delivered?

17        A.    He didn't tell us, no.

18        Q.    Was anyone with you when you

19   talked to Gilbert about your dissatisfaction

20   with the first meeting?

21        A.    No one was with me, no, I

22   don't think so.  I can't recall.

23        Q.    Did you make any suggestions

Page 223

1    about the second meeting or some other

2    meeting?

3          A.      I just told Gilbert that I

4    wasn't pleased with the meeting that David

5    had had.  And a day or two later or a week

6    later, like I say, Gilbert and Mr. Scholl

7    came in and gave us a meeting.

8          Q.      Okay.  And your recollection

9    is that David was not at that meeting?

10         A.      He was not at that meeting.

11         Q.      All right.

12         A.      And they also excused his

13   secretary from that meeting, because we

14   didn't feel like she should be in the

15   meeting.

16         Q.      Who is his secretary?

17         A.      Sharon Venable.

18         Q.      All right.  So it's your

19   recollection that David, in your mind,

20   attempted to apologize at the first meeting,

21   but what he said was unsatisfactory to you?

22                 MR. BROWN:  Object to the form

23   of the question.

FREEDOM COURT REPORTING

Page 224

1         A.      Right.

2         Q.      And then did he ever apologize

3    to y'all after that?

4         A.      No.

5         Q.      He was not even in attendance

6    at the second meeting.

7         A.      No.

8         Q.      But Mr. Darrington and

9    Mr. Scholl were?

10        A.      Yes.

11        Q.      What did Mr. Darrington say

12   then?  What did Mr. Scholl say?

13        A.      They got up and they

14   apologized for what David had done.

15        Q.      What did they say?

16               MR. BROWN:  Specifically.

17   Anything you can remember, specifically.

18        Q.      As specific as you can recall.

19        A.      They was apologizing for what

20   David had done and wanted us to try to

21   rebuild our department because it was

22   tearing everybody up.

23               And Mr. Scholl, whenever he

Page 225

1    got up and made his statement, he said he

2    was apologizing for David and he didn't know

3    why David did what he did, and that he

4    didn't even know if that was the end of it.

5         Q.     Did Mr. Scholl indicate to

6    y'all whether or not he had talked to David

7    about his choice of props in that meeting?

8         A.     He told us he was going to

9    give David counseling.

10        Q.     All right.  Can you recall

11   anything else specifically that

12   Mr. Darrington or Mr. Scholl said in that

13   meeting?

14        A.     No.

15        Q.     Was that meeting recorded?

16        A.     I don't think it was.

17        Q.     Did you make any notes of

18   either of those two meetings?

19        A.     No, I didn't.  They just let

20   us verbally tell them what we felt from the

21   meeting that David had gave us.

22        Q.     Did they let y'all share your

23   thoughts before or after they apologized to

Page 226

1    you?

2         A.    I'm not sure.  But I think we

3    went first, and then they did theirs, if I'm

4    not mistaken.  And then they might have went

5    first, and then they let us -- the ones that

6    wanted to speak, they gave, you know, you an

7    opportunity to speak.

8         Q.    How many employees took the

9    chance to speak?

10        A.    I would say in my meeting,

11   probably about five or six.

12        Q.    Were you one of them?

13        A.    Yes, I was.

14        Q.    And what did you say?

15        A.    I told them the apology David

16   gave, I didn't think it was an apology.

17        Q.    Okay.  What else?

18        A.    That was it.

19        Q.    Who else spoke, to your

20   recollection?

21        A.    Josephine Carroll.

22        Q.    Is she African-American?

23        A.    Yes.  She spoke.  Terri

Page 227

```
 1    Herring spoke.  I'm not sure who else spoke.
 2         Q.    Were you satisfied with the
 3    apology -- Well, did both Mr. Darrington and
 4    Mr. Scholl apologize?
 5         A.    Yes, they did.
 6         Q.    Were you, yourself, satisfied
 7    with that apology?
 8         A.    I was satisfied with their
 9    apology.
10         Q.    That's what I mean.
11         A.    Yes.
12         Q.    Are you aware of any employees
13    that remained dissatisfied with their
14    apology?
15         A.    I didn't talk with them about
16    it.
17         Q.    Did you make any effort to
18    talk to Mr. Darrington after this second
19    meeting?
20         A.    No, I didn't.
21         Q.    I mean that to be a broad
22    question.  Did you ever attempt to talk to
23    Gilbert Darrington about any of these events
```

Page 236

```
 1    resign their employment, as a result of that

 2    meeting, or what happened during that

 3    meeting?

 4          A.    I have no idea.

 5          Q.    Now, you told me a little

 6    while ago that by the time of the June 21st

 7    meeting, your -- your office had physically

 8    been relocated to nursing services?

 9          A.    Right.

10          Q.    Third floor of administration?

11          A.    Yes.

12          Q.    Okay.  How long did you remain

13    in that office on that floor?

14          A.    I was there from July until

15    November or December.

16          Q.    Okay.

17          A.    It would have had to have been

18    November.

19          Q.    Okay.  Now, when you say July,

20    I thought you testified --

21          A.    July of 2007 -- 2006.

22          Q.    No.  And I may have heard you

23    wrong, but I thought you testified you were
```

Page 237

```
 1    already in an office in nursing services --
 2           A.     That's what I'm saying, that's
 3    the office I was in.
 4           Q.     That you were already in the
 5    office in nursing services on June 21st,
 6    when the --
 7           A.     Right.
 8           Q.     So June --
 9           A.     So June.  For sure I was
10    already there in June.
11           Q.     All right.  So, in the nursing
12    services office, this is the third floor of
13    the administration building?
14           A.     Right.
15           Q.     June until sometime in
16    November?
17           A.     Right.
18           Q.     And mid-July your office moved
19    under the control of the nursing services?
20           A.     Right.
21           Q.     Now, explain the circumstances
22    that led to your office being moved from the
23    third floor nursing administration to some
```

Page 238

```
 1    other location in November?
 2         A.     In November, they stated to me
 3    that we were moving to work closer with the
 4    shift coordinator.
 5         Q.     Who said this?
 6         A.     Cynthia Dixon.
 7         Q.     She told you --
 8         A.     Was moving bed control with
 9    shift coordinator, who bed control works
10    side by side with.
11         Q.     The shift coordinator?
12         A.     This is the nurse that's over
13    the whole -- all nursing staff each shift.
14    Like you've got a first shift shift
15    coordinator, second shift shift coordinator
16    who all the nurses would report to.
17         Q.     So moving the bed control
18    office from nursing administration floor --
19         A.     Yes.
20         Q.     To where?
21         A.     The fifth floor, back in the
22    hospital on the fifth floor.
23         Q.     All right.  To share space
```

FREEDOM COURT REPORTING

Page 239

```
 1    with --
 2           A.      The shift coordinator.
 3           Q.      -- the shift coordinator?
 4           A.      Right.
 5           Q.      Which was an RN, a nurse?
 6           A.      Right.
 7           Q.      Was there any other unit or
 8    office that was going to share space with
 9    y'all?
10           A.      No.
11           Q.      Okay.  The shift coordinator,
12    is that always one person?
13           A.      Each shift, yes.
14           Q.      Yeah.
15           A.      Yes.
16           Q.      Basically, talking about one
17    nurse who serves in that job, per shift?
18           A.      Yes.  Yes.
19           Q.      Before y'all -- Before bed
20    control was moved over there, what was the
21    particular office being used for, the one on
22    the fifth floor?
23           A.      The shift coordinator.
```

FREEDOM COURT REPORTING

Page 240

1        Q.      Was in there alone?

2        A.      Yes.

3        Q.      Now, am I correct that bed

4   control, as a unit, was physically moved at

5   that time?

6        A.      Yes.  Right.

7        Q.      And by November of '06, was

8   bed control still you and approximately four

9   other employees?

10       A.      Right.  It sure was.

11       Q.      And did the moving of the

12  physical office of bed control from nursing

13  administration to the fifth floor, did that

14  mean that you and the other bed control

15  employees would then work out of this fifth

16  floor office?

17       A.      Right.  This was our new

18  office.

19       Q.      By November of '07, who was

20  working with you in bed control?

21              MR. BROWN:  You mean November

22  of '06?

23       Q.      Sorry.  By November of '06.

Page 242

1          Q.     Dee Smith?

2          A.     Uh-huh.

3          Q.     Janice Relf and Tonya

4    Jefferson?

5          A.     Uh-huh.

6          Q.     Who else?

7          A.     That was it.

8          Q.     This change in office location

9    affects you, Ms. Smith, Ms. Relf, and

10   Ms. Jefferson?

11         A.     Right.

12         Q.     And Cynthia Dixon told you she

13   was moving y'all's office physically over to

14   the fifth floor to consolidate you with the

15   shift coordinator?

16         A.     Shift coordinator, uh-huh.

17         Q.     For what purpose?

18         A.     Because we worked --.

19         Q.     Together?

20         A.     Right.  We worked together.

21         Q.     Can you describe the office

22   that y'all moved into?

23         A.     The office we moved into, they

FREEDOM COURT REPORTING

Page 243

1    had a door cut into that office, because it

2    was two small offices with a wall.

3            Q.    Okay.

4            A.    Plant operations came up and

5    cut a door into it.  And the door to the

6    side that bed control was on was always open

7    at all times because Cynthia Dixon told us

8    that -- we wouldn't close it because the

9    office was so small.  If you closed the

10   door, we wouldn't have a window, and the

11   office was already small.

12           Q.    Okay.  Hang on just a second.

13   So the door between the two offices that

14   linked the two offices would remain open per

15   Cynthia Dixon?

16           A.    Yes.  The shift office door

17   and the bed control was opened so that this

18   door stayed open at all times.

19           Q.    Okay.

20           A.    The door that goes back out

21   into the hall of the fifth floor, that door

22   remained open at all times.

23           Q.    Okay.  Did those doors have

Page 245

1    that I couldn't be in a closed-in area.  And

2    she assured me that the door to bed control

3    would always be open in the new move.  She

4    walked me up there herself.

5         Q.    Did Cynthia take you over to

6    the new office and show you these things

7    before y'all actually moved up there?

8         A.    Yes, she did.

9         Q.    Okay.  Did you -- Did you

10   voice any objections to her about moving

11   from nursing administration to the fifth

12   floor when she told you that?

13        A.    No, I didn't.  The only

14   objection I had was just to make sure that

15   that door stayed open at all times because

16   of the space.

17        Q.    Which door, now, there are two

18   of them?

19        A.    The door going out from the

20   bed control office.  If I'm not mistaken,

21   the door to the shift office had a window.

22   But both doors stayed open because the shift

23   nurse would be talking to bed control, we

Page 246

```
 1    would be communicating so much that it

 2    wouldn't do any good to close the door

 3    anyway, unless you was having a meeting.

 4          Q.     So when you said the door

 5    would always remain open, are you talking

 6    about the door to the hallway?

 7          A.     The door to hallway and bed

 8    control would always remain open.

 9          Q.     All right.

10          A.     If the shift coordinator was

11    having a meeting with an employee she would

12    close that door from time to time.  But I'm

13    not sure if there was a window on it.

14          Q.     You're saying the door would

15    occasionally close for some sensitive issue?

16          A.     Right.  For counseling, if you

17    need to counsel someone, you'd close it and

18    then open it back up.

19          Q.     All right.  Did Cynthia's

20    moving y'all over to the fifth floor to be

21    with, physically with the shift coordinator,

22    having been in bed control, did that make

23    sense to you?
```

FREEDOM COURT REPORTING

Page 247

1          A.      It did, yes.

2          Q.      And that was roughly in

3     November of '06?

4          A.      Yes.

5          Q.      The meeting with David Jones

6     was, as you know, in June of '06.  You went

7     under nursing service control, to your

8     recollection, in July of '06, and you stayed

9     in nursing administration offices until

10    November.

11                 Do you contend that you

12    experienced any type of retaliation before

13    you were moved over to the fifth floor

14    sometime in November of '06?

15         A.      Yes, I do.

16         Q.      What?

17         A.      To be exact, when Cynthia

18    first started telling me she was going to

19    move me over, I wanted to know why we was

20    moving over.

21         Q.      Uh-huh.

22         A.      And it was just the little

23    small things that she was doing.  But when

Page 249

1          Q.     Sometime in November.  All

2     right.  I understand all that.  But, again,

3     from June 21 until whenever you moved in

4     November to the fifth floor, do you contend

5     that some act occurred that you believe was

6     retaliatory for --

7          A.     No.  My retaliation didn't

8     start until they got the letter back from

9     the EEOC that I had filed a complaint.  And

10    that was in late November, I think, November

11    the --

12         Q.     (Indicating.)

13         A.     Yes.  And that's when -- And I

14    was already on the fifth floor then.

