**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY COWAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO.:  2:07-CV-779-MHT-TFM** |
| | § | |
| **JACKSON HOSPITAL & CLINIC,** | § | |
| **INC., a domestic corporation, conducting** | § | |
| **business in the State of Alabama,** | § | **Oral Argument Requested** |
| | § | |
| **Defendant.** | § | |

**STATEMENT OF FACTS AND MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT**
**JACKSON HOSPITAL & CLINIC, INC.**

COMES NOW the Defendant, Jackson Hospital & Clinic, Inc. ("Jackson"), and hereby

submits the following statement of fact and memorandum of law in support of its Motion for

Summary Judgment:

**STATEMENT OF FACTS**

**I.  Nature of the case and the Plaintiff's claims**

This case arises out of an employment relationship between Plaintiff Dorothy Cowan

("Cowan") and Defendant Jackson.  *See* Complaint, ¶10.  On August 29, 2007, Cowan

commenced this litigation by filing a Complaint (**Doc. 1**) in which she contends that Jackson is

guilty of racial discrimination and subsequent retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §2000e *et seq.,* and the Civil Rights Act of 1991, 42 U.S.C.

§1981a.  *See* Complaint, ¶1-2, 27, 34.  Cowan also alleges that Jackson negligently trained her

departmental director (the actor whose alleged statements/conduct underlie the discrimination

claims) on its equal employment opportunity policies and that it ultimately caused her

1

constructive discharge by creating an intolerable work environment. *See* Complaint, ¶38-40, 45. Jackson timely filed an Answer (**Doc. 8**) denying all material allegations and raising a variety of defenses.

## II.  Cowan's employment at Jackson and the bed control office

Cowan initially became employed by Jackson in 1988; she resigned her employment in March 2007. *See* Complaint ¶10.  Cowan's initial position was in the hospital's distribution office, though she subsequently transferred into the registration department. *See* Deposition of D. Cowan, p. 47, line 18 to p. 49, line 19 (excerpts attached to Motion as **Exhibit A**). Eventually, Cowan began working in a unit known as "bed control."  The bed control office assigned newly admitted patients to available beds. *See* Affidavit of Sandra P. Sperry, ¶ 5, attached to Motion as **Exhibit B**.  At that time, the bed control office was staffed by Cowan and four other employees, and it was located on the first floor of the main hospital building. *See* Cowan Dep. at p. 59 lines 1-21; p. 63 line 6 to p. 64 line 21.  Subsequently, the bed control office was moved to another office near the cafeteria. *See* Cowan Dep. at p. 64 line 22 to p. 69 line 8.

In late 1998, Cowan was given the title of bed control training coordinator, a newly created position. *See* Cowan Dep. at p. 57 line 16 to p. 58 line 7.  At that time, the bed control unit was under the control of nursing administration, which had assigned a registered nurse (RN) to oversee the bed control operation. *See* Cowan Dep. at p. 61 line 18 to p. 62 line 2; p. 75 lines 11-18; p. 76 line 11 to p. 79 line 3.  With the creation of the training coordinator position, nursing administration decided to eliminate the RN position in bed control. *See* Cowan Dep. at 75 lines 11-18.

In late 2003, the entire bed control unit was transferred out of nursing administration to the control of the hospital's registration department. *See* Cowan Dep. at p. 82 line 12 to p. 83 line 12; p. 94 line 20 to p. 95 line 20. With this move, Cowan and bed control fell within the responsibility of Rick Mann, Jackson's director of registration. *See* Cowan Dep. at p. 95 lines 1-7. With the transfer, bed control became one of several departments under the umbrella of registration. *See* Cowan Dep. at p. 96 lines 19-23. Also included were the main registration office, emergency room registration, and central scheduling (which handles pre-admission for surgeries). *See* Cowan Dep. at p. 97 line 1 to p. 98 line 10.

In August 2005, David Jones replaced Rick Mann as the director of registration. *See* Deposition of D. Jones, p. 196 lines 8-16 (excerpts attached to Motion as **Exhibit C**). Jones, who completed a master's degree in health administration from the University of Alabama at Birmingham (UAB) in 2005, had previously served as the hospital's director of sports medicine, director of business development, and director of security and communications. *See* Jones Dep. at p. 158 line 22 to p. 159 line 13; p. 29 line 2 to p. 31 line 12.

### III.  The Registration Department Staff Meeting of June 21, 2006

As director of registration, Jones periodically held departmental staff meetings. *See* Jones Dep. at p. 237 line 15 to p. 241 line 12; p. 243 lines 1-14. Topics and agendas for staff meetings were determined during supervisor meetings that Jones held in advance of the larger gatherings of the entire staff. *See id.* Jones scheduled a departmental staff meeting for June 21, 2006; the topic of the meeting, which was discussed beforehand with supervisors, was to be improving customer service, employee attitudes, and patient satisfaction. *See* Jones Dep. at p. 247 line 6 to p. 251 line 20.

In an effort to illustrate employee attitudes, Jones went to a local toy store ("Toys-R-Us") and purchased four stuffed animals – three monkeys, each a different bright color, and a gorilla – and a toy "stun gun." *See* Jones Dep. at p. 259 line 13 to p. 265 line 4; p. 266 lines 4-14. The three monkeys had phrases "smiling," "fabulous," or "friendly" embroidered across the front. *See* Jones Dep. at p. 263 lines 16-23; Cowan Dep. at p. 158 line 22 to p. 160 line 18. The gorilla had no writing. *See id.* The stun gun was a plastic futuristic-looking toy that did not resemble an actual gun. *See* Jones Dep. at p. 264 lines 1-14.

During the meeting, which was attended by both African-American and Caucasian employees, Jones began by addressing the concerns over customer service and employee attitudes. *See* Jones Dep. at p. 266 line 18 to p. 267 line 3; p. 197 lines 13-15. Intended as an accolade, Jones passed out the three stuffed monkeys with the embroidered writing to employees who were felt to have displayed a positive demeanor on a consistent basis. *See* Jones Dep. at p. 267 line 4 to p. 271 line 21; Cowan Dep. at p. 160 lines 19-22; p. 162 lines 18-21. One of the stuffed monkeys with the embroidered writing went to Martine Bettis, an African-American employee, and one went to Ann Cobb, a Caucasian employee. *See* Cowan Dep. at p. 157 line 10 to p. 158 line 8; p. 161 lines 5-10; p. 168 lines 5-13; Jones Dep. at p. 271 lines 4-21.

