**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **DOROTHY COWAN,** | ) |
| Plaintiff, | ) |
| **v.** | ) **CASE NO.: 2:07-CV-779-MHT-TFM** |
| **JACKSON HOSPITAL & CLINIC,** | ) |
| **INC.,** a domestic corporation, conducting | ) |
| Business in the State of Alabama, | ) |
| **Defendant.** | ) |

**STATEMENT OF FACTS AND MEMORANDUM IN PARTIAL OPPOSITION
OF DEFENDANT JACKSON HOSPITAL& CLINIC. INC.'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Dorothy Cowan ("Cowan") and hereby submits the

following statement of fact and memorandum in partial opposition of Defendant Jackson

Hospital & Clinic, Inc.'s ("Jackson") Motion for Summary Judgment:

**STATEMENT OF FACTS**

**I.**     Plaintiff Cowan's Pre-Bed Control Employment History
        With Defendant Jackson

Cowan began her employment with Jackson in 1988. *(Exhibit A, Excerpts of Dorothy*

*Cowan's Deposition, page 15).* Cowan's first position was in Central Supply stocking the

hospital with hospital supplies. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp 47 –*

*48).* She worked in Central Supply approximately 3-4 years prior to being promoted to the

registration department as a registration clerk. *(Exhibit A, Excerpts of Dorothy Cowan's*

*Deposition, pp. 49, 52).* Cowan applied for the promotion after learning of the position from

Jackson's bid board where qualified employees could bid on different positions available

1

throughout the hospital. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 52).* Cowan's duties as a registration clerk were to admit patients coming into the hospital, scheduling and taking them to their rooms. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 53).* Cowan remained as a registration clerk for 4-5 years. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 55).* Cowan then became a registration training coordinator. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 53).* Cowan's duties as registration training coordinator included training bed control employees. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition p. 56).*

### Cowan's Employment History **In The Bed Control Office**

Cowan began working in the bed control office on January 11, 1999. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 78).* Prior to transferring to the bed control office, Cowan was a bed control clerk. *(Exhibit B, Dorothy Cowan's Personnel Change Request dated January 4, 1999).* In December 1998, the bed control unit was within the nursing department. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 72).* The bed control training coordinator was a new position created by the nursing administrators. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 73).* Cowan was the first occupant of the training coordinator position . *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, 78).* However, the duties akin to those performed by Cowan as bed control training coordinator where previously performed by nursing. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp 57, 62).* Jackson eliminated the RN position in bed control in December, 1998. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 72); (Exhibit C, Memo dated December 29, 1998).* Jackson eliminated the RN position in an effort to reduce costs. *(Exhibit C, Memo dated December 29, 1998).*

As bed control training coordinator, Cowan's duties were to train employees in the implementation of bed assignments for the hospital. This included taking reservations from doctors' offices and other hospitals. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 60); (Exhibit D, Job Description for Bed Control Training Coordinator, Position No. 443).* Cowan exercised supervisory authority over some of the employees assigned to bed control. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 60).* Cowan received a pay raise when she moved from bed control clerk to bed control coordinator. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, 78).* During the time Cowan was bed control training coordinator, she was in an open office without a door. The office was triangular. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 63-64).* While still in the bed control unit, Cowan's office eventually moved across from the cafeteria. This office had an exterior door that remained open. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 67).*

In November 2003, the bed control unit was moved from the nursing department to the registration department. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition pp. 82-83).* Based upon her testimony, Cowan was the bed control coordinator from 1999 until approximately 2005, when David Jones ("Jones") became Director of Registration. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 100-101); (Exhibit E, David Jones' Personnel Change Request dated August 17, 2005).* David Jones was promoted to Director of Registration on August 14, 2005. *(Exhibit E, David Jones' Personnel Change Request dated August 17, 2005).*

III.    **David Jones** as Cowan's Director

After David Jones became Director of Registration, Cowan was promoted to bed control supervisor. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 100).* According to Cowan's testimony, this promotion arose out of a dispute. Specifically, Cowan complained