15         Q.     All right.  Let me just show

16    you this now.  I know you've seen it but

17    it's your charge with the EEOC.

18                        (Off-the-Record discussion

19                         was held.)

20                        (Whereupon, Defendant's

21                         Exhibit No. 10 was marked

22                         for identification.)

23         Q.     Ms. Cowan, I'm showing you

Page 250

1    what I've marked as Defendant's Exhibit 10.

2    Can you identify this for the Record?

3          A.    Yes.

4          Q.    What is this?

5          A.    This is the letter that I

6    submitted to the EEOC.

7          Q.    Look at the second page and

8    just verify for me that that is the

9    continuation of your statement.

10         A.    Yes, it is.

11         Q.    All right.  Now, is all the

12   language -- all the handwriting on this

13   Defendant's 10 yours?

14         A.    Yes, it is.

15         Q.    Okay.  And at the bottom it's

16   dated November 28, 2006?

17         A.    Yes.

18         Q.    Is that your signature?

19         A.    Yes, it is.

20         Q.    And do you see the stamp up

21   there at the top:  Received EEOC, November

22   29th?

23         A.    Yes.

Page 251

1          Q.     Okay.  So, can we agree you
2     filed this on November 29th of '06?
3          A.     Yes.
4          Q.     Okay.  Now, before we move on
5     I want to be very clear, because I want to
6     be sure I understand this.
7          A.     Okay.
8          Q.     Are you contending that you
9     were subject to any form of retaliation
10    before you filed this on November the 29th
11    of '06?
12         A.     I can't recall.
13         Q.     You can't recall?
14         A.     I cannot recall.
15         Q.     You can't recall any act that
16    you would consider retaliatory before this?
17         A.     No, I can't recall.
18         Q.     I mean, is that what --
19         A.     That's what I'm saying.
20         Q.     Okay.  I mean, is it fair to
21    say that you're not aware of any act or
22    event that occurred before you filed this
23    that you believe was retaliatory or in

Page 252

```
 1     retaliation for complaining?
 2                 MR. BROWN:  Object to the
 3     form.
 4          A.    That's right.  Right.
 5          Q.    And so is it your contention
 6     that the acts that you contend were
 7     retaliatory occurred after you filed the
 8     EEOC notice?
 9          A.    Yes.
10          Q.    And occurred because you filed
11     the EEOC notice?
12          A.    That's what I feel, yes.
13          Q.    Do you still feel that way?
14          A.    I still feel that way.
15          Q.    Okay.  All right.  About half
16     way down, you'll see it says:  Cause of
17     discrimination based on, and then there's
18     some boxes.  Do you see this?
19          A.    Yes, I see them.
20          Q.    And in those boxes are
21     checked:  Race, sex, and retaliation.  Now,
22     this question may actually be better suited
23     for Mr. Brown.  Are you claiming you were
```

Page 265

```
 1          A.      No, I didn't.

 2          Q.      At any point?

 3          A.      No, I didn't.

 4          Q.      Did you tell anybody at the

 5   hospital that you had filed a formal charge

 6   of discrimination?

 7          A.      No, I didn't.

 8          Q.      At any point?

 9          A.      No.

10          Q.      So while I understand your

11   earlier testimony to be that you shared your

12   e-mails, at least with Cynthia Dixon --

13          A.      I did.

14          Q.      -- you did not tell anyone or

15   share -- You didn't tell anybody you had

16   filed a formal EEOC charge; true?

17          A.      No, I didn't tell anyone.

18          Q.      And you didn't actually share

19   the document with anybody?

20          A.      No, I didn't.

21          Q.      Did you actually share the

22   e-mails with anyone other than the

23   recipients and Mrs. Dixon -- Ms. Dixon?
```

Page 266

```
 1          A.      No, I didn't.
 2          Q.      Okay.  With the filing of the
 3    EEOC complaint, we are up to November
 4    29th --
 5          A.      Okay.
 6          Q.      -- almost to December.  After
 7    you submitted this document to the EEOC --
 8          A.      Yes.
 9          Q.      -- I think it's your
10    contention that there was -- there were acts
11    of retaliation leveled against you?
12          A.      That's when it started, yes.
13          Q.      Okay.  What is the first event
14    that occurred that you contend occurred as a
15    retaliatory measure toward you?
16          A.      When Paula Zeigler, she came
17    to me, and she was one of the supervisors.
18          Q.      Uh-huh.
19          A.      She came to me and she was
20    telling me that they was thinking about
21    demoting bed control back up under a nurse
22    because bed control, at any other hospital
23    she had worked, was always being ran by a
```

FREEDOM COURT REPORTING

Page 270

```
 1         Q.     And you said what?  What was
 2    your response to that?
 3         A.     I asked her why they want to
 4    change it all of a sudden.
 5         Q.     And what did she say?
 6         A.     She didn't give me an answer.
 7         Q.     Okay.
 8         A.     She just told me she was going
 9    to get with Cynthia Dixon and Terri Lowery
10    on it.
11         Q.     What happened after that?
12         A.     After that Terri Lowery was
13    moved to shift office/bed control office
14    with us.
15         Q.     As a what?
16         A.     Supervisor, I suppose.  I have
17    no idea.  I had my four employees from
18    December until March.  Paula Zeigler, Terri
19    Lowery, Stephanie Lockhart, and I was moved
20    from Cynthia Dixon.  Cynthia Dixon was my
21    supervisor at first.
22         Q.     Paula, Terri --
23         A.     Paula was an interim in --
```

FREEDOM COURT REPORTING

Page 271

| | | |
|---|---|---|
| 1 | Q. | Interim what? |
| 2 | A. | In the shift office. |
| 3 | Q. | Interim shift coordinator? |
| 4 | A. | Right. |
| 5 | Q. | And then Terri Lowery came in |

6    as what, title-wise?

7         A.    I don't know.  I really can't

8    recall.

9         Q.    Did she replace Paula?

10        A.    Paula eventually left.

11        Q.    Did Terri come over to do

12   Paula's job?

13        A.    No.  They hired somebody in.

14        Q.    And then Lockhart, did you

15   say?

16        A.    Stephanie Lockhart.

17        Q.    Did Stephanie come after Terri

18   Lowery left?

19        A.    No.  Those two were still in

20   there together.

21        Q.    Is Stephanie Lockhart a nurse?

22        A.    Yes, she is an RN.

23        Q.    Okay.

Page 272

```
 1          A.      Stephanie Lockhart came after
 2   I was off from being sick.
 3          Q.      Okay.  You were back?
 4          A.      I was back.  Terri Lowery came
 5   about December the -- around December the
 6   15th.
 7          Q.      When Terri came in, was she
 8   managing shift control and bed control?
 9          A.      Yes.  I believe that's what
10   she was doing.  I never knew Terri's title.
11   Things started changing.
12          Q.      Terri and Stephanie were there
13   towards the end of your time?
14          A.      Yes.
15          Q.      What came of the decision to
16   move an RN into bed control?
17          A.      They did that after I was
18   sick.  When I left on medical leave, the
19   last of January to middle of February, I was
20   gone for like thirty days.  When I came
21   back, I met with Gilbert Darrington and
22   Terri Lowery, and they told me I would be a
23   bed control clerk and not a supervisor when
```

FREEDOM COURT REPORTING

Page 276

1    you know, try to bid on the job and replace

2    it if I didn't want to go back to bed

3    control.

4         Q.    He offered a slot to you in

5    some other position elsewhere if it came

6    open?

7         A.    If I wanted to move.

8         Q.    And you said what to all this?

9         A.    I told him I'd been in bed

10   control and I didn't want to go anywhere.

11   And I wanted to know why they was changing

12   my position while I was on family leave.

13   Because in the hospital policy, you can't --

14   Well, you're not supposed to change a

15   person's position while they're on medical

16   leave.

17        Q.    Now, let's be precise in our

18   language here.  Your title was changed from

19   supervisor to clerk?

20        A.    Right.

21        Q.    Did your compensation change?

22        A.    No, it didn't.

23        Q.    Did any of your benefits

Page 277

```
 1    change?

 2          A.      No.

 3          Q.      Did any of your

 4    responsibilities in bed control change?

 5          A.      Yes.

 6          Q.      What?

 7          A.      I was working under Laura

 8    Gardner, rather than supervising Laura

 9    Gardner.

10                  And then Terri Lowery told me

11    that I would be working all three shifts, as

12    needed.

13          Q.      Did Terri tell you that while

14    you were out or after you came back?

15          A.      After I came back.

16          Q.      Setting aside you being under

17    Laura Gardner, what would you do as a bed

18    control clerk, was it essentially the same

19    that you would have done as a supervisor?

20          A.      No, it wasn't.  I would be

21    working under her/I would be working staff.

22    And they was also going to cross-train me to

23    do staffing patients.
```

FREEDOM COURT REPORTING

Page 280

1    earlier today, brought my key back to Terri

2    Lowery for my locker while I was out sick.

3    She called me one day about 5:30 in the

4    evening to bring that key back to my locker.

5    And I brought it back up there after I got

6    my brother to drive me up there, I guess

7    around 6:30 or seven when he got off of

8    work.

9                    And I asked her if it could

10   wait until I came back, and she said she had

11   to have the key that day.

12                        (Whereupon, Defendant's

13                        Exhibit No. 11 was marked

14                        for identification.)

15        Q.     Just to kind of straighten out

16   the chronology here, I'll show you

17   Defendant's Exhibit 11.  This is a memo from

18   Mr. Darrington to you, dated the 26th of

19   January '07.  Do you see that?

20        A.     Uh-huh.  Yes.

21        Q.     And it approves your family

22   medical leave for the period set forth in

23   the document?

FREEDOM COURT REPORTING

Page 281

```
 1          A.      Yes.
 2          Q.      So is this accurate, you were
 3   approved for leave from January 22 until the
 4   20th of February, '07?
 5          A.      Yes.
 6          Q.      Okay.  As things turned out,
 7   is that the length of time that you were
 8   out?
 9          A.      Yes, it was.
10          Q.      So you came back on or about
11   the 20th of February?
12          A.      I did.
13          Q.      Okay.  I think you already
14   told us when you requested this leave it was
15   granted?
16          A.      It was.
17          Q.      There was no resistance from
18   the hospital?
19          A.      No.
20          Q.      And this was cc'd, apparently,
21   to Terri Lowery?
22          A.      Yes.
23          Q.      Why was that?
```

Page 282

```
 1        A.      Because she was working in my
 2   area.
 3        Q.      She was over there by that
 4   point?
 5        A.      Right.
 6        Q.      Okay.  Now, what led you to
 7   seek the medical leave in January of 2007?
 8        A.      When Terri Lowery came to my
 9   area on January the 21st, she came in the
10   office and she closed the door, the door
11   they told me would never be closed.  I went
12   to Terri, I went to Laura Gardner, and there
13   was another staffing clerk in there,
14   Desiree, I can't think of Desiree's last
15   name right now.
16                I went to all three of them
17   and -- I starting telling Laura and Desiree,
18   I said, Terri can't close that door.  I said
19   when she close that door, I can't breathe.
20   So I got up and I went in and I told Terri,
21   I said, Terri, this door has to be open.
22   She said, from here on out, the door will be
23   closed.
```

Page 283

```
 1          Q.      Which door now?

 2          A.      The door to the bed control

 3   office.

 4          Q.      The interior door between the

 5   two offices?

 6          A.      No.  The exterior door that

 7   goes out into the hall that was always open

 8   at all times.

 9          Q.      That's the door she said

10   needed to stay closed?

11          A.      It would be closed.  The door

12   didn't have a window on it.

13          Q.      Okay.

14          A.      And it would be closed from

15   now on.  And I asked her why; she would not

16   give me an answer.  And for the rest of that

17   day, I got up, and I walked in and out of

18   the bed control and the shift office so I

19   could breathe, because it was just taking my

20   breath.  And I wanted Terri to see, you

21   know, that I'm not playing, I'm really about

22   to pass out.

23                  So when I got off from work
```

Page 284

1     that day, I went down to my doctor's office.

2          Q.     Did you tell Terri you had

3     claustrophobia?

4          A.     Yes, I did.

5          Q.     She said what?

6          A.     She said the door still will

7     be closed.

8          Q.     She didn't give you a reason

9     why?

10          A.     She didn't.  She just said the

11     door will still be closed from here on out;

12     that this is the way it's going to be if I

13     continue to work in this area, because the

14     door will be closed.

15          Q.     She gave you no reason?

16          A.     No.

17          Q.     Did you go to your doctor that

18     very day?