Jones then produced the stuffed gorilla and pushed it down the conference table toward Charlotte Gillis, an African-American employee assigned to emergency room registration. *See* Cowan Dep. at p. 164 line 11 to p. 166 line 13. Jones indicated that the gorilla represented the "bully" of the group, the employee(s) perpetuating negative attitudes in the department. *See id.* Cowan understood that Jones was attempting to illustrate a negative attitude, which Gillis was known to display from time to time. *See* Cowan Dep. at p. 166, lines 3-13. Gillis pushed the gorilla back toward Jones's end of the table. *See* Cowan Dep. at p. 167 lines 4-16.

4

Jones then produced the toy gun intending to illustrate the effect that an employee's negative attitude can have on a patient. *See* Jones Dep. at p. 277 line 5 to p. 278 line 22; Cowan Dep. at p. 169 line 12 to p. 171 line 19. At no point did Jones point or aim the toy gun at any particular employee. *See* Cowan Dep. at p. 171 lines 7-19; p. 197 line 16 to p. 198 line 8. In fact, Jones's use of the stun gun to illustrate poor attitudes applied equally to all employees in the room, regardless of race. *See* Cowan Dep. at p. 196 line 13 to p. 198 line 8. Other than Gillis, none of the attendees verbalized an objection during the staff meeting to Jones's use of these items. *See* Cowan Dep. at p. 171 line 20 to p. 172 line 14. The meeting adjourned after approximately 15-20 minutes. *See* Cowan Dep. at p. 175 lines 7-10. At that point, Cowan returned to her office and finished her workday; she did not discuss the events of the meeting with any other attendees before leaving for the day. *See* Cowan Dep. at p. 177 lines 3-19.[1]

The following morning, Cowan sent two successive emails to Gilbert Darrington, Jackson's Director of Human Resources. *See* Emails from Dorothy Cowan to Darrington, attached to Motion as **Exhibits D** and **E**. Ed Scholl, the hospital's Vice President of Financial Affairs, was copied on the emails. *See id.* Each of the emails complained about David Jones's use of the stuffed animals and toy gun during the staff meeting the previous day. *See id.* The first email requested an apology, and the second requested a meeting to discuss the events surrounding the meeting. *See id.*

---

[1] During her deposition, Cowan suggested that Jones intentionally chose the stuffed animals and the toy gun to project racial animus toward the employees. *See* Cowan Dep. at p. 178 line 14 to p. 187 line 15. When asked for prior actions/events that gave rise to this conclusion, Cowan cited a parking pass Jones apparently provided to a Caucasian supervisor, his failed effort to require all staff (regardless of race) to begin wearing uniforms, and his failure to speak to others when passing in the corridor. *See* Cowan Dep. at p. 184 line 15 to p. 187 line 15.

5

Darrington met with Jones to discuss his offering an apology to the staff.  *See id.*  Jones promptly went to Scholl, his administrative head, to advise him of the meeting and the concerns raised by Darrington.  *See* Jones Dep. at p. 289 line 21 to p. 290 line 14.  Scholl suggested that Jones apologize to the staff, and Jones agreed to do so.  *See* Jones Dep. at p. 291 line 3 to p. 293 line 19.

A short time thereafter, Scholl, Darrington, and Jones held a meeting to apologize for Jones's use of the stuffed animals and toy gun.  *See* Cowan Dep. at p. 205 line 14 to p. 207 line 23; p. 218 line 2 to p. 221 line 15; Jones Dep. at p. 295 lines 4-20.   Cowan expressed dissatisfaction with Jones's apology, and shortly thereafter, Darrington and Scholl held a second meeting with staff; at this meeting, employees were allowed to express their feelings about the events of the June 21 staff meeting.  *See* Cowan Dep. at p. 220 line 5 to p. 223 line 7.  Darrington and Scholl both apologized to staff during this meeting, and Scholl advised that Jones would be counseled.  *See* Cowan Dep. at p. 223 line 18 to p. 227 line 9.[2]  Jones in fact was counseled by Scholl, and he acknowledged an understanding of the offense claimed by Cowan.  *See* Jones Dep. at p. 307 line 14 to p. 308 line 13; p. 311 line 4 to p. 313 line 2.

**IV. Cowan's tenure at Jackson between the June 21 meeting and her ultimate resignation**

In mid-July of 2006, Jackson moved the bed control unit back under the control of nursing administration.  *See* Cowan Dep. p. 211 line 17 to p. 212 line 21.  Earlier in the year, Jackson had retained Sandra Sperry, an independent nursing consultant based in New Jersey, to evaluate ways to improve hospital operations.  *See* Sperry Affidavit, ¶ 4, **Exhibit B**.  Sperry

---

[2] Cowan testified that Jones was not in attendance at this second meeting, *see* Cowan Dep. at p. 224 lines 5-10, but Jones testified that he attended a second meeting during which he issued a second apology to employees.  *See* Jones Dep. at p. 333 line 1 to p. 334 line 7.

6

identified several "bottlenecks" in patient processing, one of which involved the bed control unit. *See id* at ¶ 5. Because the bed control function relates more directly to nursing operations than patient registration, Sperry recommended that Jackson move the bed control office back under the control of nursing administration. *See id* at ¶ 6. Sperry recommended moving the bed control unit back to nursing in her first conference with Jackson Hospital's senior management, which occurred in early 2006. *See id.*

Jackson accepted Sperry's recommendation, but the actual transfer did not occur until the incoming chief nursing officer (CNO), Cynthia Dixon, arrived in July 2006. *See id* at ¶ 7. The timing of the move was intended to stagger organizational changes over a period of time in order to facilitate a smooth transition for Dixon. *See id.* The reorientation and relocation of the bed control office was executed solely to increase efficiency in patient care. *See id* at ¶ 8. When bed control was moved back to nursing, David Jones no longer exercised any supervisory authority over Cowan or bed control operations. *See* Cowan Dep. at p. 212 lines 17-21.

In August 2006, Sperry's consulting work had come to an end. *See* Sperry Affidavit, ¶ 9. At that point, Dixon brought in Terri Lowery, another independent nursing consultant, based in Texas, to continue the development of nursing operations. *See* Affidavit of T. Lowery, ¶ 3, attached to Motion as **Exhibit F**. Lowery, who continues to consult for Jackson Hospital, has never been employed by the hospital. *See id.* Lowery felt that the existing bed assignment practices remained deficient and that operations could be improved by locating the bed control office (as a unit), the staffing coordinator, and the house supervisor (the nurse in charge of nursing efforts during a specific shift) in two adjacent but connected offices in the main hospital building. *See id* at ¶ 5.