3

when Jones hired Angela Griffin ("Griffin") as a supervisor for central scheduling. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 118-119).* Griffin was Caucasian. *(Exhibit F, Excerpts of David Jones' Deposition, p. 171).* Griffin was receiving more money than Cowan, and she also received a parking pass while none of the other supervisors had a pass. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 119).* Only after Cowan complained did she get a pay raise and a promotion from training coordinator to bed control supervisor. Cowan complained to Jones, human resources and Mr. Scholl. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 119).* Mr. Ed Scholl was Chief Financial Officer at Jackson. *(Exhibit G, Excerpts of Ed Scholl's Deposition, p. 24).* Mr. Scholl was also Jones' supervisor. *(Exhibit G, Excerpts of Ed Scholl's Deposition, p. 37).* Mr. Gilbert Darrington was Director of Human Resources. *(Exhibit 11, Excerpts of Gilbert Darrington's Deposition, p. 30).*

Cowan testified that other employee's also complained about the circumstances around Griffin's hire. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 121).* Specifically, Patricia Edwards, Gloria Thomas, Rosa Moses, Brenda McCoy, Tern Herring, and Janice Reif complained. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 121-122).* Cowan had been employed with Jackson many years, when Griffin was hired as a supervisor with a higher pay rate and a parking pass. Cowan felt Jones and Jackson Hospital were discriminating against her. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 123).* Jackson rectified Cowan's concerns and gave her a promotion to bed control supervisor and a pay raise. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 124).*

Cowan testified that after her promotion her pay was approximately $28,000. However, due to her overtime work she was in a different pay bracket and her pay was approximately $32,000 to $38,000. *(Exhibit A, Excerpts of Dorothy Cowan s Deposition, p. 129).* Cowan

4

worked overtime when other bed control employees didn't come to work. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 130).*

IV.    **Gorilla/Monkey And Taser Gun Incident – June** 21, 2006

On June 21, 2006, Jones, Director of Registration, held a meeting. Jones' meetings, including the aforementioned meeting, were audio recorded. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 146 -147).* The staff meetings were typically held in two sections due to the size of the department. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition. pp. 147 - 148).* Cowan attended the first meeting. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 153 - 154).*

The first meeting was attended by approximately sixteen (16) employees including Cowan. Of the 16 employees, only 4 were Caucasian and the remainder were African-American. *(Exhibit A. Excerpts of Dorothy Cowan's Deposition, pp. 154 - 155).* Jones took three (3) monkeys and a black gorilla from a bag. He also had a taser or stun gun. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 156 –157, 160).*

Understandably, Cowan wondered why Jones brought said monkeys to the meeting. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 163).* Cowan did not understand Jones' illustration of monkeys to be associated with positive, warm of favorable attitudes. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 163 – 164).*

During this incident, Jones directed the employees to retrieve patients who entered the registration department immediately, or he would zap the respective employee. To further demonstrate his point, Jones waved the stun gun. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 169 –171).*

This meeting was adjourned because staff members were upset regarding Jones' actions. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 169, 173).* Jones' actions confirmed Cowan's belief that Jones is a racist. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition. pp. 177 –178).* Caucasians have long used monkeys and gorillas to refer to African-Americans. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 181).* Cowan believes that Jones choice to use the monkeys and gorilla was racist. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 182 –184).*

> Q. And before you did your monkey/gorilla incident, you didn't preface your remarks and say, I don't mean anything racial by this, did you?

> A. I didn't say that because I didn't draw any conclusion that it would be.

> Q. The terms monkey and gorilla has not used to refer to Caucasians; correct?

> A. To my best recollection, no.

> Q. They're used to refer to African-Americans; correct? So my question is: Don't you think it would have helped if you had said before the demonstration, this is my attempt to convey good attitude, happy, fabulous, before you did the monkey/gorilla demonstration? Don't you think that my have helped the employees a little bit?

> A. I believe I made those inferences, what the meeting was about that I'm here to convey about what good attitudes are, what we are trying to be as far as a department. And then we used those props as illustrations to bring that point further across.

> Q. Okay. Now, when you told Mr. Scholl about it, it didn't take him a long time to say that you needed to apologize, did it?

A. No.

Q. Do you know any – **Do you have an opinion** as to why Mr. Scholl may have told you relatively quickly you needed to apologize?