19          A.     I did.  Because my pressure

20     was up.

21          Q.     At that time, did you have a

22     home monitor, a home monitor that you would

23     check your blood pressure?

Page 285

```
 1          A.      No, I didn't.

 2          Q.      Did you go see Dr. McLeod?

 3          A.      Yes.

 4          Q.      When you went to see

 5   Dr. McLeod, whose idea was it to seek family

 6   medical leave?

 7          A.      Dr. McLeod.  My pressure was

 8   so high.

 9          Q.      Do you know what it was?

10          A.      I don't.  I'm sure he has it

11   documented.  He changed my pressure pills to

12   a higher dose.

13          Q.      Was it your impression your

14   blood pressure was higher than it normally

15   ran on that medication?

16          A.      Right.  On that medication.

17   And he changed my dosage.

18          Q.      How did you spend the one

19   month on medical leave?

20          A.      At home, laying around,

21   resting.  Going back to the doctor to see

22   him when I had to.

23          Q.      How many times did you go to
```

FREEDOM COURT REPORTING

Page 303

```
 1            Q.    All right.  Let me show you
 2   what I've marked as Defendant's Exhibit 13.
 3   Tell me when you're ready.
 4            A.    I'm ready.
 5            Q.    This is a document that has
 6   been produced by Mr. Brown in this
 7   litigation.  You can see the number 27 at
 8   the bottom is his numbering system.
 9                  It's entitled Guideline and
10   Expectations for House Office, shift
11   coordinators, bed control, and staffing
12   staff.
13                  First of all, is that your
14   signature at the bottom?
15            A.    Yes, it is.
16            Q.    And you signed that?
17            A.    Uh-huh.
18            Q.    What date?
19            A.    February 26, 2007.
20            Q.    So within roughly five days of
21   your return from medical leave?
22            A.    Right.
23            Q.    And then are you familiar with
```

Page 304

```
 1    Terri Lowery's signature?

 2            A.     Yes.

 3            Q.     Does that appear to be her

 4    signature just below yours?

 5            A.     It appears to be.

 6            Q.     All right.  What is the first

 7    item on this list?  What does it say?

 8            A.     Every person would be

 9    cross-trained in the positions.

10            Q.     All right.  So, according to

11    this document, every --

12            A.     All full-time.

13            Q.     Hang on.  All full-time staff,

14    shift coordinators or bed control or

15    staffing, in what collectively is described

16    as the house office, are going to be

17    cross-trained.  Is that inaccurate?  Did

18    that not happen?

19            A.     Yeah.  But I was the only one

20    cross-trained.

21            Q.     So despite the fact this says

22    every person --

23            A.     Right.
```

Page 309

```
 1    an agenda, they'll pass it around and let
 2    everybody in the area sign it.  I don't
 3    recall other people signing that.
 4          Q.    Okay.
 5                MR. BROWN:  He's talking about
 6    the implementation.  Was it only implemented
 7    with you?
 8          Q.    Right.
 9          A.    As far as I know, yes.
10                    (Whereupon, Defendant's
11                     Exhibit No. 14 was marked
12                     for identification.)
13          Q.    You mentioned agendas.  Let me
14    show you Defendant's 14.
15          A.    Okay.
16          Q.    And I want to give you a
17    chance to review it.
18                This is Defendant's 14.  And,
19    again, I'll represent that it was produced
20    by Mr. Brown at some point in this lawsuit.
21                This is what, Ms. Cowan?  What
22    is this document?
23          A.    This is a departmental meeting
```

FREEDOM COURT REPORTING

Page 310

```
 1    where Terri had an agenda --
 2            Q.     Okay.
 3            A.     -- restructuring the office
 4    and cross-training.
 5            Q.     All right.  And you obviously
 6    received and kept a copy of this, because
 7    this made its way to your lawyer?
 8            A.     Right.
 9            Q.     Do you have any recollection
10    of this meeting?
11            A.     I do.
12            Q.     Tell me what you remember
13    about it.
14            A.     I remember them telling all of
15    us that we would be cross-trained.
16            Q.     Yeah.  At the very top it says
17    restructuring of office/cross-training.
18            A.     Uh-huh.
19            Q.     All right.  What did they tell
20    you about that?  Wait.  Who is they?
21            A.     Terri Lowery and Cynthia
22    Dixon.  Cynthia Dixon came to this meeting.
23            Q.     Okay.  What did they tell you
```

FREEDOM COURT REPORTING

Page 311

1    about -- or tell y'all about the attendees

2    being cross-strained?

3          A.     That we would be cross-trained

4    for staffing and that you would be

5    cross-trained for bed control.

6          Q.     So by -- As of March 6th, this

7    was in the works but no one had actually

8    been cross-trained yet?

9          A.     I was being cross-trained.

10         Q.     It had already started?

11         A.     Yes.  For me.

12         Q.     Do you know if anyone else had

13   been started?

14         A.     No.

15         Q.     How do you know that?

16         A.     Because I was there in the

17   office in the area where the cross-training

18   would have taken place.

19         Q.     Do you know if any

20   cross-training occurred while you were out

21   on medical leave?

22         A.     No.

23         Q.     It didn't or you don't know?

FREEDOM COURT REPORTING

Page 312

1          A.      I'm not sure.

2          Q.      All right.  Half way down it

3     says:  Everyone reports to the interim

4     director, Terri Lowery.  There are no

5     supervisor positions in the office except

6     the director, meaning Terri.

7          A.      Right.

8          Q.      Was that discussed during this

9     meeting?

10          A.      Yeah.  She discussed that.

11          Q.      Terri?

12          A.      Terri Lowery did.

13          Q.      What did she say?

14          A.      She told us that -- that I

15     would no longer be a supervisor, and that

16     she would be the supervisor for the whole

17     area.

18          Q.      Meaning bed control, staffing,

19     and shift coordinator?

20          A.      Right.

21          Q.      Is Terri an RN?

22          A.      Yes.

23          Q.      Did Cynthia say anything about

Page 313

1    that change?

2         A.     She just sit in on the meeting

3    that evening -- When we had the meeting,

4    Cynthia sit in and Gilbert sit in on that

5    meeting.

6         Q.     Would Gilbert typically sit in

7    on a house office meeting?

8         A.     No.  He just came to that

9    meeting.

10        Q.     Do you know why?

11        A.     No.

12        Q.     Did you raise any objection or

13   commentary on this change of no supervisors

14   except the director?

15        A.     I wanted to know if my pay was

16   going to change.

17        Q.     Did you bring it up in the

18   meeting?

19        A.     No.  I brought it up to

20   Cynthia and Terri after the meeting.

21        Q.     And they said what?

22        A.     They told me as of then it

23   wouldn't for the time being.

Page 314

1      Q.    Did it change before you

2  resigned?

3      A.    No.  I wasn't there that much

4  longer.  I left at the end of March.

5      Q.    They told you -- I mean, did

6  you understand that you might lose pay at

7  some point?  Did they tell you that?

8      A.    I didn't know how they was

9  going to do it.  If you take a job title and

10  a position, then next thing you have to --

11  you would ask about is will my pay change.

12          And employees never discuss

13  their pay around another employee, so I

14  would have to ask them that after the

15  meeting.

16      Q.    Did you -- I mean, did you

17  come away from that meeting thinking that

18  your pay was subject to being decreased?

19      A.    It was already being

20  decreased, I wasn't getting my overtime.

21      Q.    Set aside the overtime.  I'm

22  talking about your base rate.

23          MR. BROWN:  Hourly rate.

Page 315

```
1          A.      No.

2          Q.      Okay.  Did you object during

3     the meeting to the no supervisor positions?

4          A.      Yes.  I asked them why I

5     wasn't a supervisor anymore.

6          Q.      And who answered you?

7          A.      Terri told me that she would

8     discuss it with me later.

9          Q.      Did she?

10         A.      She talked -- Yes, she did.

11         Q.      What did she say?

12         A.      She said that Laura would be a

13    supervisor because she was an RN.

14         Q.      Did she explain why they were

15    making an RN a supervisor?

16         A.      No.

17         Q.      Did she say anything else

18    about supervisors or lack thereof, changes

19    in hierarchy, things like that?

20         A.      No.

21         Q.      Did you make any notes at this

22    meeting?

23         A.      No, I didn't.
```

FREEDOM COURT REPORTING

Page 316

1          Q.     Have you ever -- Let me be

2    clear.  Have you ever audio recorded any

3    conversation with any employee at Jackson

4    Hospital?

5          A.     No.

6          Q.     Have you ever kept an audio

7    recording of any meeting?

8          A.     No.

9          Q.     Were these kinds of meetings

10   audio recorded officially by --

11         A.     No.  Not as far as I know.

12         Q.     Like the way that David's used

13   to be?

14         A.     No, they never were.

15         Q.     Again, this talks about house

16   office, which was those three units.

17         A.     Right.  The shift office.

18         Q.     Yeah.  Did you attend any

19   other house office meetings, as a

20   departmental thing?

21         A.     No.  Not after that, I didn't.

22   That was the only one that we had.

23         Q.     Okay.  Was this the first

Page 317

1    meeting of the so-called house office, this

2    March 6th?

3              A.    I can't recall.  I think it

4    was.

5                        (Whereupon, Defendant's

6                         Exhibit No. 15 was marked

7                         for identification.)

8              Q.    Let me show you 15.  This,

9    I'll represent to you, is documents I

10   received from the Shashys in response to a

11   subpoena.

12             A.    Okay.

13             Q.    And did you fill out this

14   application for employment?

15             A.    Yes.

16             Q.    All the handwriting in this

17   document yours?

18             A.    Yes.

19             Q.    And you filled it out on what

20   date?

21             A.    3/6/07.

22             Q.    Okay.  Which is the same day,

23   I noticed, as this house office meeting.  Do

FREEDOM COURT REPORTING

1    you see that?

2          A.    Uh-huh.

3          Q.    So did you leave the house

4    office meeting and go get an application

5    from Dr. Shashy?

6          A.    No.  I already -- I had heard

7    that Dr. Shashy was looking for a

8    receptionist, and I went by and picked up an

9    application.

10         Q.    I mean, that's what I'm --

11         A.    That's what I'm saying.

12         Q.    Did you go that same day,

13   though, and get it?

14         A.    No.  That's probably the day I

15   filled it out.

16         Q.    Okay.  Well, did you fill out

17   this application the same day as this house

18   office meeting?

19         A.    Let me see when I signed it.

20               I can't recall.

21         Q.    Well, we can agree, at least,

22   that the date on the application is March

23   the 6th?

Page 319

```
 1          A.      Right.  Yes.

 2          Q.      Okay.

 3          A.      This house office meeting was

 4   that night, around six or seven o'clock.

 5          Q.      When did you decide to resign

 6   from Jackson Hospital?

 7          A.      I can't recall the exact date,

 8   not right now.

 9          Q.      Your last date was what,

10   though?  You do know that because you've

11   already told me.

12          A.      My last day was March the

13   20th, I think.

14                  (Whereupon, Defendant's

15                   Exhibit No. 16 was marked

16                   for identification.)

17          Q.      All right.  This is

18   Defendant's Exhibit 16.

19          A.      Probably around March the

20   23rd, I think they gave me my exit, if I'm

21   not mistaken, because human resources

22   stamped this on March the 21st.

23          Q.      Do you know when you provided
```

Page 320

```
 1    this to HR, Defendant's Exhibit 16?

 2         A.    Yes.  On the 21st.  They stamp

 3    it while you're standing there.

 4         Q.    You hand delivered this?

 5         A.    Yes.

 6         Q.    To whom?

 7         A.    To --

 8         Q.    Mr. Darrington's secretary?

 9         A.    Yes.  The one at the front

10    desk.

11         Q.    Do you remember a name?

12         A.    I can't recall that girl at

13    the front desk's name.  Any time you take a

14    document to human resources, they stamp it

15    while you're standing there.

16         Q.    Did you ask to speak to

17    Mr. Darrington?

18         A.    No, I didn't.

19         Q.    Did you tell Terri Lowery you

20    were going to resign before you authored

21    this letter?

22         A.    I took a copy to Terri and

23    Gilbert at the same time.
```

FREEDOM COURT REPORTING

Page 321

1          Q.     Uh-huh.  Before that, did you

2     tell Terri, I'm leaving?

3          A.     No.

4          Q.     Did you tell Cynthia Dixon you

5     were resigning?

6          A.     No.

7          Q.     I assume you drafted this

8     letter yourself?

9          A.     I did.

10         Q.     Okay.  Toward the end you

11    said:  The job you once loved has become

12    stressful and overwhelming, due to the

13    actions of others.  Who did you have in mind

14    there?