The new office was known as the "House Office," and the three component units were relocated there in the fall of 2006. *See id.* at ¶ 6; Cowan Dep. at p. 236 line 5 to p. 240 line 18. Dixon told Cowan that the bed control unit would be moving to the fifth floor of the hospital to be with the shift coordinator. *See* Cowan Dep. at p. 242 line 12 to p. 243 line 11. Dixon took Cowan and showed her the new office before the move took place. *See* Cowan Dep. at p. 245 lines 5-16. Cowan offered no objection to the move but asked that the door remain open because of the size of the office. *See id.* The move made sense to Cowan when Dixon explained the rationale to her. *See* Cowan Dep. at p. 246 line 19 to p. 248 line 12.

After the office move was implemented, bed control and staffing occupied one room, which was connected by an interior door to a second room serving as the office of the house supervisor. *See* Lowery Affidavit at ¶ 6. Each office had a door that opened into the main hospital corridor. *See id.* The house supervisor office had an exterior window, but the bed control/staffing office did not. *See id.* Instead, the door between the two rooms was allowed to remain open except during meetings involving nursing personnel/counseling issues. *See id.*; Cowan Dep. at p. 246 lines 4-18.

On November 29, 2006, Cowan filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). *See* EEOC Charge, attached to Motion as **Exhibit G**. In the "particulars" section of the Charge, Cowan alleged as follows:

> A meeting was conducted by our Director, David Jones during which he used stuffed monkeys and a Taser to demonstrate how he would deal with 'uncooperative employees.' As the majority of those present were African-American females, this was racially discriminatory. After speaking with Gilbert Darrington Human Resource Director and Ed Scholl Asst. Administrator I was later transferred to another department. Mr. Jones is still in his previous position as Departmental Director. The general opinion is that he is protected by being related to Vickie [sic] Jones, another Asst. Administrator [sic]. This is grossly unfair. I have been employed with Jackson Hospital for the past eighteen years. I

have an excellent record, being supervisor of bed control at the time of this incident. Thank you for your time and consideration in this matter.

According to Cowan's deposition testimony, the retaliation alleged in her lawsuit did not begin until she filed this charge with the EEOC. *See* Cowan Dep. at p. 249 lines 1-14; p. 251 line 20 to p. 252 line 14; p. 266 lines 2-12. Cowan never advised anyone that she had filed a formal charge of discrimination with the EEOC. *See* Cowan Dep. at p. 265 lines 4-20; p. 363 lines 7-13. Jackson, through its legal counsel, filed written responses with the EEOC on January 5 and January 19, 2007. *See* Jackson Hospital Responses to EEOC Charge, **Exhibits H** and **I**.

Around the end of 2006, Dixon asked Lowery to focus on House Office operations in the capacity of interim director. *See* Lowery Affidavit at ¶ 7; Cowan Dep. at p. 270 line 11 to p. 272 line 11. Lowery oversaw office staffing, overtime issues, patient privacy/confidentiality concerns, and other aspects of House Office operations. *See* Lowery Affidavit at ¶ 7.

On or about January 22, 2007, Cowan was granted approximately 30 days of medical leave. *See* FMLA leave memorandum, attached to Motion as **Exhibit J**; Cowan Dep. at p. 280 line 15 to p. 281 line 19. Cowan asserted that the leave became warranted due to high blood pressure that was caused by Lowery's refusal to allow her to leave the office door open. *See* Cowan Dep. at p. 282 line 6 to p. 285 line 22. Cowan returned to work on or about February 20, 2007. *See id.*

Because of the small number of employees assigned to the House Office, routine employee absences such as illness and earned time off caused problems in terms of adequate staffing. *See* Lowery Affidavit at ¶ 8. Therefore, in February 2007, Lowery announced a plan to cross-train bed control personnel to perform the staffing function and staff coordinators and house supervisors to learn to operate bed control. *See id.*, ¶¶ 8-9. She also announced a plan to

9

more equitably staff night and weekend shifts by expanding the number of employees who might be asked to help with those shifts. *See id.*

Lowery also streamlined the organization of the House Office by announcing that all House Office staff would begin reporting directly to the interim director (rather than through "supervisors"). *See id.* Cowan asserts that her job title was changed from "bed control supervisor" to "bed control clerk." *See* Complaint, ¶35; Cowan Dep. at p. 312 lines 2-17. She did not experience any loss of compensation (rate or amount) or other benefits. *See* Cowan Dep. at p. 276 line 17 to p. 277 line 2.

In an effort to comply with hospital-wide efforts to control overtime expenditures, Lowery also implemented a guideline requiring pre-approval of overtime. *See* Lowery Affidavit at ¶ 9. Finally, Lowery eliminated the personal use of cabinets and the practice of allowing employees to lock file cabinets and keep the keys. *See id.* This had created difficulties when access to a file cabinet became necessary but the employee possessing the key was not on duty. *See id.*

Lowery announced these guidelines in mid to late February 2007, and each applied to all employees assigned to the House Office. *See id.* They were outlined in a memorandum to staff, a copy of which was signed by Lowery and each employee. *See id.*; *see* Memorandum regarding guidelines and expectations for House Office (Shift Coordinators, Bed Control, and Staffing) staff, attached to Motion as **Exhibit K**; Cowan Dep. at p. 303 line 1 to p. 304 line 5. Lowery further discussed these guidelines with the staff in a House Office departmental meeting that occurred on March 6, 2007. *See* Cowan Dep. at p. 309 line 18 to p. 317 line 4. That same day, Cowan filled out an application for employment with Drs. Shashy & Shashy, a urology practice. *See* Cowan Dep. at p. 317 line 8 to p. 319 line 1.

10

Cowan submitted a written letter of resignation to Lowery on March 21, 2007.  *See* Letter of Resignation, attached to Motion as **Exhibit L**; Cowan Dep. at p. 319 line 5 to p. 322 line 6. At no point was Lowery aware that Cowan had submitted either an internal grievance to hospital management or that she had filed an EEOC charge/complaint concerning her employment at Jackson.  *See* Lowery Affidavit at ¶ 10.