A. Would you mind rephrasing the question again.

Q. I mean, you know, you went to **see Mr. Scholl on the afternoon of June** 22, and **you told him** about the gorilla/monkey **incident. He** told you at that meeting that you needed to apologize, didn't he?

A. Yes.

Q. **He didn't have** to give it any serious consideration or thought?

A. Right.

Q. Okay. And that was even after you told Mr. Scholl what your subjective intent was; right?

A. I believe so, yes.

*(Exhibit F, Excerpts of David .Jones' Deposition, pp. 299 –301).*

Ed Scholl admitted that monkeys and gorillas can be offensive depending on your audience. *(Exhibit G, Excerpts of Ed Scholl's Deposition, p. 100)* Tellingly, Mr. Scholl believed that the way Mr. Jones sought to conduct the gorilla-monkey taser incident was incorrect. *(Exhibit G, Excerpts of Ed Scholl's Deposition. p. 127).* According to Scholl, Jones crossed the line during this demonstration. *(Exhibit N, Excerpts of Terry Herrings Deposition, p. 72).*

V.    **Jones'** As **Rebecca Myrick's Director**

Rebecca Myrick, an African-American female, became employed as a switchboard operator with Jackson in 1987. *(Exhibit I, Excerpts of Rebecca Myrick's Deposition, p. 20).* The

switchboard unit is under the security and communications department. According to Ms. Myrick, David Jones became Director of the Security and Communications Department sometime in 2002 or 2003. *(Exhibit 1, Excerpts of Rebecca Myrick's Deposition, p. 28).*

On November 12, 2004, Jones, as Mrs. Myrick's director/supervisor, issued an employee counseling reprimand to her for allegedly not following the chain of command. *(Exhibit J, Record of Employee Counseling for Rebecca Myrick dated November 12, 2004).* Mrs. Myrick contested Mr. Jones' reprimand and submitted an internal grievance in which, amongst other things, she indicated that her disciplinary action was harsh and unfair. *(Exhibit K, Rebecca Myrick's Formal Grievance dated November 17, 2004).* Interestingly, Myrick feared the possibility that Jackson would retaliate against her for stating her concerns. *(Exhibit L, Rebecca Myrick's Response to Meeting dated November 13, 2004).* Shortly thereafter, on July 8, 2005, Myrick was terminated after being informed of her termination by Jones. *(Exhibit 1, Excerpts of Rebecca Myrick's Deposition, pp. 61, 64).* Strangely, Myrick was terminated for insubordination, but was subsequently rehired by Jackson in August 2005, as a registration clerk. *(Exhibit I, Excerpts of Rebecca Myrick's Deposition, pp. 65, 76).* Ironically, Jones then became Director of the Registration Department on August 14, 2005. *(Exhibit E, David Jones' Personnel Change Request dated August 17, 2005).*

VI. Post- June 21, 2006 Facts Regarding Cowan's Employment (Including

**Retaliation And Adverse Employment Actions**

On January 16, 2007, Cowan met with her physician, Joel McCloud. Cowan represented to Dr. McCloud that she had some changes in her workplace environment. Specifically, Cowan indicated that she had informed her supervisors of her pre-existing condition of claustrophobia. However, her exterior office door remained closed causing her to develop chest pains. Dr.

McCloud opined that Cowan was suffering from increased anxiety, probably worsened by the exacerbation of Cowan's claustrophobia. Consequently, Cowan's workplace needed to be modified. *(Exhibit M. Records from Dr. McCloud Attached Collectively).*

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT JACKSON'S MOTION
## FOR SUMMARY JUDGMENT

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(e) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law".

On summary judgment, "the evidence of the non-movant is to be believed". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The court must view all the evidence and all the factual inferences drawn in light most favorable to the non-moving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 – 323 (1986); *Allen v. Tyson Foods,* 121 F. 3d 642, 646 (11th Cir. 1997).

In short, "[i]f the record presents factual issues, or if reasonable minds might disagree about the inferences arising from the facts, then the court should deny summary judgment [because on] a motion for summary judgment, the district court may not weigh evidence of find facts". *Johnson v. Governor of State of Fla.,* 353 F, 3d 1287, 1292 (11th Cir. 2003)(citations omitted).