15         A.     Terri Lowery and the way she

16    was acting with all the changes that she was

17    doing in the staffing office, and she was

18    just so hostile to me.  It was like she came

19    shortly after Jackson received that letter

20    from the EEOC.  And when she came in, it was

21    from the first time she walked in that day,

22    the whole environment toward me changed.

23    This is a woman that I took out to lunch.

Page 322

1    We went to Serendipity, because she was from

2    Texas.  And I used to take her places.  And

3    all of a sudden, she just didn't have

4    anything to say to me or do with me.  Just

5    she would walk and pass my desk and just be

6    short.  She wouldn't even speak.

7         Q.    Did you observe similar

8    behavior toward any other employee?

9         A.    No, I didn't.

10        Q.    And so I'm clear, Terri came

11   into that office after Paula Zeigler?  Paula

12   Zeigler was there --

13        A.    Paula was there first.

14        Q.    And then Paula left?

15        A.    Paula was still there for a

16   while with Terri, and then she left.

17        Q.    Do you recall why Paula left?

18        A.    Her husband was relocating.

19   They moved out of state, I'm not sure where.

20        Q.    Going back up to the beginning

21   of the second paragraph, you indicate:

22   Since your return from sick leave, you have

23   not been given the opportunity to work in

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY COWAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO.: 2:07-CV-779-MHT-TFM** |
| | § | |
| **JACKSON HOSPITAL & CLINIC,** | § | |
| **INC., a domestic corporation, conducting** | § | |
| **business in the State of Alabama,** | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT OF SANDRA P. SPERRY, MPA, APC, RN, FACHE

STATE OF NEW JERSEY                )

MORRIS COUNTY                )

BEFORE ME, a Notary Public, in and for said commonwealth and county, personally appeared Sandra P. Sperry, who is known to me, and who upon being sworn on oath, duly deposes as follows:

1. My name is Sandra P. Sperry. I am over the age of 19 years, and I have personal knowledge of all facts and matters set forth in this Affidavit.

2. I hold a Master's Degree in Public Administration with concentration in health and finance and an advanced professional certificate in Quantitative Analysis and Computer applications in Health Planning from New York University.

3. I am a Principal in Managed Transitions, a healthcare consulting organization based in Morristown, New Jersey. I have over 20 years' experience in the healthcare field, including hospital operations, planning, clinical resource management, and business development. Within the healthcare field, I have served as an executive vice president, chief operating officer, and

1

EXHIBIT
B.
Blumberg No. 5119

chief nursing officer. My healthcare consulting experience includes system analysis, productivity analysis, and operations assessment/redesign.

4. I have never been an employee of Jackson Hospital & Clinic. In January 2006, however, my organization was retained by Jackson to provide consulting services in an effort to improve the efficiency and productivity of hospital patient care operations. As part of that consultancy, I conducted an assessment of the hospital's nursing operations. This included an evaluation of what is known as "patient thru-puts," or the efficiency with which a hospital processes a patient through its system from admission to eventual discharge.

5. Our evaluation revealed several "bottlenecks" in Jackson's patient processing system. One area of concern involved the operations of "bed control," the office tasked with assigning available hospital beds to patients being admitted to the hospital. Although the bed control office had originally been under the authority of the hospital's nursing administration, it had been moved under the control of the hospital's registration department at some point prior to my arrival.

6. Because the function of assigning patients to beds in various sections of the hospital relates more directly to nursing operations than patient registration, we recommended that the hospital move the bed control office back under the control and authority of nursing administration. This change would bring Jackson in line with the practices of many similarly-sized hospitals around the country. I made the recommendation to move the bed control office back to nursing in my first conference with Jackson Hospital's senior management, which occurred in early 2006.

7. Hospital management accepted the bed control recommendation, but the actual transfer of the bed control office back to nursing did not occur until the hospital's incoming chief

2

nursing officer (CNO), Cynthia Dixon, arrived in July of 2006. The timing of the transfer was part of a plan to stagger organizational changes in order to facilitate a smooth transition for Ms Dixon.

8. As part of this reorganization, the bed control office and its personnel were relocated to the nursing administration offices. All bed control employees thenceforth operated in the organizational hierarchy of nursing administration rather then patient registration. This was a rearrangement and relocation of the bed control office, not a transfer of any specific employee, and it was implemented solely to increase efficiency in patient care.

9. My organization's consulting services at Jackson ended in August of 2006.


SANDRA P. SPERRY

SWORN TO AND SUBSCRIBED BEFORE ME this _____ day of May, 2008.


Notary Public


My commission expires: _____

RONA RESNICK
Notary Public, State of New York
No. 43-4989513
Qualified in Richmond County
Commission Expires May 1, 2011

3

FREEDOM COURT REPORTING

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5    CIVIL ACTION NO.:  2:07-cv-779

6    DOROTHY COWAN,

7              Plaintiff,

8              vs.

9    JACKSON HOSPITAL & CLINIC, INC.,

10   a domestic corporation, conducting

11   business in the State of Alabama,

12             Defendant.

13

14          S T I P U L A T I O N

15          IT IS STIPULATED AND AGREED by and

16   between the parties through their respective

17   counsel, that the deposition of David Jones

18   may be taken before Angela Smith McGalliard,

19   RPR, CRR, at the offices of Rushton,

20   Stakely, Johnston & Garrett, at 184 Commerce

21   Street, Montgomery, Alabama 36104, on the

22   18th day of April, 2008.

23             DEPOSITION OF DAVID JONES

EXHIBIT
C.

Page 29

```
 1          A.      Yes.

 2          Q.      So that would have been in '88

 3   you went to Samford?

 4          A.      No, it would have been -- I

 5   graduated May of '87, so it would have been

 6   August of '87.

 7          Q.      That's right.  How long were

 8   you at Samford?

 9          A.      Two and a half years,

10   approximately.

11          Q.      And what caused you to leave

12   Samford?

13          A.      I transferred to UAB.

14          Q.      Okay.  Which is also in

15   Birmingham?

16          A.      Yes.

17          Q.      And did you graduate from UAB?

18          A.      I did.

19          Q.      You got your bachelor's

20   degree?

21          A.      I did.

22          Q.      Was it a BS?

23          A.      Yes, it was.
```

Page 30

```
 1          Q.      Okay.  And what was it in?
 2          A.      In exercise physiology and
 3    sports medicine.
 4          Q.      Okay.  I'm familiar with
 5    sports medicine, but kind of tell me what
 6    exercise physiology, what type of courses
 7    you would take.
 8          A.      You would take anatomy and
 9    physiology, evaluation of -- evaluation of
10    injuries, you would take what's called
11    exercise and stress testing.
12          Q.      Okay.  Now, when you were in
13    college -- let me backtrack.  Excuse me.
14                  First of all, when did you
15    graduate with your BS in exercise physiology
16    and sports medicine?
17          A.      '92.
18          Q.      Okay.  Did you have any
19    full-time job from '87 to '92, while you
20    were pursuing your degree?
21          A.      No.
22          Q.      Okay.  Have you got any
23    further education, other than a bachelor's?
```

FREEDOM COURT REPORTING

Page 31

1         A.      Yes.

2         Q.      Okay.  What is that?

3         A.      Masters of Sports Medicine and

4    Athletic Training from Illinois State.

5         Q.      When did you get your MS?

6         A.      '94.

7         Q.      Okay.

8         A.      I have a Masters in Science

9    and Health Administration from UAB.

10         Q.      When did you get that degree

11   from UAB?

12         A.      '05.

13         Q.      Okay.  From '92 to '94, did

14   you have any full-time job?

15         A.      I believe I worked in the

16   interim between -- Yes, I had a part-time

17   job waiting tables.

18         Q.      From '92 to '94?

19         A.      I worked as a waiter in '92 to

20   '94.  And then --

21         Q.      Where did you work in '92 as a

22   waiter?

23         A.      Ruby Tuesday's in Birmingham.

Page 158

```
 1    that be accurate?

 2         A.    Say the question again.  I'm

 3    sorry.

 4         Q.    Okay.  On Exhibit 5 --

 5         A.    Yes.

 6         Q.    -- where it indicates that on

 7    September 12th of '03, you transferred from

 8    the sports medicine department to the

 9    business development department.

10         A.    Correct.

11         Q.    Is that accurate. as far as

12    what it says on Exhibit 5?

13         A.    Yes.

14         Q.    Okay.  So we now know before

15    you became director of registration you were

16    director of business development?

17         A.    Before I was director of

18    security, I was director of business

19    development.

20         Q.    Okay.  I apologize.  Thank

21    you.

22               Now -- Okay.  Let me see if I

23    got this right.  You initially hired as
```

FREEDOM COURT REPORTING

Page 159

```
 1    director of sports medicine; is that
 2    correct?
 3              A.     Correct.
 4              Q.     Then you became the director
 5    of business development; is that correct?
 6              A.     Yes.
 7              Q.     Then you became the director
 8    of security in the communications
 9    department?
10              A.     Correct.
11              Q.     Then you became director of
12    registration?
13              A.     Yes.
14              Q.     Okay.  Now, we've already
15    exhaustively talked about sports medicine.
16    as director of that, and security.  But now
17    I want to talk about the business
18    development directorship.  Was your first
19    day as a director September 12th of '03?
20              A.     In this role?
21              Q.     Yeah.
22              A.     I guess it was.
23              Q.     Okay.  Now, down here on the
```

Page 196

1        A.      Yes.

2        Q.      What is 904R?

3        A.      That's the department code.

4        Q.      And when you say department,

5    you're talking about the registration

6    department code?

7        A.      Correct.

8        Q.      All right.  So according to

9    Plaintiff's Exhibit 6, would it be accurate

10   that you became director of registration

11   sometime in August of '05?

12       A.      Yes.

13       Q.      Okay.  Whether it was the 17th

14   or 14th you don't know, but it would have

15   been sometime in August of '05?

16       A.      Yes.

17       Q.      Okay.  All right.  I think

18   that's it for that document.  Thank you.

19               Now, I may have asked you this

20   earlier, if I did, I apologize.  I think I

21   did.  Prior to you -- I think you said you

22   were offered the director of registration

23   position by David Smitherman.  Is that --

Page 197

```
 1          A.     No.

 2          Q.     Okay.  That's inaccurate.

 3    Who, if anyone, offered you that position?

 4          A.     Director of --

 5          Q.     Registration?

 6          A.     Mr. Scholl.

 7          Q.     Okay.  Would Mr. Scholl have

 8    offered you that position during a meeting,

 9    by e-mail, how did he offer you the

10    position?

11          A.     I believe, again, it was a

12    conversation between myself and Mr. Scholl,

13    and possibly even Mr. Henderson.

14          Q.     Okay.  You're sure -- Excuse

15    me.  You are sure that Mr. Scholl was

16    present, but you're not sure if

17    Mr. Henderson was present when you were

18    offered the director of registration

19    position?

20          A.     Correct.

21          Q.     Okay.  And is it fair to say

22    that would have been sometime in August of

23    '05, when you were offered the position?
```

FREEDOM COURT REPORTING

Page 237

1        Q.    I believe, Mr. Jones, we

2    stopped when you indicated that your

3    predecessor, Rick Mann, told you to form

4    your own opinion about the staff?

5        A.    Yes.

6        Q.    And we're talking about the

7    staff in the registration department; is

8    that accurate?

9        A.    That's accurate.

10       Q.    What, if any, understanding

11   did you have when he said form your own

12   opinion about the staff or did you have any

13   understanding?

14       A.    I didn't.

15       Q.    Okay.  Now, these monthly

16   meetings. and we're about to go into the --

17   These monthly meetings, some were mandatory,

18   some were not mandatory, that you would call

19   when you became director of the registration

20   department, would you manufacture agendas

21   for the meetings?

22       A.    Sometimes.

23       Q.    Sometimes you would not?

FREEDOM COURT REPORTING

Page 238

```
 1          A.      Sometimes I would not.
 2          Q.      I understand.  Would it be
 3    your decision as to whether agendas would be
 4    produced or not?
 5          A.      Say that again.
 6          Q.      Would it be your decision as
 7    to whether agendas would be produced or not?
 8          A.      Yes.
 9          Q.      And when the decision to
10    produce an agenda was made. would you --
11    would you produce the agenda form, or would
12    you have your secretary, Ms. Venable. do it?
13                  In terms of the issues -- That
14    was a bad question.
15                  In terms of the issues that
16    would be discussed at the monthly meetings,
17    when you decided which meeting you wanted to
18    produce an agenda for, first of all, who
19    would decide what issues would be addressed?
20    Would that be you?
21          A.      It was -- Those topics were
22    typically discussed prior to the meeting
23    with the supervisors.
```

FREEDOM COURT REPORTING

Page 239

1          Q.    Okay.  But what I'm interested

2     in, I'm sorry, I'm interested in, for lack

3     of a better term, can we say staff meetings?