Cowan began working for the Shashy medical practice at a slightly higher hourly rate of pay approximately one to two weeks after resigning from Jackson.  *See* Cowan Dep. at p. 18 lines 9-19; p. 30 line 19 to p. 31 line 3.  Cowan never submitted an amended or revised charge of discrimination to the EEOC alleging participatory retaliation or constructive discharge.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In her Complaint, Cowan claims that Jackson Hospital discriminated against her on account of her race (African-American).  Though difficult to decipher, the fundamental thrust of this claim appears to be the events occurring during the June 21, 2006, staff meeting.  *See* Complaint, ¶27.  There is also an assertion that the hospital's actions "created a hostile, abusive work environment."  *See* Complaint, ¶31.  Second, Cowan claims that, "[a]s a result of opposing an [unlawful] employment practice," Jackson retaliated against her by demoting her from a supervisor position to a clerk, moving her into an office without windows despite her known "claustrophobia" and telling her that she would be required to work all shifts.  *See* Complaint, ¶35.  Third, Cowan claims that Jackson was negligent in failing to properly train David Jones on its policies against racial discrimination.  *See* Complaint, ¶39.  Finally, Cowan asserts that Jackson "deliberately made [her] working conditions so intolerable that [she] was forced into an

11

involuntary termination." *See* Complaint, ¶45. For the reasons that follow, Jackson is entitled to summary judgment on each of these claims.

## I. Cowan's Racial Discrimination Claim

Title VII prohibits discrimination with respect to an employee's compensation, terms, conditions, or privileges of employment. *Murry v. United States AG*, 233 Fed. Appx. 911 (11th Cir. 2007), *citing* 42 U.S.C. § 2000e-2(a). Such discrimination is unlawful if it is based on the employee's "race, color, religion, sex, or national origin." *Washington v. Kroger Co*., 218 Fed. Appx. 822 (11th Cir. 2007), *citing* 42 U.S.C. § 2000e-2(a).

In this case, Cowan has made claims of discrimination under both Title VII and 42 U.S.C. §1981. The latter statute "prohibits intentional racial discrimination in the making and enforcement of private contracts, including employment contracts." *Washington*, *supra*, 218 Fed. Appx. 822, *citing* 42 U.S.C. §1981. Both statutes "have the same requirements of proof and present the same analytical framework;" thus, the Eleventh Circuit "appl[ies] cases from both bodies of law interchangeably." *See id.*

A plaintiff in a discrimination case may present either direct or circumstantial evidence in support of her claims. *See Beard v. 84 Lumber Co*., 206 Fed. Appx. 852 (11th Cir. 2006). "To establish a *prima facie* case of racial discrimination based on circumstantial evidence, [the plaintiff] must show that she was a qualified member of a protected class and was subjected to an adverse action in contrast with similarly situated employees outside the protected class." *Id.*, *citing Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1087 (11th Cir. 2004). Jackson concedes that Cowan, an African-American female, is a member of a protected class. "An adverse action is one that results in 'a serious and material change in the terms, conditions, or privileges of

12

employment as viewed by a reasonable person in the circumstances.'" *Beard, supra*, *citing Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001).

In order for employees to be "similarly situated," they must be similarly situated in all relevant aspects. *See id.* (holding salesperson-plaintiff was not similarly situated to employee who benefited from account reassignment because plaintiff had less work experience); *Jackson v. Bellsouth Telecomms*., 372 F.3d 1250, 1273 (11th Cir. 2004) (explaining that "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides [gender], since different treatment of *dissimilarly* situated persons does not violate civil rights laws") (emphasis in original).

Even if the plaintiff can establish a *prima facie* case of discrimination, summary judgment is appropriate if the plaintiff cannot show that the defendant's non-discriminatory reason for the alleged act was a pretext for discrimination. *See Beard, supra.* That is, "[o]nce the plaintiff establishes the *prima facie* case, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the employer's actions. The plaintiff then must show that the employer's reason was a pretext for discrimination." *Id.*, *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 807.

> In order to show pretext, the plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Beard, supra*, *citing Jackson v. Alabama State Tenure Committee*, 405 F.3d 1276, 1289 (11th Cir. 2005). To meet his burden of proof, a plaintiff must demonstrate that the defendant's

13

proffered legitimate reasons for its actions are weak, implausible, inconsistent, incoherent, or contradictory, such that "a reasonable factfinder could find them unworthy of credence." *Beard, supra*, *citing Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

"A subjective reason for the employer's action can be as legitimate as any other reason, and an employee cannot substitute his business judgment for that of his employer." *Id.*, *citing Chapman v. AI Transport*, 229 F.3d 1012, 1030, 1033 (11th Cir. 2000) (*en banc*). Moreover, a plaintiff's "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext." *Id.*, *citing Isenbergh v. Knight-Ridder Newspaper Sales, Inc*., 97 F.3d 436, 444 (11th Cir. 1996).

While perhaps a display of poor judgment on the part of David Jones, the events of the June 21, 2006, meeting simply do not support a viable claim of racial discrimination. Jones's presentation was made generally to an audience comprised of both African-American and Caucasian employees. Moreover, even Cowan concedes that the three stuffed monkeys were clearly intended to illustrate favorable traits of the recipients. *See* Cowan Dep. at p. 160 lines 19-22; p. 162 lines 18-21; p. 157 line 10 to p. 158 line 8; p. 161 lines 5-10; p. 168 lines 5-13; Jones Dep. at p. 271 lines 4-21.

With respect to the use of the gorilla, this case is similar to *Ferguson v. Georgia Department of Corrections*, 428 F. Supp. 2d 1339 (M.D. Ga. 2006). There, the plaintiff claimed that a poster of a gorilla on a bathroom door at the CDC was racially offensive. The plaintiff urged the court to conclude that "any depiction of a primate is always racially derogatory in a 'racially charged' environment." *See Ferguson, supra*, 428 F. Supp. 2d at 1360 n. 24. Rejecting this argument, the court stated that the context of the item, the responsibility for use, and comments/reaction to the use of the item should be considered. *See id.* The gorilla, a stuffed

14

animal that Jones bought at a toy store, was simply used to represent a negative attitude, which Cowan agrees was often displayed by the employee whom Jones allegedly singled out at the meeting. *See* Cowan Dep. at p. 166, lines 3-13. Cowan's assertion that the use of the gorilla was racially motivated hinges on nothing more than her subjective perceptions about Jones previously providing a parking pass to another supervisor, his attempting to introduce uniforms for the registration department employees, and his general behavior – perceived as unfriendly -- in the hospital corridors. *See* Cowan Dep. at p. 184 line 15 to p. 187 line 15.