### COWAN'S RETALIATION CLAIMS

A. Cowan's Retaliation And Construction Discharge **Claims Are Not Barred**

Defendant Jackson argues Cowan's retaliation and constructive discharge claims arc due to be barred because they exceed the scope of her charge of discrimination submitted to EEOC. As a result, Jackson concludes it is entitled to summary judgment.

The United States Supreme Court has held the filings of a pro se litigant should be held "'to less stringent standards than formal pleadings drafted by lawyers.'" Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (per curiam) (quoting Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). The Court recognizes that it must make reasonable allowances so that a pro se plaintiff does not forfeit rights by virtue of his lack of legal training. Arena v. Dep't of Soc. Servs. of Nassau County, 216 F. Supp. 2d 146, 151 (E.D.N.Y. 2002). A plaintiffs Title VII complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. Alexander v. Fulton County, Ga., 207 F. 3d 1303, 1332 (11th Cir. 2000). Courts are extremely reluctant to allow procedural technicalities to bar claims brought under Title VII; as such, the scope of an EEOC complaint should not be strictly interpreted. Gregory v. Georgia Dept. of Human Resources, 355 F.3d 1277, 1280 (11th Cir. 2004).

The purpose of this exhaustion requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir. 1983); *see also Wu v. Thomas,* 863 F.2d 1543, 1548 (11th Cir. 1989).

In light of the purpose of the EEOC exhaustion requirement, we have held that a "plaintiffs judicial complaint is limited by the scope of the EEOC investigation which can

reasonably be expected to *grow* out of the charge of discrimination." *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1332 (11th Cir. 2000) (internal quotation and citation omitted); *Sanchez,* 431 F.2d at 466 (noting that the allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to the allegations contained in the charge). Courts are nonetheless "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Sanchez,* 431 F.2d at 460-61. As such, this Court has noted that "'the scope of an EEOC complaint should not be strictly interpreted.'" *Id. at* 465 (citation omitted).

The proper inquiry here therefore is whether Cowan's complaint was like or related to, or grew out of, the allegation contained in her EEOC charge. Cowan, without the aid of legal counsel, filed an EEOC charge before she resigned, In her EEOC charge, Cowan briefly sets forth the details of the June 21, 2006 meeting during which Jones used a "laser gun" and monkeys and a gorilla to describe employees. Cowan also checked the race, sex and retaliation boxes under the "cause of discrimination" section.

After a careful reading of Cowan's EEOC charge prepared without the assistance of counsel, and under the liberal EEOC charge standards of Sanchez, it is clear that Cowan's retaliation and constructive discharge claims are not administratively barred. The facts alleged in her complaint were "like or related to, or grew out of, the allegations contained in her EEOC charge. Specifically, Cowan, amongst other things, alleged in her EEOC complaint that she was transferred to another department subsequent to speaking with Scholl and Darrington.

Jackson argues that because Cowan only sets forth pre-EEOC retaliatory acts in her EEOC charge yet testifies in her deposition, that Jackson also retaliated against her *after she* filed her EEOC charge, that she is barred from advancing her retaliation and constructive discharge

claims. Jackson's argument must fail. The Eleventh Circuit dictates that a plaintiff need not

have filed a charge with the EEOC to preserve his ability to later litigate a retaliation claim. For

example, when a retaliation claim is based on adverse actions taken against an employee *after*

the initial EEOC charge is filed, it can be said that the retaliation claim grows out of a properly

filed employment discrimination charge, and it is not necessary for a plaintiff to file a second

charge specifically alleging retaliation. *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169

(11 th Cir. 1988).

In *Gupta v. East Texas State Univ.,* 654 F.2d 411 (5th Cir. Unit A Aug. 1981), the court

held that:

> it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging
> a retaliation claim growing out of an earlier charge; the district court has ancillary
> jurisdiction to hear such a claim when it grows out of an administrative charge
> that is properly before the court. There are strong practical reasons and policy
> justifications for this conclusion. It is the nature of retaliation claims that they
> arise after the filing of the EEOC charge. Requiring prior resort to the EEOC
> would mean that two charges would have to be filed in a retaliation case --
> double filing that would serve no purpose except to create additional procedural
> technicalities when a single filing would comply with the intent of Title VII. *Id.*
> *at* 411.