4          A.    Yes.

5          Q.    Where people like Ms. Cowan

6     and other staff members would be present.

7     are you following me?

8          A.    Yes.

9          Q.    And those would happen on a

10    monthly basis, essentially?

11         A.    Yes.

12         Q.    And some of the meetings would

13    be mandatory and nonmandatory; correct?

14         A.    Yes.

15         Q.    My question is relative to the

16    agenda that would be discussed at the

17    meeting, sometimes there would be a printed

18    agenda and other times there would not;

19    right?

20         A.    Correct.

21         Q.    Okay.  Now, the printed

22    agenda, would that be disseminated to the

23    staff members at these monthly meetings?

```
 1          A.    Yes.

 2          Q.    Okay.  So everybody would get

 3     a copy?

 4          A.    Yes.

 5          Q.    And I would assume the purpose

 6     of that was probably severalfold. one so

 7     that everybody can be on the same page as to

 8     what issues would be discussed?

 9          A.    Yes.

10          Q.    And, number two, to facilitate

11     the organization of the meeting?

12          A.    Yes.

13          Q.    Okay.  When would you decide

14     what issues should be addressed at the

15     monthly staff meetings?  Was it like the

16     night before, where you would review some

17     things; or a week before and you would say,

18     I think these issues need to be discussed?

19     When did you --

20          A.    Typically. the formation of

21     the agenda started with the supervisors

22     meetings that I would routinely have.

23          Q.    I got you.  I got you.
```

Page 241

```
 1                    So what would happen is, you
 2      would -- Basically the monthly staff
 3      meetings would be contingent on -- Strike
 4      that.
 5                    The content of the monthly
 6      staff meetings would be based on what was
 7      discussed in the supervisor's meeting; is
 8      that a fair assessment?
 9           A.     That's a fair assessment.
10           Q.     Okay.  And how often would you
11      have supervisors meetings?
12           A.     Monthly.
13           Q.     Okay.  Were these all
14      mandatory meetings?
15           A.     Were they all mandatory
16      meetings?
17           Q.     Yes.
18           A.     I don't think they were
19      mandatory, but everybody routinely showed
20      up.
21           Q.     Now when you say supervisor
22      meetings, are you talking about the
23      supervisors exclusively within the
```

FREEDOM COURT REPORTING

Page 243

```
 1         Q.    Okay.  All right.  So -- Just
 2    so I'm clear, any issues that would be
 3    discussed in a staff meeting would have been
 4    issues that would have previously been
 5    discussed in a supervisors meeting?
 6         A.    Yes.
 7         Q.    And the supervisors would have
 8    articulated to you what, if any, concerns
 9    they had regarding employee performance; is
10    that correct?
11         A.    The purpose of that meeting
12    was a time for us to evaluate ourselves and
13    to gather information, and I would rely
14    heavily on input from my supervisors.
15         Q.    Okay.  All right.  Now, and
16    this gets us to where we need to go.  We
17    kind of touched on earlier, as a point of
18    reference, the June 21, 2006, meeting.
19    Okay?
20         A.    Okay.
21         Q.    And I believe you indicated
22    that you received a copy of Ms. Cowan's
23    racial discrimination lawsuit; is that
```

1    June 21, '06, meeting?  Did you receive any

2    notes?

3          A.    I don't believe I did.

4          Q.    Did you take any notes?

5          A.    I didn't take any notes, no.

6          Q.    Okay.  Now, to the best of

7    your recollection, when did you decide what

8    issues would be discussed during the June

9    21st, '06, meeting?

10          A.    Again, within another

11    supervisor's meeting prior to that.

12          Q.    No.  But I'm saying do you

13    recall when you decided what issues would be

14    addressed at the June 21st, '06, meeting?

15    Was it a week before, two weeks before?

16          A.    Again, I can't remember when

17    that was set.  I know that we discussed the

18    topics again with the supervisors, prior to

19    the meeting.

20          Q.    Okay.  And what were the

21    topics of the June 21st, '06, meeting?

22          A.    To address customer service

23    and attitude within the department.

Page 248

```
 1          Q.     Any other issues?

 2          A.     Patient satisfaction.

 3          Q.     All right.  Any other issues?

 4          A.     No.

 5          Q.     Okay.  Relative to customer

 6     service, did you have -- Did you or the

 7     supervisors have concerns regarding

 8     particular employees' issues with customer

 9     service?

10          A.     Yes.

11          Q.     Okay.  Tell me the names of

12     the individuals you had concerns relative to

13     customer service.

14          A.     Charlotte Gillis, Rosa Moses.

15          Q.     Hold on.  Gillis, Moses?

16          A.     Yes.

17          Q.     Okay.  Charlotte Gillis is

18     African-American or Caucasian?

19          A.     African-American.

20          Q.     Rosa Moses, African-American?

21          A.     Yes.

22          Q.     And anyone else?

23          A.     Gloria Thomas.
```

FREEDOM COURT REPORTING

Page 249

1           Q.     Anyone else?

2           A.     Diane -- What was Diane's last

3      name?  I can't remember Diane's last name.

4      She worked in the emergency department.

5           Q.     Is Gloria African-American or

6      Caucasian?

7           A.     Diane?

8           Q.     Gloria.

9           A.     Gloria is African-American.

10          Q.     And Diane is Caucasian?

11          A.     Yes.

12          Q.     Anyone else?  I mean, that you

13     can think of.

14          A.     Not that I can think of.  It

15     was a problem throughout the department,

16     though.

17          Q.     Any problems with Ms. Cowan,

18     specifically, regarding customer service?

19          A.     Not in regards to customer

20     service, because she didn't really have much

21     to do with customer service.  Her job was

22     behind the scenes.

23          Q.     I understand.  I'm just trying

Page 250

```
 1    to make sure, because this is my only

 2    opportunity, absent something else

 3    happening, which I don't anticipate, to take

 4    your deposition.

 5                Were these concerns reflected

 6    in Ms. Gillis, Ms. Moses, Ms. Thomas, or

 7    Diane's evaluations?

 8         A.    Actually, they have been

 9    addressed to the supervisors themselves.

10         Q.    Okay.  We're going to move

11    quickly.  Same question as applies to

12    attitude concerns.  Which employees did you

13    have attitude concerns with when you went to

14    the June 21, '06, meeting?

15         A.    Probably those same

16    individuals.

17         Q.    Okay.  And that would be

18    Gillis, Moses, Thomas, and Diane, I believe

19    you said you couldn't remember her last

20    name?

21         A.    Right.

22         Q.    What about patient

23    satisfaction?
```

Page 251

```
 1          A.      Patient satisfaction was a
 2    concern for all our department because it
 3    was how the patients were evaluating us and
 4    our courtesy.
 5          Q.      I see.
 6          A.      It was done by a third-party
 7    group of how we were scored.
 8          Q.      Okay.  So when the patients
 9    would fill out -- would they fill out
10    evaluation forms?
11          A.      Yes.
12          Q.      When they filled out the
13    evaluation forms, was anyone -- any staff
14    member specifically implicated, or was it
15    just a random type evaluation?
16          A.      Sometimes, depending on if the
17    -- if the applicants wrote in patient names.
18    sometimes they wrote praises, sometimes they
19    wrote negative remarks about specific
20    individuals.
21          Q.      Okay.  Relative to the June
22    21st meeting. were you aware of any
23    particular staff members that you had
```

FREEDOM COURT REPORTING

Page 259

1    Whoa.   Yes or no.

2          Q.    Your objection is fair because

3    now I think about it, Ms. Cowan did not say

4    three black monkeys.

5                You decided as part of

6    facilitating the meeting that you were going

7    to bring three monkeys and one gorilla; is

8    that correct or incorrect?

9          A.    That I decided to bring them

10   in?

11         Q.    Yes.

12         A.    I did.

13         Q.    Okay.   And where did you get

14   those three monkeys and gorillas?

15         A.    It was decided upon that I was

16   looking for a means to bring our point

17   across in a delicate manner of addressing

18   customer service, attitudes in the

19   department.

20         Q.    And we've talked about -- I'm

21   sorry.   Go ahead.

22         A.    I was just trying to arrive to

23   your question.

FREEDOM COURT REPORTING

Page 260

```
 1          Q.     Go ahead.  I apologize.
 2          A.     Okay.  And so I went to Toys R
 3    Us to try to find some props.
 4          Q.     I mean, what did you call
 5    props?
 6          A.     Something to support the role
 7    or to --
 8                 MR. WILSON:  Illustrate?
 9          A.     Illustrate, thank you.
10    Illustrate my point inside the department.
11          Q.     Well, let me ask you this,
12    would you ever consider a Swastika to be a
13    prop?
14          A.     No.
15          Q.     Okay.  But in this particular
16    instance, you considered three monkeys and a
17    gorilla to be a prop in an effort to get
18    your point across?
19          A.     The reason why those props
20    were chosen --
21                 MR. WILSON:  No.  No.  Just
22    give him yes or no.
23          Q.     Let him finish.  You've got
```

FREEDOM COURT REPORTING

Page 261

```
 1   something to say, go ahead.  Go ahead,
 2   Mr. Jones, if you've got something to say.
 3              MR. WILSON:  Go ahead.
 4        A.    That the phrases of smiling,
 5   fabulous, friendly, were on the --
 6   embroidered on the monkeys.  I didn't go
 7   intentionally with a mind of buying monkeys.
 8              Again, I was looking for props
 9   to illustrate the point.  And when I saw
10   those, I said, well, that's kind of what I'm
11   looking for.  It could have been giraffes,
12   it could have been elephants with the same
13   embroidery, and I probably would have
14   thought the same.
15        Q.    Not to state the obvious, but
16   you are Caucasian; correct?
17        A.    Yes.
18        Q.    And you've never been
19   subjected, nor members of your ethnic group
20   in America have never been subjected to
21   lynchings; is that correct?
22        A.    I'm afraid I don't understand
23   the question.
```

Page 262

```
1          Q.    You are Caucasian?

2          A.    Yes.

3          Q.    And my question is, members of

4    your ethnic group have not been subjected to

5    wide-spread lynchings, have they?  Is that a

6    fair statement?

7          A.    I think that's a fair

8    statement.

9          Q.    Nor have they been called

10   monkeys and gorillas, have they?

11         A.    No.

12         Q.    Okay.  Are you familiar with a

13   dictionary by the name of Wikipedia?

14         A.    I've seen it.

15         Q.    That's a respected online

16   dictionary, is it not?

17               MR. WILSON:  Object to the

18   form.

19         Q.    Do you think it's respected?

20         A.    I've never been on Wikipedia.

21   I know it exists on the Internet.

22         Q.    Would you be surprised if I

23   represented to you that the term gorilla and
```

Page 263

```
1     monkey, by Wikipedia's definition, is
2     considered to be racial epithets?
3            A.     It could.
4            Q.     When you were at Toys R Us,
5     purchasing these three monkeys and a
6     gorilla, it never occurred to you that that
7     could be very inciteful and hurtful to
8     people of African-American decent?
9            A.     No, it did not.
10           Q.     Okay.  Now, we've already
11    talked about your training -- Well, not
12    training.  Well, let me scratch that -- your
13    training regarding cultural diversity:
14    right?
15           A.     Yes.
16           Q.     Okay.  Now, I think you said
17    that -- Did the gorilla have any writing on
18    it?
19           A.     No, I don't believe it did.
20           Q.     Okay.  But the three monkeys
21    have smiling, fabulous, and friendly.
22           A.     Yes.  Something along those
23    lines.
```

Page 264

```
 1          Q.      Now, isn't it true you also
 2    brought in a stun gun?
 3          A.      Yes.
 4          Q.      Now, a stun gun is another
 5    term for taser, is that pretty accurate?
 6          A.      I don't think that's accurate.
 7          Q.      What is a stun gun?  A stun
 8    gun is used particularly by law enforcement
 9    officers; is that right?
10          A.      It was a plastic,
11    phaser-looking, futuristic type toy that was
12    brought into the department.  It didn't
13    resemble an actual gun.  It was more of a
14    Star Wars, Star Trek phaser-looking device.
15          Q.      Okay.  Now, when you brought
16    the three monkeys and gorilla -- let me
17    first of all establish this:  What color was
18    the gorilla?
19          A.      Black.
20          Q.      And what color were the three
21    monkeys?  They were different colors; right?
22          A.      Correct.
23          Q.      What colors were the monkeys?
```

FREEDOM COURT REPORTING

Page 265

1          A.     I can't recall off the top of

2     my head, but bright colors of either green,

3     yellow, purple, blue.  I'm not sure what the

4     colors were.