Finally, Jones used the toy gun to illustrate the effect that an employee's negative attitude can have on a patient. *See* Jones Dep. at p. 277 line 5 to p. 278 line 22; Cowan Dep. at p. 169 line 12 to p. 171 line 19. Jones never pointed or aimed the toy at any particular employee. *See* Cowan Dep. at p. 171 lines 7-19; p. 197 line 16 to p. 198 line 8. In fact, Jones's application of the toy gun applied equally to all employees in the meeting, regardless of race. *See* Cowan Dep. at p. 196 line 13 to p. 198 line 8.

More importantly, there is no evidence whatsoever that Jones's use of these illustrations was aimed solely at Cowan, nor is there any evidence that Jones's actions at the staff meeting effected any material change in the terms, conditions, or privileges of her employment. *See Beard, supra*. Consequently, to the extent that Cowan claims that David Jones discriminated against her at the June 21, 2006, staff meeting, Jackson is entitled to summary judgment.

As noted previously, Cowan's discrimination claim makes a passing reference to a "hostile, abusive work environment." *See* Complaint, ¶31. In order to establish that Cowan was subjected to a hostile work environment on account of her race, "the conduct in question must be severe or pervasive enough that a reasonable person would find it hostile or abusive." *Clover v. Total Sys. Servs., Inc*., 176 F.3d 1346 (11th Cir. 1999); *citing Oncale v. Sundowner Offshore*

*Servs., Inc.,* 523 U.S. 75 (1998). That is, the harassment must be "sufficiently severe or pervasive [so as] to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Id.*, *citing Watkins v. Bowden,* 105 F.3d 1344, 1355 (11th Cir.1997). "To determine whether the conduct is sufficiently severe or pervasive, [the Court must] consider '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Tatt v. Atlanta Gas Light Co*., 138 Fed. Appx. 145 (11th Cir. 2005), *citing Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*).

The Eleventh Circuit has held that "in order to hold an employer responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 959 (11th Cir 1997), *citing Splunge v. Shoney's, Inc.,* 97 F.3d 488, 490 (11th Cir.1996) and *Silver v. KCA, Inc.,* 586 F.2d 138, 142 (9th Cir. 1978) ("Even a continuing course of racial harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action").

Cowan fails to satisfy any of the criteria associated with the severity or pervasiveness requirements. With respect to frequency of conduct, Jones was Cowan's director for approximately 11 months, yet there is essentially a single event at issue – the June 21, 2006, staff meeting. This flies in the face of the Supreme Court's recent observation that hostile environment claims by their very nature involve repeated conduct that occurs over a series of days or perhaps years. *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101,

115 (2002).  In terms of severity, Cowan (and all other attendees) was at worst subjected to an

ill-conceived attempt to illustrate employee attitudes (good and bad) and customer service issues.

Again, even Cowan concedes that some of the illustrations were intended to be laudatory.

Jones's conduct was not physically threatening or humiliating, closer perhaps to an offensive

utterance, though not even overtly racial in nature.  Finally, there is simply no evidence at all that

Jones's actions/statements interfered with Cowan's job performance.  Therefore, any claim of

hostile environment discrimination fails, and Jackson is entitled to summary judgment.


## II.  Cowan's Retaliation Claim(s)

### A.  Cowan's retaliation and constructive discharge claims are barred as they exceed the scope of her charge of discrimination submitted to the EEOC

This Court, in keeping with Eleventh Circuit precedent, has held that a plaintiff claiming

Title VII discrimination against her employer is barred from expanding the scope of her judicial

complaint to allege new acts of discrimination that were not included in her EEOC charge.  *See,*

*e.g., Robinson v. Regions Fin. Corp*., 242 F. Supp. 2d 1070 (M.D. Ala. 2003).  That is, any Title

VII claims of discrimination must first be exhausted through administrative remedies; otherwise,

the plaintiff's claims are not ripe for adjudication:

> The starting point of ascertaining the permissible scope of a
> judicial complaint alleging employment discrimination is the
> administrative charge and investigation. *Griffin v. Carlin,* 755 F.2d
> 1516, 1522 (11th Cir. 1985). No action alleging a violation of Title
> VII … may be brought unless the alleged discrimination has been
> made the subject of a timely filed EEOC charge. *Alexander v.
> Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000); *see also* 29
> U.S.C.A. § 626(d). Not all acts complained of, however, need have
> been included in the EEOC charge; rather, an employee may
> include in her lawsuit a claim for injury resulting from any practice
> which "was or should have been included in a reasonable
> investigation of the administrative complaint." *Griffin,* 755 F.2d at
> 1522. Thus, ***an employee's lawsuit is limited by the scope of the***

17

> *EEOC investigation which can reasonably be expected to grow out of a charge of discrimination*. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir. 1983).

*Id.* at 1079 (emphasis added).

The exhaustion requirement "ensure[s] that the EEOC has the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts. Moreover, the charge requirement serves to notify the employer of the allegations made against it." *Ayers v. Wal-Mart Corp.*, No. Civ. A. 04-1002, 2005 U.S. Dist. LEXIS 43754 (M.D. Ala. October 7, 2005),[3] *citing Gregory v. Ga. Dep't of Human Res.,* 355 F.3d 1277, 1279 (11th Cir. 2004); *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir. 1983); *Daniels v. Mobile Register, Inc.,* No. Civ. A. 04-0832, 2005 U.S. Dist. LEXIS 44875, 2005 WL 1505856 (S.D. Ala. June 24, 2005); *Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1319 (11th Cir. 2001); and *Bost v. Fed. Express Corp.,* 372 F.3d 1233, 1238-39 (11th Cir. 2004).