In *Gupta,* the district court had allowed the plaintiff to amend his complaint to add

allegations of retaliatory discharge, even though he had not filed charges with the EEOC.

Although Baker did not seek leave to amend the complaint in this case before she filed the

motion for injunctive relief, the court's reasoning in *Gupta* still applies. It has long been

established in this circuit that the scope of a judicial complaint is defined by the scope of an

EEOC investigation that "can reasonably be expected to grow out of the charge of

discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970); *see also*

*Turner v. Orr,* 804 F.2d 1223, 1226-7 (11 th Cir. 1986). Because a claim of retaliation could

12

reasonably be expected to grow out of the original charge of discrimination, the district court had

jurisdiction over the motion for injunctive relief.

B.    Cowan's Retaliation Claim Is Not Due **To Be Dismissed On** The Merit.

Title VII provides protection against retaliation for those who oppose illegal

discrimination or participate in Title VII processes. Claims of retaliation which are based on

circumstantial evidence, follow the traditional *McDonnell Douglas* tripartite framework of

shifting burdens of proof. *Meeks v. Computer Assoc. Int* 1, 15 F.3d 1013, 1021 (11th Cir. 1994).

A plaintiff bringing a retaliation claim must establish a prima facie case by showing that (1) she

engaged in statutorily protected expression, (2) there was subsequently an adverse employment

action, and (3) there is a causal link between the protected expression and the adverse action. *Id.

at* 1021; see also, *EEOC v. Reichhold Chem.,* 988 F.2d 1564, 1571-72 (11th Cir. 1993). To

recover for retaliation, the plaintiff "need not prove the underlying claim of discrimination which

led to her protest," so long as she had a reasonable good faith belief that the discrimination

existed. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989);

see also *Meeks v. Computer Assocs. Int 'I.,* 15 F.3d 1013, 1021 (11th Cir. 1989) (holding

retaliation is a separate violation of Title VII. "To recover for retaliation, the plaintiff need not

prove the underlying claim of discrimination which led to her protest, 'so long as she had a

reasonable good faith belief that the discrimination existed." (quoting *Tipton v. Canadian

Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989)).

As we explained in *Reichhold Chem.,* we interpret "the causal link requirement broadly; a

plaintiff merely has to prove that the protected activity and the negative employment action are

not completely unrelated." 988 F.2d at 1571-72 (citing *Simmons v. Camden County Bd. Of

Educ.,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S. Ct. 385, 88 L. Ed. 2d

338 (1985)). Once the *prima fade* case is established, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Tipton,* 872 F.2d at 1495 (internal quotation omitted). The plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation. *Reichhold Chem*.*,* 988 F.2d at 1572.

In *Meeks,* the district court specifically found that Meeks had carried her burden:

This Court finds retaliation. Specifically, this Court finds the testimony of the Plaintiff regarding the existence and nature of retaliatory conduct by her supervisor and that it commenced after her complaint regarding unequal pay to be credible. Conversely, the Court finds the testimony of the Plaintiffs supervisor, Laverne Peter, not to be credible on these points.

The court also expressly found that Meeks had been constructively discharged. Thus, the district court concluded that Mecks had engaged in protected conduct (she had complained of unequal pay); that adverse employment action had occurred (the court credited Meeks' testimony as to the *nature of retaliatory conduct* and found that she had been constructively discharged); and that the two were related. The court expressly found that Computer Associates' proffered explanations were not credible and that Meeks' testimony was credible. Taken as true, Meeks' testimony supports the district court's findings of constructive discharge and retaliation. The district court's ruling on this issue was therefore not clearly erroneous and must be affirmed.

Pursuant to 42 U.S.C. § 2000e-3(a), there are two forms of statutorily protected conduct. An employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" or (2) "he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Clover v*. *Total System Servs., Inc.,* 157 F.3d 824, 827 (11th Cir. 1998)(quoting 42

U.S.C. § 2000e-3(a)). These are know, respectively, as the "opposition" and participation" clauses.