5          Q.     I understand.  Now, prior to

6     your monkey/gorilla demonstration, did

7     Ms. Venable know that this was going to take

8     place?

9          A.     The supervisors knew the

10    intent of the meeting.

11         Q.     Okay.  Let me ask you this:

12    Is it your contention that they knew that

13    you were going to do a monkey/gorilla

14    demonstration?

15         A.     They didn't know about the

16    props, no.

17         Q.     Okay.  For some reason you

18    decided not to disseminate that to them?

19         A.     Again, in my concept of

20    mentioning to them, I told them what we need

21    to try to do is convey about proper

22    attitudes of customer service in our meeting

23    and that was agreed upon.  The fact that I

Page 266

```
 1    didn't bring the -- I didn't know that I was
 2    going to buy those props at the time, at
 3    that meeting.
 4           Q.    When did you buy those props,
 5    the night before?
 6           A.    The night before.
 7           Q.    Okay.  You purchased them from
 8    Toys R Us here in Montgomery?
 9           A.    Excuse me?
10           Q.    Did you purchase them from
11    Toys R Us here in Montgomery?
12           A.    Yes.
13           Q.    Along with the gun?
14           A.    Yes.
15           Q.    Okay.  Were you alone when you
16    purchased those?
17           A.    Yes.
18           Q.    Okay.  Tell me, when you came
19    in and you began to do the demonstration,
20    tell me how you tried to. as you said,
21    demonstrate your point.
22           A.    I stated that with -- We
23    wanted to be like our -- First of all, I
```

Page 267

```
 1    began by addressing our concerns about

 2    customer service and attitudes in the

 3    department.

 4            Q.    Okay.

 5            A.    And that we wanted to be more

 6    in line with some of the illustrations of

 7    the monkeys -- of what the stitching or the

 8    embroidery of the monkeys stated as being

 9    happy, smiley, and friendly.  What we didn't

10    want was to be more --

11            Q.    Was it fabulous, smiley, and

12    friendly?

13            A.    I can't remember.

14            Q.    Okay.

15            A.    It was something along those

16    lines to represent positive attitudes.  It

17    was smiley or along those lines.

18            Q.    Let me ask you this.  Do you

19    think equating someone with a monkey is

20    positive?

21            A.    Do I think equating someone

22    with a monkey --

23            Q.    Do you think equating someone
```

Page 268

```
 1   with a monkey is positive?

 2        A.    Again. my intent of the

 3   meeting was to reiterate -- this is the

 4   attitudes of being smiley. being friendly,

 5   and fabulous.

 6        Q.    But my specific question is

 7   about the monkeys and the gorilla. Is that

 8   your understanding of trying to indicate

 9   something positive?

10              MR. WILSON:  Object to the

11   form.

12        Q.    You can answer.

13        A.    Let me ask you to rephrase the

14   question. please.

15        Q.    Well, I think you said that

16   your intent was to -- Well, I don't want to

17   -- Let me scratch that.

18              I think you said that you

19   wanted to demonstrate something positive.

20   Is that -- or am I wrong about that?

21              MR. WILSON:  I think he said

22   he wanted to illustrate something about

23   positive demeanor or attitudes.
```

Page 269

```
 1          Q.    Is that what you wanted to do?
 2          A.    Yes.
 3          Q.    Okay.  My question was, is
 4     characterizing someone as a monkey or
 5     gorilla, is that your understanding of --
 6               MR. WILSON:  Object to the
 7     form.  Go ahead.
 8          A.    I sure didn't want to go into
 9     the meeting creating further divisiveness
10     inside the meeting.  So, again, by stating
11     that the type of -- what does it feel like
12     to have someone that smiles, that's
13     friendly, those were the things in which I
14     was trying to convey.
15          Q.    Why didn't you get a clown or
16     something?  Why monkeys and why a gorilla?
17          A.    Well, as I mentioned to you
18     before, it could have been -- it could have
19     been the clowns, it could have been
20     elephants, it could have been anything.
21     It's just that the embroidery on those
22     monkeys went with what I was trying to
23     convey:  We need to smile to our customers,
```

Page 270

1    we need to be friendly to our customers, we

2    need to have fabulous attitudes if that's

3    what the third one was or whatever.

4           Q.    Okay.

5           A.    That's the reason why the

6    message was being carried out.

7           Q.    I believe you said that the

8    racial composition of the June 21st meeting,

9    in your estimation, was about

10   sixty-five/thirty-five, sixty-five percent

11   African-American, thirty-five percent

12   Caucasian; correct?

13          A.    Yes.

14          Q.    Now, the three monkeys,

15   smiley, fabulous, and friendly, they were

16   disseminated to certain people, were they

17   not?

18          A.    Yes.

19          Q.    At the meetings?

20          A.    Yes.

21          Q.    Who was smiley disseminated

22   to?

23          A.    I don't recall.

FREEDOM COURT REPORTING

Page 271

```
 1          Q.     What about fabulous and
 2    friendly?
 3          A.     I don't recall.
 4          Q.     Isn't it true that all three
 5    of the monkeys were disseminated to
 6    African-American employees?
 7          A.     No.
 8          Q.     That's not true?
 9          A.     That's not true.
10          Q.     Is it your testimony under
11    oath that at least one of them was
12    disseminated to a Caucasian employee?
13          A.     Yes, it was.
14          Q.     Which Caucasian employee was
15    that?
16          A.     Ann Cobb.
17          Q.     Okay.  Now, how is it that you
18    distinctly remember Ann Cobb?
19          A.     Because Ann Cobb exemplified
20    the attitudes in the department that we
21    desired.
22          Q.     Okay.  And which monkey did
23    she get?
```

```
 1          Q.    Did you throw it away
 2    immediately after the meeting?
 3          A.    No.  I think I had it for the
 4    day -- for the night.
 5          Q.    Okay.  Now, relative to the
 6    gun, was there any demonstration that you
 7    used a gun for?
 8          A.    Yes.
 9          Q.    Tell me about that.
10          A.    Again, it was meant to talk
11    about how people perceive or exude their
12    attitudes to others.  You can have people
13    that are having a very good day who -- are
14    actually having a great day, then you have
15    those that you walk up to and tell that
16    person:  How is your day.  And the next
17    thing you know the person is saying, well,
18    it rained today, I have to get my hair set:
19    everything is always very dark and gloomy in
20    their attitudes.
21               So what happens with this,
22    it's almost as if someone zaps your euphoria
23    or positive attitude right out from
```

1    underneath you.  What does it feel like when

2    you leave from somebody after you say you

3    have a good attitude, you're having a good

4    day. and that person just kind of brings

5    your day down; and it's like they zap that

6    positive energy that you have away from you.

7    And now when you walk away. it's not the

8    same attitude you had at the very beginning,

9    at the very end.

10        Q.    Did you tell any of the

11   employees during that meeting that if they

12   didn't correct their conduct you're going to

13   zap them?

14        A.    I don't recall ever saying

15   something like that.

16        Q.    Okay.  At any time did you

17   wave the gun in the air?

18        A.    I don't recall if I did or

19   not.

20        Q.    Okay.  You didn't point the

21   gun at anybody specifically: right?

22        A.    I don't think I did, no.

23        Q.    Okay.  Now, and we've been

Page 289

1   along those lines on them.

2        Q.    Okay.  Are you finished?

3        A.    Yes.

4        Q.    Then she goes on to say you

5   made a ludicrous comment waving a stun gun,

6   that if they didn't cooperate, from the

7   staff, they would be stunned.  Are you

8   disputing that?

9        A.    I don't ever recall waving the

10  stun gun and saying I was going to shoot

11  anybody, no.

12       Q.    So the answer is yes, you do

13  dispute that; right?

14       A.    Yes.

15       Q.    And Ms. Cowan goes on to say

16  that she wants an apology; correct?

17       A.    She does.

18       Q.    And asking that a meeting be

19  conducted immediately; correct?

20       A.    Yes.

21       Q.    Now, we've already talked

22  about your subsequent transfers through

23  Mr. Scholl and some other people.  At any

FREEDOM COURT REPORTING

```
 1    time did you go talk to Mr. Scholl about

 2    this monkey/gorilla incident?

 3         A.    Yes.

 4         Q.    Okay.  When did you talk to

 5    Mr. Scholl?

 6         A.    I believe it was the same day.

 7         Q.    Okay.  Did he summon you to

 8    his office, or did you just --

 9         A.    I voluntarily went to him.

10         Q.    Why did you go see him?

11         A.    Him being my direct

12    supervisor.  I felt like I needed to go to

13    him to advise him of the meeting and the

14    concerns that were brought up by Gilbert.

15         Q.    Okay.  Now, before you did

16    this gorilla/monkey demonstration, you

17    didn't go talk to Mr. Scholl, did you?  You

18    didn't go talk to him and ask how he might

19    feel about that, did you?

20         A.    No.

21         Q.    As a matter of fact, you

22    didn't talk to anybody and ask them how they

23    might feel about the gorilla/monkey
```

FREEDOM COURT REPORTING

Page 291

1    incident, did you?

2           A.     No, I did not.

3           Q.     Okay.  But after

4    Mr. Darrington told you about how some of

5    the employees felt about this and they felt

6    it was racially motivated, you went to see

7    Mr. Scholl; right?

8           A.     Yes.

9           Q.     And you went to see him on

10   your own initiative, didn't you?

11          A.     Yes.

12          Q.     Okay.  Tell me -- And this was

13   the morning after, on the 22nd, shortly

14   after you had a meeting with Mr. Darrington?

15          A.     At some point in the day, yes,

16   I did.

17          Q.     Okay.  And what else did you

18   talk to Mr. Scholl about?

19          A.     I recapped the scenario, as

20   I've given to you in my testimony, what I

21   said, my intentions of the meeting, and that

22   there are -- there were concerns raised by

23   staff about the monkeys.

FREEDOM COURT REPORTING

Page 292

```
 1          Q.    Did you -- So you specifically
 2     told Mr. Scholl that you used three monkeys
 3     and a gorilla in a staff meeting comprised
 4     of African-Americans?
 5          A.    I did.
 6          Q.    And did Mr. Scholl indicate
 7     that he felt you needed to apologize for
 8     that?
 9          A.    Yes.
10          Q.    Okay.  He told you that he
11     felt you needed to apologize; right?
12          A.    Yes.
13          Q.    Okay.  Now, when you left
14     Mr. Scholl's office, did you go apologize?
15          A.    Not immediately right then I
16     didn't, no.
17          Q.    Why not?
18          A.    Because it took time to gather
19     all the people up and set a meeting so that
20     everybody could possibly attend the meeting.
21          Q.    Okay.  When did you decide to
22     set up the meeting?
23          A.    It was shortly after that.
```

FREEDOM COURT REPORTING

Page 293

```
 1           Q.      Okay.  Did you issue an agenda
 2    for that meeting?
 3           A.      No.
 4           Q.      Okay.  Just so I'm clear, it's
 5    your testimony that after you left
 6    Mr. Scholl's office -- was this during the
 7    morning of the 22nd or after -- afternoon?
 8           A.      I believe it was in the
 9    afternoon sometime.
10           Q.      Okay.  So after you left
11    Mr. Scholl's office on June 22nd, '06, after
12    you told him about the gorilla/monkey
13    incident, he told you that he felt you
14    needed to apologize; correct?
15           A.      Correct.
16           Q.      And did you agree with
17    Mr. Scholl's assessment that you needed to
18    apologize?
19           A.      Yes.
20           Q.      Okay.  Was that the first time
21    that you realized that you needed to
22    apologize?
23           A.      Yes.
```

```
 1    inquire as to who may have been offended by

 2    your gorilla/monkey demonstration?

 3            A.     No, I did not.

 4            Q.     Okay.  Did there come a time

 5    when an apology was issued by you?

 6            A.     Yes.

 7            Q.     Okay.  When was that apology

 8    given?

 9            A.     Within days.

10            Q.     24th, 25th?

11            A.     Short time afterwards.  I'm

12    sorry, I don't recall the exact date.

13            Q.     Okay.  Did you issue a written

14    or verbal apology?

15            A.     Verbal.

16            Q.     Okay.  Who was present at this

17    verbal apology?

18            A.     Gilbert Darrington.

19            Q.     All right.

20            A.     And the staff.

21            Q.     Let me see if I can help you a

22    little bit.  Was Ierri Herring present?

23            A.     She could be.
```