In *Robinson*, this Court held that two of plaintiff's claims were barred because they addressed "entirely new acts of discrimination." *See Robinson, supra*. The plaintiff in that case had made four claims, one of which was barred by the statute of limitations and another which was clearly included in the plaintiff's EEOC charge. As for the two remaining claims, the Court held that it could consider those claims "only if they should have been included in a reasonable investigation of the administrative complaint." *Id.*, *citing Griffin,* 755 F.2d at 1522. The Court acknowledged that the two claims at issue, like the claim included in the EEOC charge, involved a failure to promote. *Id.* However, that "similarity" was "not enough" to allow the plaintiff to

---

[3] This opinion is a Recommendation of United States Magistrate Judge Vanzetta Penn McPherson and was adopted by this Court in *Ayers v. Wal-Mart Corp.*, 2006 U.S. Dist. LEXIS 71772 (M.D. Ala. Sept. 29, 2006).

include those claims in her lawsuit. *Id*. The Court contrasted the case before it with prior judicial decisions on this issue:

> This is not a situation in which a single EEOC charge reasonably leads to an investigation of the claims of an entire class, nor is it a situation in which an administrative notice with regard to one defendant provides notice to another, nor is it even a situation in which the EEOC, in investigating a minor charge of discrimination, discovers other discriminatory practices.
>
> Instead, … [plaintiff] is offering entirely new acts of discrimination, never investigated by the EEOC. While the allegations with regard to these two claims are the same as those she made in her EEOC charge -- she was allegedly denied a promotion due to her race, sex, and age -- she has provided no evidence and offered no argument as to why the EEOC could reasonably have been expected to investigate these two later claims based on her June 2001 EEOC charge. Not only did these later claims arise more than six months after she filed her EEOC charge, they are also, more importantly, completely discrete and distinct from the claim that is the subject of the EEOC charge … [Plaintiff] nowhere alleges a connection, for example, between Regions's failure to promote her to Assistant Branch Manager [as alleged in her EEOC charge] and its failure to promote her to Support Center Representative [as alleged in her lawsuit]. As such, the court must conclude that a reasonable investigation of Robinson's June 2001 EEOC charge would not include allegedly discriminatory acts that occurred after she filed that charge. Robinson's original EEOC charge also would have failed to trigger Regions's investigatory and conciliatory procedures with regard to Robinson's most recent allegations. [The two claims at issue] entail simply "allegations of new acts of discrimination, offered as the essential basis for the requested judicial review," as such, they "are not appropriate." Robinson's post-EEOC charge allegations, while similar in nature to those contained in her June 2001 charge, cannot reasonably have been expected to grow out of her original charge of discrimination.
>
> Robinson's allegations that Regions discriminated against her in the past would neither cause the EEOC to investigate possible discrimination in every instance in which Robinson applied for a promotion in the future, nor would it put Regions on notice that it should expect a charge of discrimination in every future instance in which it refused Robinson a promotion. As such, Robinson's

> failure to file an EEOC charge with respect to [the two claims at
> issue] are fatal to these claims to the extent they rest on Title VII …

*Id.* at 1079-80 (citations and footnotes omitted).

"As a general rule, courts may not consider allegations of discrimination that involve adverse employment actions of a different type than those contained in the charge." *Tarrance v. Montgomery County Bd. of Educ.*, 157 F. Supp. 2d 1261 (M.D. Ala. 2001), *citing Williams v. Int'l Paper Co.*, 85 F. Supp. 2d 1184, 1195-98 (S.D. Ala. 2000); *Williams v. Hager Hinge Co.*, 916 F. Supp. 1163, 1174 (M.D. Ala. 1995); and *Mack v. W.R. Grace Co.*, 578 F. Supp. 626, 632 (N.D. Ga. 1983). In *Tarrance*, this Court held that the plaintiff's claims in litigation, including, among other things, a reassignment in job position, were not reasonably related to his EEOC charge of non-promotion. *Id.* at 1266; *see also Moorer v. City of Montgomery*, No. Civ. A. 06-672, 2006 U.S. Dist. LEXIS 55701 (M.D. Ala. Aug. 9, 2006) (holding plaintiff's claims barred because suspension, the focus of the EEOC charge, was qualitatively different from termination or promotion, as alleged in legal complaint, and because "complaining about events occurring in October 2005 is different from complaining about events occurring in April 2005"). Moreover, one Alabama federal court has held that it is "aware of no authority for allowance of discrete claims that occurred after the filing of an EEOC charge, but before the conclusion of the investigation. … The EEOC charge must be filed within the 180-day time period *after* the discrete discriminatory act occurred." *Andrews v. Atl. Marine, Inc.*, No. Civ. A. 03-0280, 2005 U.S. Dist. LEXIS 28533 (S.D. Ala. Oct. 18, 2005), *citing Morgan, supra,* 536 U.S. at 113 (emphasis in *Andrews*).

In this case, Cowan's charge to the EEOC, which she filed on November 29, 2006, alleged that she had been transferred to another department in retaliation for opposing (through

two internal e-mails) the perceived discriminatory conduct of David Jones during the June 21,

2006, staff meeting.  *See* EEOC Charge, **Exhibit G**.  This was the sum, substance, and extent of

the retaliation claim articulated to the EEOC.  It was to that charge that Jackson responded to the

EEOC.  *See* Jackson Hospital Responses to EEOC, **Exhibits D** and **E**.  Yet, in her deposition

testimony (given in April 2008), Cowan repeatedly testified that the illegal retaliation did not

begin until *after* she filed the EEOC charge:

> Q:  […] But, again, from June 21 until whenever you moved in November to the fifth floor, do you contend that some act occurred that you believe was retaliatory for –
>
> A:  No.  My retaliation didn't start until they got the letter back from the EEOC that I had filed a complaint.  And that was in late November, I think, November the --
>
> . . .
>
> Q:  […] I mean, is it fair to say that you're not aware of any act or event that occurred before you filed this [charge] that you believe was retaliatory or in retaliation for complaining?
>
> Mr. Brown:  Object to the form.
>
> A:  That's right.  Right.
>
> Q:  And so is it your contention that the acts that you contend were retaliatory occurred after you filed the EEOC notice?
>
> A:  Yes.
>
> Q:  And occurred because you filed the EEOC notice?
>
> A:  That's what I feel, yes.
>
> Q:  Do you still feel that way?
>
> A:  I still feel that way.
>
> . . .

Q: Okay.  With the filing of the EEOC complaint, we are up to November 29th –

A:  Okay.

Q:  -- almost to December.  After you submitted this document to the EEOC –

A:  Yes.

Q: -- I think it's your contention that there was – there were acts of retaliation leveled against you?

A:  That's when it started, yes.

*See* Cowan Dep. at p. 249 lines 1-14; p. 251 line 20 to p. 252 line 14; p. 266 lines 2-12. Moreover, all of the instances of retaliation set forth in Cowan's Complaint occurred after she filed her EEOC charge.  *See* Complaint, ¶35.