      1.    **Opposition Retaliation**

Under the opposition clause, a plaintiff engages in "statutorily protected activity" when he protests an employer's conduct which is actually lawful, so long as he demonstrates "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir. 1997). It is, however, insufficient for a plaintiff "to allege his belief in this regard was honest and bona tide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

Cowan not only demonstrates "a good faith, reasonable belief that Jackson was engaged in unlawful employment practices", the record also testifies that her belief was "objectively reasonable". Specifically, Jones' use of monkeys and a gorilla during the June 21, 2006 meeting was viewed by Cowan *as* racist and offensive to other African-Americans at the meeting. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 178 - 181).* Tellingly, Jones' supervisor, Ed Scholl believed he crossed the line in this regard. *(Exhibit N, Excerpts of Terry Herring's Deposition, p. 72).*

Crude historical depictions of African-Americans as ape-like is as American as apple pie. African-Americans have historically been dehumanized in this country and associated with primates or apes. Jones' admitted during his deposition that he was aware of the racial connotations of monkeys/gorillas where African-Americans arc concerned. *(Exhibit F, Excerpts of David Jones' Deposition, p. 299).* Importantly, Jones is not familiar with Caucasians being referred to as monkeys and gorillas. *(Exhibit F, Excerpts of David Jones' Deposition, p. 299).*

Jackson's argument that because there were a few Caucasians present during Jones' racist demonstration, that somehow this minimizes Jones' discriminatory intent is insulting. Furthermore, this mentality demonstrates Jackson's racial insensitivity and hostility.

Furthermore, Cowan's belief that Jones' use of monkeys and gorillas is objectively reasonable in light of Jones' previous employment decisions. Specifically, Jones hired Angela Griffin ("Griffin") as a supervisor for central scheduling. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 118 –119). (Exhibit F, Excerpts of David Jones ' Deposition, p. 171).* Griffin was receiving more money than Cowan. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 119).* Only after Cowan complained to Jones, human resources and Mr. Scholl did she get a pay raise and a promotion from training coordinator to bed control supervisor. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 119).* Mr. Ed Scholl is Chief Financial Officer at Jackson. *(Exhibit H, Excerpts of Ed Scholl's Deposition, p. 24).* Mr. Scholl was also Jones' supervisor. *(Exhibit G, Excerpts of Ed Scholl's Deposition, p. 37).* Mr. Gilbert Darrington was Director of Human Resources. *(Exhibit If, Excerpts of Gilbert Darrington's Deposition, p. 30).*

In addition, Cowan testified that other employee's also complained about the circumstances around Griffin's hire. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 121).* Specifically, Patricia Edwards, Gloria Thomas, Rosa Moses, Brenda McCoy, Terri Herring, and Janice Relf complained. *(Exhibit A. Excerpts of Dorothy Cowan's Deposition, pp. 121-122).*

Hiring a less qualified person can support an inference of discriminatory motivation. *See Alexander v. Fulton County,* 207 F.3d 1303, 1340 (11th Cir.2000). Here, the fact that Jones hired Griffin as a supervisor, paying a higher salary above an employee who had been at Jackson

for more than seventeen (17) years supports an inference of discrimination. This is bolstered by the fact that after complaining Cowan received a promotion and pay raise.

Jackson argues that Cowan's retaliation claims are not cognizable because she suffered no adverse employment action. In particular, Jackson contends that the transfer of Cowan's unit was inconsequential. This argument has no merit. Although Cowan's hourly rate of pay remained the same after the transfer, she was demoted from bed control supervisor to bed control clerk, a position she previously held prior to being promoted to supervisor in January, 1999. This "reorganization" also resulted in Cowan's loss of overtime pay. Pursuant to *McCabe v. Sharrett,* 12 F.3d 1558 (11th Cir. 1994), a transfer is an adverse employment action even though salary did not increase, where eligibility for salary increases was less. Cowan's career advancement and promotion opportunities were obviously undermined and diminished by this demotion. She was essentially starting over. Under certain circumstances, the decision to take away an employee's additional responsibilities, which improve her career advancement potential, can be considered an adverse employment action for the purposes of a retaliation claim. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S.53_, 126 S.Ct. 2405, 2415-16. In addition, Cowan lost the additional prestige and office responsibilities that came with being bed control supervisor. *See Hinson v. Clinch County, Georgia Bd. of Edw.,* 231 F.3d 821, 829-30 (11th Cir. 2000Xexplaining that transfer can be adverse if it involves loss of prestige and responsibility),