Page 307

```
 1    never make it to administration.  Do you
 2    dispute that?
 3            A.    I do.
 4            Q.    Okay.  Let's quickly talk
 5    about this investigation that you talked
 6    about that Mr. Darrington did.
 7                  Do you know the outcome of the
 8    investigation?
 9            A.    The outcome?
10            Q.    Right.  The outcome of the
11    investigation.  He said he was going to do
12    an investigation.
13            A.    I don't.
14            Q.    Okay.  Were you ever
15    reprimanded for this conduct?
16            A.    Yes.
17            Q.    Yeah.  You were reprimanded?
18            A.    Yes.
19            Q.    Okay.  I didn't get --
20                  MR. BROWN:  Do you have a copy
21    of that reprimand, Ben, because we didn't
22    get that?
23                  MR. WILSON:  It was verbal.
```

Page 308

```
 1          Q.      Was it verbal?  Was that a
 2   verbal reprimand?
 3          A.      Yes.
 4          Q.      Okay.  Tell me about the
 5   content of that verbal reprimand.
 6          A.      That I should have had better
 7   thought than to have used monkeys in the
 8   meeting; and despite the fact of what I was
 9   trying to convey to the staff, that it was
10   the wrong use of props; and that anything
11   along those lines. that if I was ever to do
12   them again, it should be brought to Ed's
13   attention.
14          Q.      They didn't tell you that the
15   next infraction would result in termination?
16          A.      I believe that nothing was
17   mentioned as far as termination.
18          Q.      Okay.  Did -- Now, who
19   actually gave you the reprimand?
20          A.      Mr. Scholl.
21          Q.      Okay.  Did he use the term
22   props to describe the three monkeys and
23   gorilla?
```

FREEDOM COURT REPORTING

Page 311

1          Q.    And you were one of the ones
2     that recommended that; correct?
3          A.    Yes.
4          Q.    But you received a verbal
5     reprimand for engaging in a gorilla and
6     monkey demonstration that several
7     African-American employees thought were
8     racist; right?
9               MR. WILSON:  Object to the
10    form.
11         Q.    Did you receive anything else
12    other than a verbal reprimand?
13         A.    No.
14         Q.    Okay.  You weren't placed on
15    probationary status, were you?
16         A.    I'm not aware if I was or not.
17         Q.    Well, if you would have been,
18    you would have received some written
19    notification of it, wouldn't you?
20         A.    Yes.
21         Q.    All right.  Do you think
22    that's fair?
23               MR. WILSON:  Object to the

FREEDOM COURT REPORTING

Page 312

1    form.

2        Q.    You can answer.

3        A.    I believe my understanding of

4    the incidents that took place, and the

5    reprimand that was given to me, that I

6    sincerely take heart to the fact of what was

7    conveyed in the meeting.

8        Q.    I'm sorry, sir. I apologize,

9    what did you just say? I apologize.

10       A.    I said that the reprimand that

11   was given to me was fully understood, it was

12   taken to heart, and, again, that I state

13   that I was hurt by the represented racial

14   undertones, that was certainly not my

15   intent.

16       Q.    Let me ask you this. You keep

17   getting back to the fact that you were hurt,

18   and I'm trying to understand the source of

19   any hurt feelings.

20            Did it ever occur to you that

21   the African-American employees might be

22   deeply hurt by a gorilla/monkey

23   demonstration?

Page 313

1         A.      After the fact it was brought

2    to my attention, yes.

3         Q.      I'm going to show you this

4    document and if you would show that to

5    Mr. Wilson -- to Ben, I'm sorry.

6                 MR. WILSON:  Okay.

7         Q.      And that's what was produced.

8    Now, this is a eight-page document dealing

9    with the policies and procedures of Jackson

10   Hospital.  It was produced by Jackson.

11        A.      Uh-huh.

12        Q.      And I don't want to -- I'm

13   just going to call your attention, because

14   you know, what I want to do is, go ahead and

15   speed this up.

16                Now, let me call your

17   attention to the third page, where it says

18   -- in section B where it says verbal

19   warning, written warning, do you see that?

20        A.      Yes.

21        Q.      It says:  A complete record of

22   employee counseling and warning forms.  It

23   says prior counseling and warnings of

Page 333

```
 1              Q.     Now, Mr. Jones, did there come
 2     a time when you issued another apology?
 3              A.     Yes.
 4              Q.     Okay.  Why did you issue a
 5     second apology?
 6              A.     It was -- Ed had brought it to
 7     my attention we felt like that a second
 8     apology was in order to reconvey my sincere
 9     apology to the staff.
10              Q.     The second apology, do you
11     know who was there?
12              A.     Again, it was --
13              Q.     Mr. Darrington was there?
14              A.     Mr. Darrington was there,
15     Mr. Scholl.
16              Q.     Was Ms. Cowan there?
17              A.     I don't remember if she was or
18     not.
19              Q.     What was the substance of your
20     apology?
21              A.     Again, I just wanted to
22     reiterate to the staff my sincere apologies
23     and for the use of props and any racial
```

Page 334

```
 1     interpretation that the puppets may have

 2     given to the staff.  That was, again, not my

 3     intent by mentioning that or drawing any

 4     conclusions along those lines.

 5          Q.    Okay.

 6          A.    I think I said something along

 7     the lines that it was an error in judgment.

 8          Q.    Okay.  Let me show you this.

 9     That's -- It purports to be an evaluation

10     but I'll let you tell me if it is or not.

11     Look over it very quickly.

12               Look on the second page, and I

13     think you'll -- I'm not sure if that's your

14     signature or not, but it purports to be.

15          A.    Yes.

16          Q.    Okay.  And have you seen that

17     document before?

18          A.    I believe I have.

19          Q.    All right.

20          A.    It's got my signature on it,

21     so --

22          Q.    I understand.  Well, I can't

23     assume.  I've just got to be sure because
```

From:      Dorothy Cowan
To:        Gilbert Darrington
Date:      6/22/06 8:54AM
Subject:   Patient Access Dept  Meeting

I would like to express my opinions on the department meeting on yesterday, 06/21/06. Our Director David Jones, offended quite a few employees, and me personally. This department is 95% African-American, and he referenced to his employees as monkeys! He named them as Fabulous, Friendly, and Gorilla  He made the ludicrous comment, waving a stun gun that if he didn't have cooperation from his staff, they would be stunned! I would like for there to be a mandatory meeting immediately, demanding an apology This is insubstantial wording  and I must say, lack of professionalism

Thanks,
Dorothy

Dorothy Cowan
Bed Control Supervisor
Jackson Hospital & Clinic
334-293-8102 Office
334-293-8756 Fax
334-519-3824 Beeper

CC:        Ed Scholl



EXHIBIT

D.

From:       Dorothy Cowan
To:         Gilbert Darrington
Date:       6/22/06 9:44AM
Subject:    Department Meeting

I was very upset this a.m. when I sent you the e-mail regarding the events that took place at yesterdays
patient access department meeting. I was offended, frightened, and treated in a undignfied manner Mr
Jones inappropriately used stuffed animals and a stun gun during the meeting He compared all of the
African American employees to a monkey. He had two stuffed monkeys and a stuffed gorrilla He had
names written on them Fabulous, Friendly, and Gorilla He gave Gorilla to Charlotte and said she was the
big bully of the group He further went on to grab the gun, wave it in the air and stated if we all didn't begin
acting right he would shoot us with the gun. I hope this E-mail has better discribed the events as they took
place. I would like to speak to you both as soon as possible about yesterdays events and how we should
proceed

Dorothy Cowan
Bed Control Supervisor
Jackson Hospital & Clinic
334-293-8102 Office
334-293-8756 Fax
334-519-3824 Beeper

CC:         Ed Scholl


EXHIBIT
E.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **DOROTHY COWAN,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | §   **CASE NO.: 2:07-CV-779-MHT-TFM** |
| | § |
| **JACKSON HOSPITAL & CLINIC,** | § |
| **INC., a domestic corporation, conducting** | § |
| **business in the State of Alabama,** | § |
| | § |
| **Defendant.** | § |

### AFFIDAVIT OF TERRI LOWERY, R.N., B.S.N.

| | |
|---|---|
| STATE OF ALABAMA | ) |
| MONTGOMERY COUNTY | ) |

BEFORE ME, a Notary Public, in and for said commonwealth and county, personally appeared Terri Lowery, who is known to me, and who upon being sworn on oath, duly deposes as follows:

1. My name is Terri Lowery, R.N., B.S.N. I am over the age of 19 years, and I have personal knowledge of all facts and matters set forth in this Affidavit.

2. I obtained my diploma in nursing in 1965 from Sinai Hospital School of Nursing in Baltimore, Maryland. I obtained my bachelor's of science in nursing at the University of South Alabama in 1997. I have over 40 years' experience in the healthcare field, including hospital and nursing operations, and planning. My experience includes the development of a pilot program for patient assignments at three different level II trauma centers (two facilities in Florida and one in Louisiana). I also served as a house supervisor for several years in a 225-bed hospital similar in size to Jackson Hospital, and my duties in that capacity included bed control operations.

1



3. I am a resident of Little Elm, Texas. I have never been an employee of Jackson Hospital & Clinic. In August of 2006 Cynthia Dixon, Jackson Hospital's Vice President of Patient Services (who oversees all nursing operations), asked me to serve as a consultant on various aspects of nursing and related healthcare operations. I had no involvement in Jackson Hospital operations prior to that time. My services as a consultant to Ms Dixon and senior hospital management continue at the present time.

4. When I arrived at Jackson Hospital, its bed control office, which assigns beds to patients being admitted to the hospital, had recently been transferred to the control of the hospital s nursing administration. This action was taken to improve communication between bed control and nursing units regarding patient admissions, and it was consistent with the practices of many other hospitals. At the time of my arrival, the bed control office was located in the nursing administration offices in the hospital's administrative building across the street from the main hospital building.

5. I evaluated the bed assignment practices and found them to be deficient in several respects. For example, an incoming patient would often be assigned to a bed without a full assessment of acuity or the workload of the floor nursing staff. This led to imbalances in the number of patients per floor nurse. I also felt that there was insufficient communication between bed control and house supervisors (registered nurses serving in a supervisory role during a particular shift). Therefore, Cynthia Dixon and I began to consider locating the bed control office, the staffing coordinator, and the house supervisor in two adjacent but connected offices in the main hospital building.

6. After this was implemented, bed control and staffing occupied one room, which was connected by an interior door to a second room serving as the office of the house supervisor.

2

Each office had its own door that opened into the main hospital corridor. The house supervisor office had an exterior window, but the bed control/staffing office did not. Nevertheless, the door between the two rooms was allowed to remain open except during meetings involving nursing personnel/counseling issues. The new office was to be known as the "House Office, and the three component units were relocated there in the fall of 2006.

7. After the House Office was up and running, I occasionally sat in and covered the bed control function. Ms. Dixon eventually asked me to focus my attentions to House Office operations in the capacity of interim director. This included oversight of shift staffing overtime, patient privacy/confidentiality concerns, and all other aspects of the office's operations.

8. Because the total number of employees assigned to bed control and staffing was small, adequate coverage of the units in the face of illness, leave, and the like remained a challenge. Therefore Ms. Dixon and I determined that it would benefit operations to cross-train bed control personnel to perform the staffing function and vice versa. In addition, we wanted the house supervisors to learn how to handle bed control. It was also felt that fairness would be better served by more equitably staffing night and weekend shifts.

9. I also attempted to maximize efficiency by having all house office staff report directly to the interim director (rather than through "supervisors"). Because of the relatively small number of employees assigned to the House Office, operations would be better served by reducing the number of persons to whom rank-and-file employees were required to report. In keeping with hospital-wide efforts to control overtime expenditures, I also implemented a guideline requiring pre-approval of overtime. Finally, in an effort to maximize access to business file cabinets in the office, I eliminated the personal use of cabinets and the practice of allowing some employees to lock file cabinets and keep the keys. This had caused problems

3

when access to a file cabinet was needed, yet the employee holding the key was not at work. Each of these changes was announced in mid-to-late February 2007, and each applied to all employees assigned to the House Office. They were outlined in a memorandum to staff, a copy of which was signed by each employee and myself. Each of these changes was implemented solely to improve the operation and function of the unit. A true and correct copy of the memorandum in question is attached hereto as Exhibit 1. This memorandum was prepared in the ordinary course of hospital operations, and it was part of hospital routine and practice to do so. The memorandum was drafted as part of the implementation of the guidelines set forth therein.