As the Court is well aware, there are two species of retaliation under Title VII – oppositional and participatory.  The "opposition clause" prohibits an employer from retaliating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  *Murry, supra, citing* 42 U.S.C. § 2000e-3(a).   By contrast, the "participation clause" of the statute contemplates retaliation occurring because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *See id.*  In light of her testimony and her pleading, it is plainly evident that Cowan's charge to the EEOC was oppositional in nature, while her current lawsuit is based only on participatory retaliation.

As noted previously, whether courts will allow the advancement of claims not specifically put forth to the EEOC turns in large part on notice to the employer.  Here, Jackson responded in writing to the EEOC charge on January 5 and January 19, 2007.  *See* Jackson

Hospital Responses to EEOC, **Exhibits D** and **E**, respectively. The hospital addressed Cowan's stated allegations of discrimination and retaliation. At the time Jackson responded, Cowan was still employed in bed control; her eventual resignation did not occur until approximately two months thereafter. *See* Letter of Resignation, **Exhibit L**. Moreover, the House Office guidelines that appear to lie at the heart of Cowan's retaliation claim had not even been distributed to the staff. Therefore, Jackson never had any notice at the administrative level of any claim of participatory retaliation or constructive discharge. The retaliation claim now advanced in this lawsuit is substantively and legally different from that presented to the EEOC; therefore there was no exhaustion of administrative remedies, and Jackson is entitled to summary judgment on the retaliation and constructive discharge claims.

### B. <u>Cowan's retaliation claim is due to be dismissed on the merits</u>.

Even if this Court concludes that Cowan's retaliation claim is properly in this litigation, Jackson is nonetheless entitled to summary judgment based on the strength of the evidence. "To establish a *prima facie* case of retaliation under Title VII, [the plaintiff] must show (1) that she engaged in statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that a causal relationship exists between the two events." *Tatt, supra, citing Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004); *Little, supra,* and *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1074 (11th Cir. 1995) (per curiam).

Under the first element, the plaintiff "need not prove the merits of her underlying complaint," but she "must demonstrate 'a good faith, reasonable belief that [the defendant] was engaged in unlawful employment practices.'" *Id.* That is, the plaintiff "must prove both (1) a subjective, good faith belief that [the defendant] engaged in an unlawful employment practice

and (2) that her belief was objectively reasonable." *Id.* The Eleventh Circuit has emphasized that both the subjective and objective elements must be present:

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little, supra.* Objective reasonableness is measured "against existing substantive law." *Tatt, supra, citing Clover, supra*; *see also Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 n. 2 (11th Cir.1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

Under the third element, the "plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Murry, supra, citing Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, [the Court] must focus on the actual knowledge and actions of the decision-maker." *Id.*, *citing Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002).

The Eleventh Circuit has established the following burden-shifting procedure in a Title VII retaliation case:

> Once a *prima facie* case is established, the burden shifts to the employer to rebut the presumption of retaliation by producing

24

> legitimate reasons for the adverse employment action.  *Sullivan v. AMTRAK*, 170 F.3d 1056, 1059 (11th Cir. 1999).  If the employer offers legitimate reasons, the presumption of retaliation disappears. *Id.*  The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.  *Id.*

*Murry, supra.*

As noted previously, there are two distinct types of retaliation:  (1) opposition retaliation and (2) participatory retaliation.  *See* 42 U.S.C. § 2000e-3(a).  While Cowan's deposition testimony is clear that she now advances a participatory retaliation claim, Jackson will address both species out of an abundance of caution.

### 1. __Opposition Retaliation__

"Under the 'opposition clause,' an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'"  *Murry, supra, citing* 42 U.S.C. § 2000e-3(a).  Moreover, "by the terms of the statute … not every act by an employee in opposition to racial discrimination is protected.  The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual."  *Little, supra, citing Silver, surpa.*

There is no opposition retaliation in this case.  The only suggestion of oppositional retaliation that Cowan has ever made is that she was transferred to another department after complaining about David Jones's actions in two emails to management.  *See* EEOC Charge, **Exhibit G**.  As has been shown, however, Cowan's entire unit was transferred to the control of another department (nursing) in a move that had been determined at the administrative level several months before the Jones incident.  *See* Sperry Affidavit, ¶ 6.  This move, which was

25

suggested by an independent nursing consultant, simply restored an organizational plan that had been in place until bed control was placed under registration in 2003. *See* Cowan Dep. at p. 82 line 12 to p. 83 line 12; p. 94 line 20 to p. 95 line 20; *see also* Sperry Affidavit.

### 2. **Participatory Retaliation**

"[U]nder the 'participation clause,' an employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Murry, supra*, *citing* 42 U.S.C. § 2000e-3(a). As discussed above, to establish a *prima facie* case of retaliation, the plaintiff must prove the following elements: "(1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." *Id.*, *citing Gupta, supra*. "A plaintiff can show participation in a protected activity by demonstrating that she had a subjective, good-faith belief that her employer was engaged in unlawful employment practices and that her belief was objectively reasonable in light of the facts and record presented." *Id.*, *citing Little, supra*.

Cowan cannot support her claim of participatory retaliation. First, all of the instances of perceived retaliation cited by Cowan occurred at the hands of Terri Lowery, an independent nursing consultant retained by Cynthia Dixon to improve nursing operations. The law is clear that the actual decision-maker must be aware of the protected conduct. *See Gupta, supra,* 212 F.3d at 590. The proper focus is on actual knowledge and intent, not constructive knowledge and assumed intent. *See id.* "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person

taking the adverse action was aware of the protected expression." *See Bass v. Board of County Commissioners*, 256 F.3d 1095, 1119 (11th Cir. 2001). The allegedly retaliatory actions occurred in February 2007, some two or three months after Cowan filed her EEOC charge. Beyond that, it is undisputed that the actor behind the alleged retaliation, Terri Lowery, had no knowledge of the fact that Cowan had filed a formal charge of discrimination with the EEOC. *See* Lowery Affidavit, ¶ 10; Cowan Dep. at p. 265 lines 4-20; p. 363 lines 7-13. Lowery was not even aware that Cowan had submitted an internal grievance over the June 21, 2006, staff meeting. *See* Lowery Affidavit, ¶ 10. Under these circumstances, Cowan cannot establish a prima facie case of retaliation.

Even if Cowan could meet her initial burden, the actions giving rise to Cowan's retaliation claim were undertaken for legitimate, non-retaliatory reasons. The consolidation of bed control with related offices into a single "house office" and the subsequent directives streamlining office hierarchy, implementing cross training and shift changes, requiring pre-approval of overtime expenditures, and eliminating personal file cabinets affected all of the employees in the house office, not just Dorothy Cowan. *See* Guidelines, **Exhibit K**.