To qualify as an "adverse employment action," the action must either be an ultimate employment decision or else must meet some threshold level of substantiality. Ultimate employment decisions include decisions such as termination, failure to hire, or demotion." *Stavropoulos v. Firestone,* 361 F.3d 610, 616-17 (11th Cir. 2004). Cowan's "transfer" as Jackson argues, while in and of itself may not be significant, nevertheless constitutes an adverse

employment action since Cowan was demoted and stripped of her supervisory duties. *See Davis v. Town of Lake Park,* 245 F.3d 1232, 1239 (11th Cir. 2001)(reassignment with significantly different responsibilities constitutes a tangible employment action). Although a job reassignment is not usually considered an adverse employment action for purposes of Title VII, "a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige and responsibility." *See Hinson,* 231 F.3d at 829; *see also Weston-Brown v. Bank of America Corp.,* 167 Fed. App'x 76, 80 (11th Cir. 2006)(holding that a lateral transfer (or denial of a transfer request) is ordinarily not regarded as an adverse employment action under Title VII merely because the employee subjectively finds one position preferable to the other, absent some evidence that the plaintiff suffered a material loss of pay, prestige, or other quantifiable benefit).

Viewing the record in the light most favorable to Cowan, the evidence is sufficient to support Cowan suffered an adverse employment action. It is clear from the facts on record, that the adverse employment actions were directly related to her having engaged in the protected conduct. In short, a reasonable fact-finder could conclude that Cowan suffered a loss of prestige, responsibility and promotional or career advancement opportunities by being demoted to bed control clerk.

In the present *case,* Cowan obviously engaged in protected conduct when she complained about the June 21, 2006 gorilla/monkey meeting. Further, Cowan suffered adverse employment action, Specifically, Cowan was demoted from bed control supervisor to bed control clerk; her pay was affected *as* she was denied overtime work; she was placed in an office where the door was required to be closed despite her request that the door remain open due to her clinically diagnosed claustrophobia. As a result of being forced to work in a closed-in environment,

Cowan was forced to take time off under the Family Medical Leave Act due to her elevated blood pressure. Consequently, Cowan was forced to resign due to her health concerns.

> 2.    Participatory Retaliation

Under participatory discharge a plaintiff engages in "statutorily protected activity' when he participates in an EEOC investigation, proceeding, or hearing. *Clover v. Total System Servs., Inc.,* 157 F.3d 824, 830 (11 [th] Cir. 1998). An employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Murry* To establish a prima facie case of retaliation, the plaintiff must prove the following elements: "(1) she parti

Jackson argues Cowan cannot support her claim of participatory retaliation because all instances of retaliation cited by Cowan occurred at the hands of Terri Lowery, an independent nursing consultant retained by Cynthia Dixon (Dixon) to improve nursing operations. In August, 2006, Lowery was hired by Dixon. Lowery moved the bed control office, the staffing coordinator, and the house supervisor into two adjacent connecting offices in the main hospital. (See Affidavit of T. Lowery, attached to Defendant Jackson's Motion for Summary Judgment as Exhibit H). The new office was known as the "House Office." As evidence by Defendant's Exhibit 1, entitled "Guidelines and expectations for House Office", Lowery was serving as Interim Staffing Director. *(See Exhibit I attached to* Defendant's Motion for Summary Judgment). Dixon informed Cowan that the bed control unit would be moving to the fifth floor of the hospital to be with the shift coordinator. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 242 — 243).* Dixon showed Cowan her new office before the move. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 245).* Cowan asked Dixon to allow the door to remain open because of the size of the office. *See id.*

The 11th Circuit has recognized that the "'cat's paw theory" may be utilized by the plaintiff to prove "that the discriminatory animus behind the recommendation caused the discharge . . . if the plaintiff shows that the decision-maker followed the biased recommendation without independently investigating" the recommendation. *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* Essentially, where the individual accused of discriminatory animus is "an integral part" of a multi-level personnel decision, their improper motivation may "taint[] the entire ... process." *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999).