10. I now understand that Dorothy Cowan filed a charge of discrimination with the Equal Employment Opportunity Commission on or about November 29, 2006. Ms. Cowan resigned her employment at Jackson Hospital on or about March 21, 2007. At no time during my involvement with Ms. Cowan or the House Office was I aware that Ms. Cowan had submitted either an internal grievance to hospital management or had filed an EEOC charge/complaint concerning her employment at Jackson Hospital

Terri Lowery RN BSN
TERRI LOWERY

SWORN TO AND SUBSCRIBED BEFORE ME this _7th_ day of May, 2008.

Notary Public

My commission expires: _8-17-11_

4

<u>Guidelines and expectations for House Office (Shift coordinators, Bed Control, and Staffing) staff:</u>

To be more effective and serve as a team, every person will be cross trained to those positions within their scope and abilities (start with fulltime staff)

Absolutely no gossiping or negative talk to or about others

Chain of command must be followed at all times

No information should leave the House Office or be discussed with others; sharing information to physicians and others that is not appropriate or not following chain of command is grounds for suspension up to immediate termination.

Negative attitudes will not be tolerated; passive / aggressive behavior that tears down the team should not be displayed

Telephones will be answered at all times; the desk should never be left uncovered Rolling calls to voice mail is discouraged and will be eliminated

Professional and courteous guest relations are very important and should be maintained at all times

All staff now report directly to the Staffing Director (Interim is Terri Lowery).

No overtime is allowed unless pre-approved by the Director.

There are no "personal" file cabinets or desk in the office; all supplies and equipment are shared between everyone and keys are community property

I understand these guidelines and have had the opportunity to discuss them with my supervisor.

Dorothy Cowan
Employee

2-26-07
Date

Terri Lowery RN
Director

2-26-07
Date

EXHIBIT
1

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| FEPA | |
| X  EEOC | 420-2007-00949 |

and EEOC

State or local Agency, if any

| NAME(Indicate Mr. Ms. Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Dorothy Ree Cowan | 334-356-9592 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2185 Beverly Drive | Montgomery Alabama | 12-25-57 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| David Jones | ONE | 334-293-8834 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1725 Pine Street | Montgomery Alabama 36106 | montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| Jackson Hospital | 334-293-8834 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1725 Pine Street | Montgomery Alabama 36106 | montgomery |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)):

[✓] RACE     [ ] COLOR     [✓] SEX     [ ] RELIGION     [ ] AGE
[✓] RETALIATION     [ ] NATIONAL ORIGIN     [ ] DISABILITY     [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)     LATEST (ALL)

[✓] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

A meeting was conducted by our Director, David Jones during which he used stuffed monkeys and a Taser to demonstrate how he would deal with "uncooperative employees." As the majority of those present were African-American Females this was racially discriminatory. After speaking with Gilbert Darrington Human Resource Director and Ed Scholl Asst. Administrator I was later Transfered to another Department. Mr. Jones is still in his previous position as Department Director. The general opinion is that he is protected by being related to Vichie Jones, another Asst. Administrator. This is grossly unfair. I have been employed with Jackson Hospital for the past eighteen years. I have an excellent record, being supervisor  →

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| Date 11-28-06     Charging Party (Signature) Dorothy Cowan | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC FORM 5 (Test 10/94)

EXHIBIT
G.

of Bed control at the time of the incident. Thank you for your time and consideration in this matter.

LAW OFFICES
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.

A PROFESSIONAL ASSOCIATION

184 COMMERCE STREET
MONTGOMERY, ALABAMA 36104

BENJAMIN C. WILSON
EMAIL: BCW@RSJG.COM
DIRECT TELEPHONE:
(334) 206-3194
DIRECT FACSIMILE:
(334) 481-0831

MAILING ADDRESS:
POST OFFICE BOX 270
MONTGOMERY, ALABAMA 36101-0270

WWW.RSJG.COM

January 5, 2007

Samuel O. Hall
Enforcement Supervisor
Equal Employment Opportunity Commission
Birmingham District Office – 420Ridge
Park Place1130 22nd Street, South
Birmingham  Alabama 35205

> RE:   **Charging Party:**    **Dorothy R. Cowan**
>         **Respondents:**      **Jackson Hospital & Clinic**
>                              **David Jones**
>       **EEOC Charge No.:  420-2007-00949**

Dear Mr. Hall:

Pursuant to the Notice of Charge of Discrimination dated December 6, 2006, please accept this correspondence as a response submitted on behalf of Jackson Hospital & Clinic and David Jones to the charges of discrimination filed by Dorothy Cowan.  JHC and Mr. Jones affirmatively state that they are not guilty of discriminating against Ms. Cowan based on her race or sex, nor did they retaliate against her.  Consequently, these respondents urge this commission to issue a notice finding no cause regarding these allegations.

Ms  Cowan s complaint arises out of a June 21, 2006 departmental meeting involving employees assigned to the hospital's patient access department.  Mr. David Jones director of patient access/communications, led the meeting, which, among other things, addressed the issue of employee professionalism and positive attitudes on the job.  During the meeting, Mr. Jones employed several stuffed monkeys and a fake stun gun (a toy) as props to illustrate uncooperative employees.  After the meeting, Ms. Cowan complained that the use of stuffed monkeys and the toy gun was racially demeaning and insensitive.

The hospital s senior management, specifically Ed Scholl, the hospital s vice president of finance, learned of the meeting in question the day after it occurred.  Mr. Scholl promptly met with and counseled Mr. Jones about his choice of props and exhibits and the notion that those had been viewed as offensive by Ms. Cowan. During this meeting with Mr. Jones, Mr. Scholl provided education on racial sensitivity, and he instructed Mr. Jones to meet with the staff to acknowledge his poor choice of exhibits and to apologize. Mr. Jones did so.  In a separate meeting with the staff, Mr. Scholl expressed disappointment in Mr. Jones' decisions, apologized, and informed the staff that he had counseled Mr. Jones accordingly.  When several employees



Samuel O. Hall
January 5 2007
Page 2

meeting with the staff, Mr. Scholl expressed disappointment in Mr. Jones' decisions, apologized, and informed the staff that he had counseled Mr. Jones accordingly. When several employees shared views about the sincerity of Jones' initial apology, Mr. Scholl, who was not in attendance at the first meeting, called another meeting for Mr. Jones to apologize again. At this meeting, Mr. Scholl witnessed what he considers a sincere apology to the staff and a commitment to be sensitive to everyone's position, opinions and feelings. Gilbert Darrington Director of Human Resources, attended all three staff meetings regarding this incident.

Ms. Cowan's claim of retaliation is baseless. Ms Cowan and the bed control department were relocated under the supervision of nursing administration in September, 2006. This move was made at the request of the vice president of patient care. Mr. Scholl has had discussions with nursing administration since the spring of 2005 concerning such a move. It is commonplace in many hospitals for the bed control function to be supervised by the nursing department rather that the registration department. The move was made strictly as a patient care issue.

Issues of the type raised by Ms. Cowan are taken with sincerity and are addressed promptly. There is, however, no basis to conclude that any action was taken with any intent to discriminate or retaliate against Ms. Cowan in any way. Mr. Jones simply made a poor decision in the course of executing his managerial responsibilities. Senior management is keenly aware of the sensitivity of such matters, it promptly intervened in an effort to raise the level of awareness, and it remains vigilant to address issues of the sort raised by Ms. Cowan.

Based on the foregoing, these respondents anticipate a finding of no cause. Otherwise please let me know if you have any further questions or concerns regarding this matter.

Sincerely yours,

BEN C. WILSON

BCW/dcr

cc:   Gilbert Darrington (JH&C)
      Ed Scholl (JH&C)
      Glenda Bryan-Brooks (EEOC)

LAW OFFICES

## RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.

A PROFESSIONAL ASSOCIATION

BENJAMIN C. WILSON
EMAIL: BCW@RSJG.COM
DIRECT TELEPHONE:
(334) 206-3194
DIRECT FACSIMILE:
(334) 481-0831

184 COMMERCE STREET
MONTGOMERY, ALABAMA 36104

MAILING ADDRESS:
POST OFFICE BOX 270
MONTGOMERY, ALABAMA 36101-0270

WWW.RSJG.COM

January 19, 2007

Samuel O. Hall
Enforcement Supervisor
Equal Employment Opportunity Commission
Birmingham District Office – 420Ridge
Park Place1130 22nd Street, South
Birmingham, Alabama 35205

          RE:    Charging Party:    **Dorothy R. Cowan**
                 Respondents:       **Jackson Hospital & Clinic**
                                    **David Jones**
                 EEOC Charge No.: **420-2007-00949**

Dear Mr Hall:

      Please accept this letter as a clarification of one of the statements made in our response to the EEOC filing of Dorothy Cowan. Toward the end of correspondence, there is a reference to discussions about transferring the bed control department to nursing administration. In the initial letter, it states that those discussions began in the spring of 2005. Those discussions began in the spring of 2006, not 2005.

      Please incorporate this clarification into our response to Ms. Cowan's allegations. I appreciate your attention to this, and I hope you will let me know if you have any questions.

                            Sincerely yours,

                            BEN C WILSON

BCW/dcr

cc:    Gilbert Darrington (JH&C)
       Glenda Bryan-Brooks (EEOC)





JACKSON
HOSPITAL

To:        Dorothy Cowan

From:      Gilbert Darrington
           Human Resources Director

Date:      January 26, 2007

RE:        **Family and Medical Leave (FML) — Intermittent**

| Start Date of FML | 1/22/2007 |
|---|---|
| Ending Date of FML | 2/20/2007 |

**Your absence for the above period has been approved as Family &
Medical Leave. The reason for your absence from work is one of the
qualifying events for a Family & Medical Leave designation. You will
need to maintain weekly contact with your supervisor regarding your
status and intent to return to work.**

The Family and Medical Leave Act of 1993 entitles eligible employees up to 12 weeks of
job-protected leave for certain family and medical reasons within a 12 month period.
The 12-month period is measured backward from the date any family and medical leave
is used. Should you still not be able to return to work at the end of 12 weeks total
Family & Medical Leave, you will need to apply for a personal leave of absence. (Please
refer to JH policy on Leave of absence.)

If you have any questions, please give Brandi Kelsey or myself a call at 293-8834.

Cc:    Terri Lowery

**EXHIBIT
J.**

**Guidelines and expectations for House Office (Shift coordinators, Bed Control and Staffing) staff:**

To be more effective and serve as a team, every person will be cross trained to those positions within their scope and abilities (start with fulltime staff)

Absolutely no gossiping or negative talk to or about others

Chain of command must be followed at all times

No information should leave the House Office or be discussed with others;   sharing information to physicians and others that is not appropriate or not following chain of command is grounds for suspension up to immediate termination.

Negative attitudes will not be tolerated; passive / aggressive behavior that tears down the team should not be displayed

Telephones will be answered at all times; the desk should never be left uncovered. Rolling calls to voice mail is discouraged and will be eliminated

Professional and courteous guest relations are very important and should be maintained at all times.

All staff now report directly to the Staffing Director (Interim is Terri Lowery).

No overtime is allowed unless pre-approved by the Director

There are no "personal" file cabinets or desk in the office; all supplies and equipment are shared between everyone and keys are community property

I understand these guidelines and have had the opportunity to discuss them with my supervisor.

_Dorothy Cowan_
Employee

_2-26-07_
Date

_Terri Lowery RN_
Director

_2-26-07_
Date

EXHIBIT
K

Terri Lowrey, Interm Director
Central Staffing & Bed Control
Jackson Hospital
1725 Pine Street – 5ᵗʰ Fl
Montgomery, AL 36106

RECEIVED

MAR 2 1 2007

HUMAN RESOURCES

Ms. Terri Lowery,

It is with deepest regret that I present you with a formal letter of resignation. As you know I have been employed with Jackson Hospital for over 18 years and served as Bed Control Supervisor for over 12 years. During my tenure here at Jackson I have had a number of both good and meaningful experiences. However, I am also regretful in informing you of recent experiences that greatly influence my need for resignation.

Since my return from sick leave I have not been given the opportunity to work in Bed Control. I have not even been given the privilege of covering Bed Control while others are at lunch. I have even been asked very sternly by my immediate supervisor, when attempting to assist, to get up from the Bed Control area and sit somewhere else. I have asked on several occasions for an explanation for this and my position as supervisor; both of which I have never received a straight answer. I have never worked in such confusion and rudeness since being employed here. This job that I once loved has become stressful and at times overwhelming due to the actions of others. Additionally, it has become the foundation of recent medical problems I am currently experiencing.

I do apologize for any inconvenience this may cause you. I wish Jackson Hospital the best and hope you each feel the same in regards to me

Sincerely,

*Dorothy Cowan*

Dorothy Cowan

CC:   Human Resources

*2185 Beverly Drive * Montgomery, AL 36111*
*(334) 356-9592*


EXHIBIT
L.