More importantly, each of these actions was implemented by an experienced independent nursing consultant for the sole purpose of improving the operation of the house office. *See* Lowery Affidavit. The history of the bed control office unquestionably reflects an evolution of the location, function, and operation of that unit; that evolution was ongoing long before the staff meeting of June 21, 2006. In short, there is no basis upon which to conclude that the acts underlying Cowan's claim were undertaken to retaliate against her for submitting an EEOC charge. Therefore, Jackson Hospital is entitled to summary judgment on Cowan's retaliation claim(s).

### III.  Constructive Discharge

The Eleventh Circuit has held that, in the context of a constructive discharge claim, "a plaintiff must show that an employer imposed conditions that were so intolerable that a reasonable person would be compelled to resign." *Rutledge v. SunTrust Bank*, 2008 U.S. App. LEXIS 1088 (11th Cir. Jan. 18, 2008), *citing Fitz v. Pugmire Lincoln-Mercury, Inc.,* 348 F.3d 974, 977-78 (11th Cir. 2003) (holding that a withdrawal of a reprimand, an offer to transfer to another managerial role, two posted cartoons, suspicions of an unsubstantiated plot to terminate the plaintiff's employment, and unsubstantiated allegation of unequal pay did not show constructive discharge).

Cowan's burden in showing constructive discharge is "quite high." *Beltrami v. Special Counsel*, 170 Fed. Appx. 61 (11th Cir. 2006) (affirming summary judgment because employee could not show that working conditions were objectively intolerable); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005) ("The fact that one of the possible outcomes is that he would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge").

> Because the standard of proof for a constructive discharge claim is higher than that for a hostile work environment claim, the plaintiff must show more than that she was subjected to actionable harassment. A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation. Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.

*Van der Meulen v. Brinker Int'l*, 153 Fed. Appx. 649 (11th Cir. 2005) (citations omitted) (emphasis in original); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (holding that being berated in public was not sufficient to show constructive

28

discharge); *compare Fitz, supra,* (being reprimanded and hearing from coworkers of management's intent to fire were insufficient to show constructive discharge) *and Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) (receiving poor evaluations was not sufficient to establish constructive discharge) *with Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1015 (11th Cir. 1994)  (holding court's finding of constructive discharge was supported by evidence of plaintiff being placed on probation, receiving unjustified work evaluations, and being repeatedly screamed at so that supervisor's "spit was flying in [plaintiff's] face") *and Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 552 (11th Cir. 1997) (holding that summary judgment for defendants was inappropriate where plaintiff was relieved of all responsibilities and was given a chair with no desk, and other employees were instructed not to speak to her).

In light of the demanding legal standard for establishing constructive discharge, Cowan's claim fails.  In view of the timing of her resignation and the content of her resignation letter, it is evident that the policies that Terri Lowery announced for the House Office in February 2007 undergird this claim.  These policies, however, applied to all House Office staff, not just Cowan, and were designed to improve the function and efficiency of that office.  *See* Lowery Affidavit. A review of the written guidelines suggests, moreover, that the policies were also intended to improve patient confidentiality as well as employee attitudes and overall morale.  *See* Guidelines, **Exhibit K**.   Consequently, Cowan simply cannot persuasively contend that employment conditions imposed on her were so intolerable that no reasonable employee could tolerate them.  Therefore, Jackson Hospital respectfully urges this Court to dismiss this claim.

## IV.  <u>Negligent Training on Racial Discrimination Policies</u>

Finally, Cowan contends that Jackson failed to properly train David Jones on its policies against racial discrimination and that this failure caused harm to her as a result of Jones's "abuse of his supervisory authority."  This claim is ostensibly based on the events transpiring during the June 21, 2006, staff meeting.  As has been demonstrated, however, Jones's actions were intended to illustrate the theme of the meeting (*i.e.*, the effects that poor employee attitudes have on hospital operations and customer service), and were not intended to offend or upset the attendees. Indeed, Jones's intentionally choosing illustrations that would offend and arouse his audience would have in no way advanced the specific goal of the meeting or, by extension, the quality of his department.

Moreover, when advised about employee complaints over his choice of illustrations, Jones promptly went to Ed Scholl, his senior administrator, to advise him of the meeting and the concerns raised.  *See* Jones Dep. at p. 289 line 21 to p. 290 line 14.  Scholl suggested that Jones apologize to the staff, and Jones agreed to do so.  *See* Jones Dep. at p. 291 line 3 to p. 293 line 19.  Jones and Scholl separately apologized to the staff, and Jones was counseled about the incident.  There is simply no evidence that Cowan experienced any harm caused by Jackson's alleged failure to adequately train David Jones on its policies against racial discrimination. Therefore, Jackson moves this Court to dismiss this state law claim along with the federal discrimination claims previously addressed.

30

## V. <u>CONCLUSION</u>

Cowan's cannot establish a prima facie case of racial discrimination, constructive discharge, or negligence on the part of Jackson Hospital. Her retaliation and constructive discharge claims are barred as they impermissibly exceed the scope of the charge submitted to the EEOC. Moreover, the retaliation claim(s) are due to be dismissed on their merits as there is no causal connection between the alleged retaliatory acts and the complaint to the EEOC or, alternatively, those acts were taken for legitimate, non-retaliatory reasons. Therefore, Jackson Hospital respectfully moves this Court to enter an Order granting its Motion for Summary Judgment and dismissing all of Cowan's claims with prejudice.

/s/ Benjamin C. Wilson_____
**BENJAMIN C. WILSON**
**Ala. Bar No.: asb-1649-i54b**
**Attorney for Defendant**
**Jackson Hospital & Clinic, Inc.**

**OF COUNSEL:**
**RUSHTON, STAKELY, JOHNSTON**
**& GARRETT, P.A.**
**P.O. Box 270**
**Montgomery, Alabama  36101-0270**
**Phone:  (334) 206-3194**
**Fax:  (334) 481-0831**
**bcw@rsjg.com**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed above and foregoing document with the Court via CM-ECF, on this the 12th day of May 2008, and that service will be made electronically by CM-ECF on the following counsel of record:

Dwayne L. Brown, Esq.
Law Office of Dwayne L. Brown, P.C.
Post Office Box 230205
Montgomery, Alabama 36123-0205

/s/ Benjamin C. Wilson
OF COUNSEL