Based upon the record, the "cat's paw theory" is at work in the present case. Dixon was intimately involved in the decision to move bed control employees. Dixon actually showed Cowan her new office before the move. Dixon knew about Cowan's claustrophobia. Cowan specifically asked Dixon to allow the door to remain open, and Dixon assured her that it would. In reliance thereof, Cowan did not object to the relocation. Cowan also asked Lowery to allow the door to remain open. She refused. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, pp. 283 –284 ). Jackson is clearly using* Lowery as a mere conduit, or "cat's paw" to give effect to it discriminatory animus.

Furthermore, from the record before the Court, it appears there is a genuine issue of fact as to whether Tern Lowery ("Lowery") is an independent contractor or an "employee". Courts have adopted three tests in distinguishing between an "employee" and an independent contractor: (1) the common-law agency test first set forth in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989) and reaffirmed by the Supreme Court in *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. 318, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992);

(2) an economic realities test; and (3) a combination of the agency and economic realities tests ("hybrid test"). *Cobb v. Sun Papers, Inc.,* 673 F.2d 337, 340-41 (11th Cir.), *cert. denied,* 459 U.S. 874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982). Certainly, according to the record, Jackson held Lowery out as an interim director, and not an independent consultant. Lowery's self-serving affidavit does not overcome the genuine factual dispute on her employment status.

**CONSTRUCTIVE DISCHARGE**

Cowan's claim of constructive discharge presents a special set of facts. Cowan concedes that her burden in surviving summary judgment on this issue is quite high.

Cowan sought medical treatment due to her objective reasonable belief that she was being subjected to an intolerable working environment. Specifically, *as* supported by the record, Dr. McCloud opined that Cowan's work environment caused her blood pressure to rise considerably. Consequently, Dr. McCloud recommended that Cowan alleviate herself from work resulting in her applying for medical leave. Tellingly, Jackson does not dispute, nor indeed can it dispute, that Cowan's medical leave was legitimately based.

Unfortunately, Cowan's health (elevated blood pressure) was being jeopardized and was in further jeopardy due to her oppressive working environment at Jackson. This work environment included being forced to work in a close environment irrespective of her claustrophobia.

To further complicate matters, while on medical leave, Cowan was contacted by Darrington and informed that upon her return, she would be demoted to a bed control clerk. No employee should be forced to decide between their health and employment. Unfortunately, Cowan was faced with this difficult choice. According to Cowan, her desire was to advance her

career at Jackson, and eventually retire from her employment. *(Exhibit A, Excerpts of Dorothy Cowan's Deposition, p. 361).*

In lieu of the foregoing, a reasonable person facing Cowan's medical problems would have felt compelled to resign from Jackson. *Pipkins v. City of Temple Terrance, Fla.,* 267 F.3d 1197, 1201 (11th Cir. 2001). Therefore, Plaintiff resigned on March 21, 2007. As a result of resigning, and finding another job, Cowan's hypertension significantly approved. *(Exhibit M, Records from Dr. Joel McCloud Attached Collectively).*

Cowan moves this Honorable Court to deny Jackson's motion for summary judgment on the issues of retaliation and constructive discharge.

Respectfully Submitted,

/s/Dwayne L. Brown
Dwayne L. Brown (BRO149)
Attorney for the Plaintiff

Of Counsel:

Law Office of Dwayne **L. Brown,** PC
Post Office Box 230205
Montgomery, Alabama 36123-0205
Telephone: (334) 277-3757
Facsimile: (334) 277-3613
E-Mail: dbrownadbrownatty.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served via the Court's ECF system on June 30, 2008 and the same will be sent to the following via e-mail by the Court's ECF system: **Ben** C. **Wilson, esq.**

/s/Dwayne L. Brown
Of Counsel