## IN THE UNITED STATES DISTRICT COURT
RECEIVED**FOR THE MIDDLE DISTRICT OF ALABAMA**
## NORTHERN DIVISION

DOROTHY COWAN,                              )
                                            )
            **Plaintiff,**                  )
                                            )        **Civil Action No. 2:07cv779**
**vs.**                                     )
                                            )
**JACKSON HOSPITAL & CLINIC,**              )
**INC., a domestic corporation, conducting**  )
**business in the State of Alabama,**        )
                                            )
            **Defendant.**                  )

### PLAINTIFF'S RESPONSE IN PARTIAL OPPOSITION TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, Dorothy Cowan, by and through her undersigned

counsel, and respectfully moves this Honorable Court to deny Defendant Jackson

Hospital (Jackson's) motion for summary judgment relative to Plaintiff's retaliation and

constructive discharge claims.  Plaintiff files contemporaneously herewith its response

in partial opposition to Defendant's motion for summary judgment (doc. no. 14).  Due to

the voluminous nature of Plaintiff's exhibits, said exhibits will be hand delivered under

separate cover.

Respectfully Submitted,

Dwayne L. Brown (BRO049)
Attorney for the Plaintiff

Of Counsel:
**Law Office of Dwayne L. Brown, PC**
Post Office Box 230205
Montgomery, Alabama 36123-0205
Telephone: (334) 277-3757
Facsimile: (334) 277-3613
E-Mail: dbrown@dbrownatty.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served via the Court's ECF system on July 1, 2008 and the same will be sent to the following via e-mail by the Court's ECF system: **Ben C. Wilson, Esq.**

Of Counsel

# Exhibit A,

# Excerpts of Dorothy Cowan's Deposition

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CIVIL ACTION NO.:  2:07-cv-779

6    DOROTHY COWAN,                    COPY

7         Plaintiff,

8         vs.

9    JACKSON HOSPITAL & CLINIC, INC.,

10   a domestic corporation, conduction

11   business in the State of Alabama,

12        Defendant.

13

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16   between the parties through their respective

17   counsel, that the deposition of Dorothy

18   Cowan may be taken before Angela Smith

19   McGalliard, RPR, CRR, at the offices of

20   Rushton, Stakely, Johnston & Garrett, at 184

21   Commerce Street, Montgomery, Alabama 36104,

22   on the 17th day of April, 2008.

23        DEPOSITION OF DOROTHY COWAN

## FREEDOM COURT REPORTING

15

1      Q.      Uh-huh.

2      A.      I would have to be there, on

3  call, and we would have to make sure the

4  patients was being taken care of whenever

5  the disaster drills were taking place.  I

6  was at all the tornado and hurricane drills

7  we had at Jackson, stayed overnight.

8      Q.      Do you have any legal training

9  of any kind?

10     A.      No.

11     Q.      Have you ever worked in human

12  resources or in a risk management context?

13     A.      No.

14     Q.      You came to Jackson in what

15  year?

16     A.      1988.

17     Q.      And I believe you left in

18  March of 2007?

19     A.      Yes.

20     Q.      All right.  Were there any

21  breaks in your employment at Jackson

22  Hospital between 1988 and 2007?

23     A.      No.

## FREEDOM COURT REPORTING

47

1    Q.    Yeah.  Okay.  Anything other

2  than that?

3    A.    No.

4    Q.    Has anyone ever treated you

5  for posttraumatic stress, other than

6  Dr. McLeod?

7    A.    Dr. Hutto.

8    Q.    Okay.  Is he still in practice

9  down there in Thomasville?

10    A.    He's in Selma.

11    Q.    Selma?

12    A.    Uh-huh.

13    Q.    Okay.  Am I correct, though,

14  that you haven't seen Dr. Hutto in a number

15  of years?

16    A.    Oh, Lord.  Probably thirty

17  years.

18    Q.    Yeah.  When did you start

19  working at Jackson initially?

20    A.    I started October 24, of '98

21  -- '88.  I'm sorry, 1988.

22    Q.    What was your first position?

23    A.    I worked in central supply.

## FREEDOM COURT REPORTING

48

1           Q.     All right.  And what were your

2    duties there?

3           A.     Stocking the hospital.

4           Q.     Okay.  Is central supply the

5    unit that --

6           A.     All the hospital supplies.

7           Q.     Okay.  And who was your

8    supervisor?

9           A.     Mary Bell Jackson.

10          Q.     Can you spell her first name?

11          A.     M-A-R-Y, B-E-L-L, Jackson.

12          Q.     Okay.  What was your first --

13    Were you hourly?

14          A.     Yes.

15          Q.     What was your first hourly

16    rate of pay?

17          A.     Way back in '88, probably

18    about -- I'm just going to say roughly about

19    six dollars.

20          Q.     Okay.  You were full-time?

21          A.     Full time.

22          Q.     Okay.  At that point was there

23    an office for central distribution?  Well,

## FREEDOM COURT REPORTING

49

1    that's a bad question.

2                Where was central distribution

3    based?

4         A.      In the hospital, in the

5    basement of the hospital.

6         Q.      Now, this would have been

7    obviously years before they did the

8    renovation and the --

9         A.      Uh-huh.

10        Q.      Okay.  Was it in the basement

11   of --

12        A.      Jackson Hospital, yes.

13        Q.      Okay.  And how long did you

14   work in central distribution?

15        A.      Probably about three or four

16   years.  Long enough to get a promotion to

17   registration.

18        Q.      You went then to registration?

19        A.      Yes.

20        Q.      I'm going to get to that in

21   just a second.

22        A.      Uh-huh.

23        Q.      Let me ask you a few things

## FREEDOM COURT REPORTING

52

1    Q.    All right.  Did Ms. Jackson do

2  that review?

3    A.    Yes, she did.

4    Q.    Okay.  And at some point you

5  were removed from probationary status, I

6  assume?

7    A.    Yes.

8    Q.    Okay.  How is it you came to

9  -- you say three or four years after that

10  you moved into registration?

11    A.    Right.

12    Q.    Was there just an opening

13  there that you saw?

14    A.    Jackson Hospital has a board

15  that you bid on different positions.

16    Q.    Okay.  Has that always been

17  the case while you were there?

18    A.    Yes.  If you qualified.

19    Q.    Sure.  What was your exact

20  title in registration, when you moved over

21  there?

22    A.    When I moved to registration,

23  I started off as a registration clerk.

## FREEDOM COURT REPORTING

53

1          Q.      Uh-huh.

2          A.      And then I went to

3    registration training coordinator.  And from

4    there, I became a bed control supervisor.

5          Q.      Registration coordinator?

6          A.      Right.  I trained other

7    people.

8          Q.      I've seen documentation that

9    suggests you moved into registration

10   sometime in 1992, does that sound accurate

11   to you?

12         A.      Probably, yes.

13         Q.      In what department was

14   registration at that time?

15         A.      It was under the business

16   office, I think, way back then.  Because we

17   was in the old hospital.

18         Q.      Now, as a registration clerk,

19   give me an overview of your duties.

20         A.      I would be admitting patients

21   coming into the hospital, scheduling, taking

22   them to rooms.

23         Q.      Okay.

# FREEDOM COURT REPORTING

55

1        A.     She had a training manual that

2 we went over, on-job training.

3        Q.     All right.  And were you

4 subjected to any other type of probationary

5 status when you moved over to registration?

6        A.     Yes.  Each position at

7 Jackson, when you move into it, you're on

8 probation for like six months to a year.

9        Q.     All right.  And did your rate

10 of pay change when you moved to

11 registration?

12        A.     Yes, it did.

13        Q.     Did it go up?

14        A.     Yes.

15        Q.     Do you recall how much?

16        A.     I'm not sure.

17        Q.     Okay.  How long did you serve

18 as a clerk before you became a coordinator?

19        A.     About four or five years, I

20 would think.

21        Q.     Okay.  And when you became a

22 coordinator, did you continue to perform the

23 duties of a registration employee, or were

## FREEDOM COURT REPORTING

56

1    you fully training?

2        A.    I was fully -- I was training

3    other registration employees.

4        Q.    That was not put very well.    I

5    mean, when you became a coordinator, all of

6    your time was devoted to training other

7    employees, is that what you're saying?

8        A.    Training employees that was in

9    bed control, yes.

10       Q.    I thought you became a

11   coordinator -- you said you were a

12   registration coordinator?

13       A.    Okay.  I had two training --

14   At first I was a training registration

15   coordinator, which was short term.

16       Q.    That's what I want to talk

17   about.

18       A.    Okay.

19       Q.    You trained other employees --

20       A.    Right.  In the registration

21   area.

22       Q.    All right.  When you were

23   doing that, was all of your time devoted to

## FREEDOM COURT REPORTING

57

1     training other people?

2          A.     Right.

3          Q.     Okay.  At that point, did you

4     have any involvement in bed control?

5          A.     Yes.

6          Q.     Tell me about that.

7          A.     My job in registration was

8     short -- was short-term because they started

9     me working with a nurse, which nurses used

10    to do bed control at Jackson.

11         Q.     Uh-huh.

12         A.     And once I became up under

13    nursing, the registration nurse, I became a

14    training coordinator for the other

15    registration clerks.

16         Q.     Okay.  When did you move into

17    bed control -- the bed control unit?

18         A.     Before I left the old

19    hospital, but I couldn't give you an exact

20    year.

21         Q.     Okay.  Again, I've seen some

22    documentation in the personnel file that

23    suggests you moved into bed control around

# FREEDOM COURT REPORTING

60

1         A.     Dee Smith, Terri Herring,

2  that's about the only two that I can recall

3  right off.

4         Q.     Dee Smith?

5         A.     Dee, D-E-E, Smith.

6         Q.     Okay.  So at that -- Initially

7  did you have any supervisory authority over

8  Dee Smith, Terri Herring, or any of these

9  other employees?

10        A.     Right.

11        Q.     You did?

12        A.     I did.

13        Q.     Give me -- Tell me about the

14  nature of that authority, what was it?

15        A.     I would train them how to do

16  the bed assignments for the hospital.  We'd

17  take reservations from doctors' offices,

18  other hospitals --

19        Q.     Uh-huh.

20        A.     -- administration, or whoever

21  was calling us, recovery room.

22        Q.     When you were the bed control

23  training coordinator, was all your time

## FREEDOM COURT REPORTING

62

1    under it in the old hospital, it was up

2    under nursing.

3        Q.    Okay.  When you became the

4    training coordinator, you told me that

5    Carmen Bowe was your supervisor.  Who was

6    the director of registration or the

7    registration department?

8        A.    Rick Mann.

9        Q.    At that time?

10       A.    Yes.

11       Q.    This position of bed control

12   training coordinator, were you the first one

13   to occupy it?

14       A.    Yes.

15       Q.    So it was a new position you

16   took?

17       A.    It was a new position.

18       Q.    Okay.  Had someone been doing

19   anything akin to that before you took it

20   over?

21       A.    Yes.  Nursing had it before.

22       Q.    Ms. Cowan, do you mind if we

23   take a quick break?

## FREEDOM COURT REPORTING

63

1          A.        We can.

2                    MR. WILSON:   Are you okay with

3      that?

4                    MR. BROWN:   Yes.

5                    (Recess taken.)

6          Q.        Ms. Cowan, when you were in

7      the position of bed control training

8      coordinator, did you have your own office?

9          A.        Yes, I did.

10         Q.        All right.   And was it in the

11     base -- the first floor, I think you said,

12     of the hospital?

13         A.        Yes, the first floor.

14         Q.        Can you describe the office

15     that you were in -- the characteristics of

16     the office you were in at that time?

17         A.        It was like a triangle.   It

18     didn't have a door on it.

19         Q.        It didn't have a door, what do

20     you mean?

21         A.        A door.   I mean, we left the

22     door off of it because the office --

23     Whenever we moved into that building, none

# FREEDOM COURT REPORTING

64

1    of the offices had doors on them whenever we

2    first moved over there.

3              Q.       Was it an interior office?

4              A.       Yes, it was.

5              Q.       All right.  So did it have any

6    windows?

7              A.       No.

8              Q.       But just a space for a door

9    that was left off?

10             A.       Right.  Left open.  It was an

11   open room.

12             Q.       Okay.  And had you been in

13   that particular office ever since you

14   initially arrived in bed control?

15             A.       Yes.  For a period of time.

16             Q.       Okay.  How long?  You say a

17   period of time, help me with that.

18             A.       Okay, I would -- My period of

19   time, I started off in that office until

20   they moved me to an office around by the

21   cafeteria.

22             Q.       What point did you move to the

23   office near the cafeteria?

67

1    in there before?

2          A.      No.  I was in there after the

3    move.  They moved me to that office after --

4    I was in the triangular office at first --

5          Q.      Uh-huh.

6          A.      -- then they moved me into the

7    office across from the cafeteria, which is

8    in front of the patio.

9          Q.      Okay.  When you were in the

10   office across from the cafeteria, from the

11   patio, were you in bed control at that time?

12         A.      Right.

13         Q.      Did that office have windows?

14         A.      It had a small window and a

15   door.  But the door was open.

16         Q.      Was the door an interior

17   doorway or an exterior doorway?  I mean, did

18   it lead to another room in the hospital or

19   did it go outside?

20         A.      No.  Just leads from my

21   office, straight out of the office.

22         Q.      Okay.

23         A.      If you walk out of the office

## FREEDOM COURT REPORTING

72

1       Q.     Okay.  And it deals with bed

2  control.

3       A.     Right.

4       Q.     And by then -- By December of

5  '98, you were already in bed control; right?

6       A.     Right.

7       Q.     Okay.  And as you see, the

8  memo indicates that they are eliminating an

9  RN position in bed control.  Do you see

10  that?

11       A.     Yes, I'm looking at it.

12       Q.     All right.  And if you go down

13  to the third line, you see the bed control

14  assignment process can be handled by a

15  registration bed control coordinator, see

16  attached job description.  Do you see that?

17       A.     Right.

18       Q.     Okay.  This suggests that as

19  of December 1998 that bed control was at

20  that point within the nursing department.

21       A.     Right.

22       Q.     Is that consistent with your

23  recollection?

## FREEDOM COURT REPORTING

73

1    A.    Right.

2    Q.    Okay.  It also suggests that

3    they are creating -- the nursing

4    administrators are creating, essentially, a

5    new position of bed control training

6    coordinator?

7    A.    Right.

8    Q.    Would you agree with that?

9    A.    Yes.

10    Q.    Okay.  And then near the

11    bottom you see it says:  The current bed

12    control clerk position will also remain.  Do

13    you see that last line?

14    A.    Yes.  Uh-huh.

15    Q.    All right.  Who would have

16    held the bed control clerk position at that

17    point?

18    A.    My relief people, the people

19    that came on after I did.

20    Q.    What was your job title

21    immediately before you became bed control

22    training coordinator?

23    A.    I was a registration clerk

## FREEDOM COURT REPORTING

78

1                      for identification.)

2          Q.      Let me show you Defendant's

3    Exhibit 3.

4          A.      Okay.

5          Q.      What is this document?  I

6    mean, what type of document is this?

7          A.      This is a pay raise.  I'm

8    moving from a bed control clerk to a bed

9    control training coordinator.

10         Q.      Right.  And the date of this

11   is January 4, 1999; right?

12         A.      Right.

13         Q.      So if you compare this with

14   Defendant's Exhibit 1, this change from bed

15   control clerk to training coordinator, was

16   accomplished within a week of the

17   recommendation to create the position.

18         A.      Right.

19         Q.      So as you say, you became the

20   first occupant of the training coordinator

21   position?

22         A.      Right.

23         Q.      And I think we all agree, at

82

1     director of registration?

2          A.     Right.

3          Q.     The first two sentences is

4     really what I wanted to ask you about.  It

5     says:  A general discussion was held

6     transferring the bed control to the

7     registration department.  The duties for

8     Ms. Cowan will remain unchanged until her

9     job description has been updated.

10                Did I read that correct?

11         A.     Right.

12         Q.     All right.  Do you recall

13    hospital administration deciding to move bed

14    control out of nursing and back to the

15    registration department in roughly November

16    of 2003?

17         A.     It was moved, but I can't give

18    you an exact date.

19         Q.     That's fair.

20         A.     Okay.

21         Q.     So when you came into bed

22    control, it was in nursing?

23         A.     Right.

## FREEDOM COURT REPORTING

83

Q.    And then at some point
thereafter, it was apparently --

A.    -- moved to registration.

Q.    The unit as a whole was moved
back to the registration department?

A.    Right.

Q.    All right.  At the time, did
you have any objections to your unit being
moved from nursing back to registration?

A.    No.

Q.    Or to registration?

A.    No.

Q.    Okay.  When this move from
nursing back to registration was
accomplished, did your office location
change?

A.    I'm not sure about that.  Not
-- I can't give you the exact year it
changed, but it changed.  But whenever --
possibly 2003 I was still in the triangle
office.

Q.    And you're just -- You're just
uncertain as to whether a change in location

101

1    accurate?

2        A.    That's since I've been gone.

3        Q.    So that would be after March

4    of '07?

5        A.    Right.

6        Q.    Okay.  So David comes onboard

7    as the director, then at some point after

8    that you become a supervisor?

9        A.    Yes.

10        Q.    All right.  So you went from a

11    training coordinator to a supervisor?

12        A.    Yes.

13        Q.    In title?

14        A.    Yes.

15        Q.    Did you get any change in pay

16    when you became a supervisor?

17        A.    Yes, I did.

18        Q.    All right.  Did you have to

19    apply for the supervisor position?

20        A.    Yes, I did.

21        Q.    All right.  What was the

22    change in salary -- wage?

23        A.    Probably like a dollar raise,

# FREEDOM COURT REPORTING

100

1    Q.    Is that yes?

2    A.    Yes.

3    Q.    At some point, I think you

4  took the title of supervisor, bed control

5  supervisor?

6    A.    Yes.

7    Q.    Do you recall when?

8    A.    After David Jones came on.

9    Q.    When did David Jones come

10  onboard?

11    A.    I'm not sure about the date.

12    Q.    What was his title when he --

13    A.    The director of registration,

14  central scheduling, bed control; the same

15  areas he was director, Rick Mann was no

16  longer our director.

17    Q.    All right.  So David Jones at

18  some point became the director of

19  registration?

20    A.    Right.

21    Q.    Now, it's my understanding

22  that the overall department name was changed

23  at some point to patient access; is that

## FREEDOM COURT REPORTING

118

1    Q.    Of what?

2    A.    I'm not sure about the date.

3    Q.    I mean, is it fair to say that

4    around the time frame of 2005, 2006 that

5    there were a number of new systems,

6    policies, and procedures going into place

7    that affected your unit?

8    A.    Yes.

9    Q.    Other than the STAR system,

10   was there any new procedure or protocol that

11   required employees like you to be trained or

12   undergo training?

13   A.    No.

14   Q.    Now, as you know, the staff

15   meeting that I think lies at the heart of

16   your lawsuit took place on June 21, 2006?

17   A.    Right.

18   Q.    Okay.  I'm going to get to

19   that in a minute.

20   A.    Uh-huh.

21   Q.    But before we get to that, I

22   want to ask you, did you and David Jones

23   ever have any dispute of any kind before

# FREEDOM COURT REPORTING

119

1    June 21?

2              A.        Yes, we did.

3              Q.        Tell me about that.

4              A.        When Angela Griffin came on,

5    he hired her in as a supervisor for central

6    scheduling.   I was a training supervisor for

7    bed control --

8              Q.        Uh-huh.

9              A.        -- which gave her more money

10   than bed control was getting.   And after I

11   complained to David, human resources, and

12   Mr. Scholl, I got a pay raise and my job

13   title changed from training coordinator to

14   bed control supervisor.   I don't know if I

15   made what Angela made or what, but my pay

16   rate changed.   And this Angela Griffin also

17   had a parking pass, and I asked David if she

18   was just a supervisor how did she get a

19   parking pass and none of the other

20   supervisors had a parking pass.

21             Q.        And he said what?

22             A.        He never gave me an answer.

23             Q.        And Angela Griffin was hired

## FREEDOM COURT REPORTING

121

1        Q.     Did any of the other

2   employees, managers complain about the

3   circumstances around Ms. Griffin's hire?

4        A.     Yes.

5        Q.     Who?

6        A.     The other registration clerks

7   in the area, the other supervisor.

8        MR. BROWN:  I think he wants

9   the names.

10       Q.     Yeah.  Tell me everybody.

11       A.     I can give you the name of the

12   supervisor would be Patricia Edwards.

13       Q.     Okay.

14       A.     She was in the ER.

15       Q.     All right.

16       A.     She became a supervisor of ER

17   at the same time, whenever they moved me up

18   to supervisor for bed control.

19       Q.     Okay.

20       A.     The employees that were

21   complaining about Angela Griffin, I would

22   say Gloria -- let me give a name, Gloria

23   Thomas, Rosa Moses.

## FREEDOM COURT REPORTING

122

1      Q.      Moses?

2      A.      Moses, M-O-S-E-S.  Brenda

3   McCoy, Terri Herring, Janice Relf, Dee

4   Smith.  That's all I can recall right off,

5   as far as the names.

6      Q.      Ms. Griffin was hired in as a

7   manager; right?  Or a supervisor?

8      A.      Supervisor, as far as I know.

9      Q.      Yeah.  Why would the

10   nonsupervisory employees complain about her

11   employment package as a supervisor?

12      A.      It was the relationship that

13   David had with this -- she was a Caucasian.

14   It was the relationship that he had with

15   her.  You could just tell that he was, you

16   know, making a difference.

17      Q.      But, I mean, you don't dispute

18   the notion that as a supervisor, she would

19   typically be hired in with an employment

20   package, meaning pay and benefits that might

21   be superior to rank-and-file employees?

22      A.      Meaning?

23      Q.      She's hired in as a

123

1    supervisor.

2         A.    Right.

3         Q.    So she shouldn't -- She

4    wouldn't have the same overall employment

5    compensation and benefit package as a

6    rank-and-file employee, would she?

7         A.    No, she wouldn't.  But as far

8    as myself, who had been there for, like,

9    seventeen or eighteen years, I felt like he

10   was discriminating against me for him to

11   hire her in with this, with a parking pass.

12   And I've been there forever, and my job was

13   next to some of the administrator jobs, you

14   know, as far as getting to that hospital and

15   getting beds assigned every day.  That was

16   my fight with him about that parking pass.

17        Q.    I mean, your personal

18   objection was her pay rate?

19        A.    Right.

20        Q.    And her parking pass?

21        A.    Right.

22        Q.    All right.  Did you complain

23   to him in writing or was it all verbal?

# FREEDOM COURT REPORTING

124

1          A.       It was verbal.

2          Q.       Okay.

3          A.       And I went through the chain

4     of command.  I went to human resources

5     director and to Mr. Scholl and I can't -- it

6     was another guy that was there before the

7     new people came that was over IS, I can't

8     think of his name.  He was also in the

9     meeting, but I can't think of his name.

10    He's gone now.

11         Q.       So is it your testimony that

12    you complained directly to David,

13    Mr. Scholl, and who else?

14         A.       Gilbert Darrington.

15         Q.       Gilbert Darrington.  All

16    right.  Your concerns were rectified,

17    though; right?

18         A.       Right.

19         Q.       You were given a pay raise?

20         A.       Right.

21         Q.       You were given a new title?

22         A.       Yes.

23         Q.       And so -- Okay.  Strike that.

## FREEDOM COURT REPORTING

129

1        Q.     Did you ever tell David that

2  you thought his treatment of Angela Griffin

3  was motivated in part or in whole by her

4  race?

5        A.     No.

6        Q.     Other than the Angela Griffin

7  matter and uniform matter, did you have any

8  other disputes with David before June 21,

9  '06?

10       A.     I had one once with him.  I

11  was sick, and with me being a supervisor,

12  one of my girls was sick, and he was arguing

13  with us about the overtime, he wanted us to

14  cut overtime.  But at that particular time

15  it was okay to do overtime.

16       Q.     Okay.  Help me out.  What

17  about overtime was -- What was it about the

18  overtime that was coming up?

19       A.     My job pay was like probably

20  twenty-eight thousand.  I worked overtime, I

21  was in a whole other pay bracket of like

22  thirty-two to thirty-eight thousand dollars.

23       Q.     Due to your overtime work?

## FREEDOM COURT REPORTING

130

1      A.      Uh-huh.  With my overtime.  I

2  always worked.  If somebody didn't show up

3  or didn't come in, I worked on through bed

4  control.

5      Q.      Okay.  So what was the nature

6  of the dispute with David?  Who was sick?

7      A.      I was sick that particular

8  weekend myself.

9      Q.      Uh-huh.

10      A.      But I had to still work for

11  the girl that was calling in.  And he didn't

12  want me to ask the ER reg supervisors,

13  people to help with bed control, one of the

14  ones that had been cross-trained, he

15  wouldn't let me let her come up there and

16  work.  It was not fair, you know, a person

17  that's been cross-trained and she couldn't

18  work that area.

19      Q.      So even at that point, were

20  there people assigned to other departments

21  like ER registration that had been

22  cross-trained and knew how to do the bed

23  control job?

## FREEDOM COURT REPORTING

146

1    did tell me anything.

2              Q.    Okay.  All right.

3                    We were talking about the June

4    21st meeting.  We had just gotten into that,

5    and I may have asked you this, and I'm sorry

6    if I did.  But do you recall taking any

7    minutes of that meeting, you personally?

8              MR. BROWN:  I'm sorry, did you

9    say the June 21st?

10             MR. WILSON:  June 21, 2006,

11   meeting.

12             MR. BROWN:  I'm sorry.  I just

13   blanked out for a minute.

14             A.    I would have took my regular

15   supervisor minutes of that meeting.

16             Q.    For the Record, do you have

17   those notes as we sit here today?

18             A.    No.

19             Q.    Is it your recollection that

20   Ms. Venable was taking, for lack of a better

21   word, official notes of that meeting?

22             A.    Yes.

23             Q.    You told me that they would

## FREEDOM COURT REPORTING

147

1    typically record, audio record meetings.

2         A.    Right.

3         Q.    Do you know, as we sit here

4    today, whether that meeting was, in fact,

5    audio recorded?

6         A.    Yes.  All the meetings that

7    David did was audio recorded.

8         Q.    There was never an exception

9    to that to your recollection?

10        A.    Not to my recollection.  Not

11   that I can recall.

12        Q.    Are you aware of any other

13   participants in that meeting that took

14   notes, handwritten notes?

15        A.    No.

16        Q.    Since -- Between the time of

17   that meeting and today, have you ever had

18   notes or written impressions of any other

19   participant of that meeting?

20        A.    No.

21        Q.    It's my understanding that due

22   to the size of the department that staff

23   meetings would typically be held in two

# FREEDOM COURT REPORTING

148

1    different settings?

2          A.      Different sections, right.

3          Q.      Yeah.  Did you have any

4    particular habit in which section you sat in

5    -- you participated in?

6          A.      No.  It just depends on how

7    busy you was and the time of day that the

8    time was set up, if you would go to the

9    earlier meeting or the later meeting.

10         Q.      Yeah.  Were the meetings

11   typically back to back?

12         A.      Yes.

13         Q.      Okay.  And did the department

14   basically break down half and half?

15         A.      Right.

16         Q.      More or less?

17         A.      Yes.

18         Q.      Okay.  Where was this

19   particular meeting held?

20         A.      It was held in the conference

21   room on 3 South.

22         Q.      Were they typically held

23   there, the staff meetings?

## FREEDOM COURT REPORTING

153

1          Q.      You didn't mention Charlotte.

2          A.      Right.

3          Q.      But you have in your

4    interrogatory Charlotte Gillis was there?

5          A.      Right.

6          Q.      Tonya Jefferson?

7          A.      Yes.

8          Q.      Martine Bettis?

9          A.      Yes.

10         Q.      Mary Zeigler?

11         A.      Yes.

12         Q.      And Jackie Singleton?

13         A.      Yes.

14         Q.      All right.  Can you recall

15   anyone else who was present for that

16   meeting, other than the people that you told

17   me about today and the people listed in your

18   interrogatory fifteen response?

19         A.      I'm thinking that Gloria

20   Thomas and Rosa Moses was in my meeting, but

21   I'm not sure about those two.

22         Q.      And, again, I may have asked

23   you this, I don't mean to repeat myself:  Do

## FREEDOM COURT REPORTING

154

1    you know whether you were in the first or

2    second session?

3            A.      I went to the first meeting.

4            Q.      Okay.  What is Sharon

5    Venable's race?

6            A.      Caucasian.

7            Q.      What is Terri Herring?

8            A.      African-American.

9            Q.      Gloria Thomas?

10           A.      African-American.

11           Q.      Jennifer Robinson?

12           A.      African-American.

13           Q.      Rosa Moses?

14           A.      African-American.

15           Q.      Janice Hathcock?

16           A.      Caucasian.

17           Q.      Is it Janet or Janice?

18           A.      Janice, J-A-N-I-C-E, Hathcock.

19           Q.      Rebecca Myrick?

20           A.      African-American.

21           Q.      Ann Turner?

22           A.      Caucasian.

23           Q.      Ann Cobb?

# FREEDOM COURT REPORTING

155

1      A.      Caucasian.

2      Q.      Charlotte Gillis?

3      A.      African-American.

4      Q.      Tonya Jefferson?

5      A.      African-American.

6      Q.      Martine Bettis?

7      A.      African-American.

8      Q.      Mary Zeigler?

9      A.      African-American.

10     Q.      Jackie Singleton?

11     A.      African-American.

12             Sharon Venable is with a V.

13     Q.      Yeah.   It's V-E-N-A-B-L-E.

14             Ms. Cowan, walk me through

15     what you recall being said at that meeting

16     and what is your recollection of what was

17     said and what happened.

18             (Off-the-Record discussion

19             was held.)

20     Q.      Walk me through what you

21     remember.

22     A.      What I can remember on June

23     the 21st, 2006, when we came into the

156

1  meeting, we had a sign-in sheet. There was

2  a sign-in sheet of all the people that were

3  there.

4          Q.     Were those typically

5  maintained?

6          A.     Yes. All the sign-in sheets

7  -- each meeting that we had, we had the

8  sign-in sheets.

9          Q.     All right.

10          A.     We signed in, and I don't know

11  what the heading was for this meeting, but

12  when David came in he was telling us about

13  how he wanted the area to start -- for us to

14  start doing and being in the area.

15                So he proceeded to get these

16  monkeys out of a bag, the little monkeys

17  with the long arms. And one of them had

18  "fabulous" on it.

19          Q.     All right. How many monkeys

20  are we talking about?

21          A.     He had three monkeys for each

22  meeting, and one gorilla for the whole

23  entire meeting.

## FREEDOM COURT REPORTING

157

1    Q.      Three monkeys and one gorilla?

2    A.      Right.  There was a total of

3    six monkeys, but the meeting I was in had

4    the three monkeys, then he had monkeys for

5    the second set.

6    Q.      Well, the meeting you were in

7    had three monkeys?

8    A.      Three monkeys and one gorilla

9    and a stun gun.

10   Q.      All right.  Okay.  Now, back

11   up a little bit.  He started talking about

12   being in areas what now?

13   A.      The way he wanted us to be in

14   our area.

15   Q.      The way he wanted you to be?

16   A.      Right.  Or the way you

17   appeared to him.

18   Q.      Okay.

19   A.      That's the part, whenever he

20   said:  This is the way you appear to me.

21   Like he gave Martine a monkey with

22   "friendly" on it, I think.

23   Q.      Okay.

# FREEDOM COURT REPORTING

178

1          A.          It really made me feel like he

2    really was racist then.  I already was

3    feeling like, you know, he was racist from

4    the start.  But whenever he did that and

5    then after Charlotte did that with the

6    gorilla, I was like it was more than me in

7    this room that's feeling this.  I just

8    didn't feel like he should have had that.

9          Q.          What do you mean?

10          A.          He shouldn't have had the

11    monkeys and gorilla and stun gun for a

12    demonstration for a ninety-five percent

13    black meeting.  I wouldn't have done that.

14          Q.          Well, do you think that he

15    chose those props knowing that they would

16    engender feelings of emotion in the

17    participants in the room?

18          A.          I have no idea.

19          Q.          Do you think he did that on

20    purpose?

21          A.          I have no idea what he was

22    thinking.

23          Q.          Do you allow for the

## FREEDOM COURT REPORTING

179

1    possibility that it was simply a bad choice

2    on his part and nothing more?

3              MR. BROWN:  Object to the form

4    of the question.

5              Q.     I mean, is that even a

6    possibility in your mind?

7              MR. BROWN:  Same objection.

8              A.     I think it was a bad choice.

9              Q.     Well, do you allow for the

10   possibility that it was a bad choice made

11   without any intent to cause anger or

12   animosity in the employees?

13             MR. BROWN:  Objection to the

14   form of the question.

15             A.     Can I ask --

16             MR. BROWN:  No.  No.  No.

17   Just --

18             Q.     I'm afraid you need to answer

19   it first.  If you don't understand it --

20             A.     I don't understand it.

21             MR. BROWN:  Just ask him to

22   repeat it.

23             A.     Will you repeat it?

## FREEDOM COURT REPORTING

180

1          MR. BROWN:  Hold on.  Just for
2     the Record, whenever I object, you can
3     answer the question.  I'm just objecting
4     because I object to the form of the
5     question.
6          A.      Okay.  That's why I was
7     looking --
8          MR. BROWN:  But if you don't
9     understand the question, ask him to repeat
10    it.
11         A.      Okay.  Now I understand.
12         Q.      All right.  Do you allow for
13    the possibility -- Is it even possible in
14    your mind that the use of those monkeys and
15    the stun gun was, while perhaps a bad
16    choice, a choice that he made without any
17    intention to cause animosity or anger
18    amongst employees in that meeting?
19         MR. BROWN:  Object to the form
20    of the question.
21         When she finishes the answer,
22    I need to take this call.
23         A.      I -- It would be hard for me

## FREEDOM COURT REPORTING

160

1           (indicating).

2                    Q.      About a foot high?

3                    A.      Yeah.  A little black gorilla.

4                    Q.      Did the gorilla have any label

5      or language on it?

6                    A.      No.

7                    Q.      Did it have anything on it?

8                    A.      No.

9                    Q.      Was it -- What color was the

10     gorilla?

11                   A.      It was black.

12                   Q.      What color were the other

13     monkeys?

14                   A.      One of them was a bright

15     yellow, one of them was green.

16                   Q.      Okay.

17                   A.      And I think one of them was a

18     hot pink or purple, I'm not sure.

19                   Q.      Okay.  All right.  So he was

20     using the three monkeys to illustrate

21     positive attitude or demeanor?

22                   A.      For the department.

23                   Q.      All right.  So to that end,

# FREEDOM COURT REPORTING

163

1    you're going.

2         Q.    Was he trying to convey

3    positive statements about how this employee

4    behaved?

5         A.    Right.

6         Q.    Okay.  Was that your

7    perception at the time?

8         A.    Not really.  Because I'm

9    wondering why he's in this meeting with

10   these monkeys, you know.

11        Q.    Well, did you understand at

12   the time that he was trying --

13        A.    I tried to, yes.  I really

14   did.

15        Q.    Let me finish, just so it's

16   clear.

17        A.    Okay.

18        Q.    Did you understand at the

19   time, that with at least the three monkeys,

20   he was trying to illustrate demeanor that he

21   felt to be positive or warm or favorable?

22             MR. BROWN:  Object to the

23   form.

## FREEDOM COURT REPORTING

164

1      A.      I just wasn't looking at it

2  like that.

3      Q.      Okay.

4      A.      Okay.  That's the only way I

5  can say that.

6      Q.      All right.  What -- Keep

7  walking me through what you can recall.

8      A.      Okay.

9      Q.      He had three monkeys, he gave

10  one to each employee.

11      A.      Right.  Then he gave -- He

12  pushed the gorilla down the table about this

13  long (indicating) to Charlotte Gillis.

14      Q.      Okay.

15      A.      And she pushed it back to him.

16  And that's what really started --

17          MR. BROWN:  It's about an

18  eleven or twelve-feet table?

19          THE WITNESS:  Right.  Right.

20          MR. WILSON:  That's about

21  right.

22      Q.      Did he say anything?

23      A.      He said:  This is a bully.

## FREEDOM COURT REPORTING

169

1    you're not sure who the third monkey went

2    to?

3         A.    I'm not sure.  No, I wouldn't

4    put a name down because I'm not sure.

5         Q.    So, he then passes this

6    gorilla to Charlotte, she passes it back, he

7    passes it back, what happened after that?

8         A.    After -- Shortly after that,

9    the meeting was adjourned because everybody

10   was upset because of the way he was doing

11   her with the gorilla.

12        Q.    Did he do anything else with

13   the gorilla to Charlotte, other than push it

14   down the table to her to tell her she was

15   the bully?

16        A.    He finally set it down in

17   front of her and said it was for her.  But

18   she left it on the table and got up.  Then

19   he got up with the stun gun and said if we

20   don't start -- when the patients walk up out

21   there to registration, this is what he

22   expect us to -- I guess if a patient come

23   up, he wants you to go out there and get

# FREEDOM COURT REPORTING

171

1      was to illustrate timeliness for patients at

2      registration?

3           A.     Right.  That's what he said.

4           Q.     All right.  And he waved it

5      around, you say?

6           A.     Yeah, he waved it around.

7           Q.     Did he aim it or point it at

8      any particular employee?

9           A.     No.

10           Q.     Did he single out any employee

11     in the room when he was using the stun gun

12     as a prop?

13          MR. BROWN:  Object to the form

14     of the question.

15          A.     No.  He was just standing up

16     waving the stun gun.

17          Q.     Did he threaten to, quote, zap

18     any particular employee?

19          A.     No.

20          Q.     Did anybody other than

21     Charlotte, object to the gorilla at the

22     time?  I mean, did anybody verbalize an

23     objection?

## FREEDOM COURT REPORTING

173

1    that stun gun after he used it.  Because I'm

2    sure he could -- you know, he could -- he

3    could feel the vibes from us.  I mean, it

4    was just wrong.  We never did finish the

5    meeting, the meeting just adjourned.

6          Q.      Okay.  Did anyone say anything

7    while he was using the stun gun?

8          A.      No.  I said to Jennifer

9    Robinson, that was sitting beside me, I

10    asked her:  What is he doing?

11          Q.      Okay.  What did she say?

12          A.      She just looked at him.

13          Q.      Who made the decision to

14    adjourn the meeting?

15          A.      He did.

16          Q.      All right.  Did anyone get up

17    and walk out of the meeting --

18          A.      No.

19          Q.      -- before it was over?

20          A.      No.

21          Q.      Did anybody threaten --

22          A.      No.

23          Q.      -- to do that?

## FREEDOM COURT REPORTING

181

1    to say.

2                    (Recess taken.)

3        Q.      We were talking about

4    Mr. Jones' motivation in using those

5    particular items in the staff meeting.  And

6    I think you told me that you're not sure --

7    you don't know what he was thinking?

8        A.      But with him being a

9    Caucasian, as far back as I can remember,

10   any time you've got monkeys, stun guns,

11   gorillas, you're referring to an

12   African-American, especially if you're using

13   them in a meeting with ninety-five percent

14   black.  That's the way I saw that.

15               MR. BROWN:  I think he asked

16   about do you know his motivation, that's one

17   of the reasons I object.  I'm going to talk

18   to Mr. Jones about that tomorrow.

19               THE WITNESS:  Okay.

20               MR. BROWN:  I think he's

21   asking do you know why he did it.

22               THE WITNESS:  No, I don't.

23       Q.      I was asking that.  And I was

## FREEDOM COURT REPORTING

182

1    asking, in retrospect, do you allow for the

2    possibility that it was simply a bad choice

3    made innocently on his part?

4            MR. BROWN:  I'm going to

5    object to the form.  I think he's asking

6    about your perception.

7            A.    My perception, no.

8            Q.    That's not even a possibility?

9            A.    No.  I just see it as being

10   racist, because we was already having

11   problems with Mr. Jones.  I feel like that's

12   why he bought those monkeys and gorillas,

13   trying to demonstrate to us, and this was

14   the things that he went out and bought to

15   bring to the meeting.

16           Q.    Okay.  So it's your judgment

17   that he specifically chose items that some

18   might feel have a racial overtone --

19           A.    Right.  That's the way I feel.

20           Q.    Hang on.  He specifically

21   chose items that have -- could be deemed to

22   have a racial overtone?

23           A.    Right.

## FREEDOM COURT REPORTING

183

1    Q.    He chose them on purpose?

2    A.    I can't say he chose them on

3    purpose.  That's just the way it came

4    across.

5    Q.    It's your judgment he chose

6    props that had racial overtones with an eye

7    toward offending, angering, upsetting the

8    employees in the room?

9    MR. BROWN:  Object to the form

10   of the question.

11   A.    I don't know if he felt he was

12   going to upset everybody in the room.  But I

13   know he probably had an idea he was going to

14   upset somebody, especially with the gorilla

15   and the stun gun.  Surely that wouldn't make

16   anybody happy to get a gorilla.

17   Q.    What I'm getting at,

18   Ms. Cowan, is I'm trying to figure out if

19   you think that Mr. Jones chose the items

20   that he chose intentionally because of some

21   racist overtone, or racially-demeaning

22   connotation that they carry, or could be

23   construed to carry?

## FREEDOM COURT REPORTING

184

1          A.       I do.  I feel like that's why

2     he chose those.

3          Q.       You told me a moment ago that

4     you -- Well, let me strike that and ask you

5     this.

6                   A minute ago you made

7     reference to prior problems that kind of, in

8     your mind, made it rational to conclude that

9     he was presenting these stuffed animals and

10    stun guns towards some racial end?

11         A.       Right.

12         Q.       What did you have in mind?

13         A.       That's the way we came across

14    to him.

15         Q.       I know.  But what had gone on

16    before that meeting that kind of solidified

17    in your mind that the use of these

18    particular props was racially motivated?

19         A.       It was the way that David had

20    been treating us in the past.

21         Q.       Like what?

22         A.       The meetings, like the raise,

23    the parking meters -- the parking pass.

## FREEDOM COURT REPORTING

242

1          Q.     Dee Smith?

2          A.     Uh-huh.

3          Q.     Janice Relf and Tonya

4   Jefferson?

5          A.     Uh-huh.

6          Q.     Who else?

7          A.     That was it.

8          Q.     This change in office location

9   affects you, Ms. Smith, Ms. Relf, and

10  Ms. Jefferson?

11         A.     Right.

12         Q.     And Cynthia Dixon told you she

13  was moving y'all's office physically over to

14  the fifth floor to consolidate you with the

15  shift coordinator?

16         A.     Shift coordinator, uh-huh.

17         Q.     For what purpose?

18         A.     Because we worked --.

19         Q.     Together?

20         A.     Right.  We worked together.

21         Q.     Can you describe the office

22  that y'all moved into?

23         A.     The office we moved into, they

## FREEDOM COURT REPORTING

243

1   had a door cut into that office, because it

2   was two small offices with a wall.

3          Q.      Okay.

4          A.      Plant operations came up and

5   cut a door into it.  And the door to the

6   side that bed control was on was always open

7   at all times because Cynthia Dixon told us

8   that -- we wouldn't close it because the

9   office was so small.  If you closed the

10  door, we wouldn't have a window, and the

11  office was already small.

12         Q.      Okay.  Hang on just a second.

13  So the door between the two offices that

14  linked the two offices would remain open per

15  Cynthia Dixon?

16         A.      Yes.  The shift office door

17  and the bed control was opened so that this

18  door stayed open at all times.

19         Q.      Okay.

20         A.      The door that goes back out

21  into the hall of the fifth floor, that door

22  remained open at all times.

23         Q.      Okay.  Did those doors have

## FREEDOM COURT REPORTING

245

1    that I couldn't be in a closed-in area.  And

2    she assured me that the door to bed control

3    would always be open in the new move.  She

4    walked me up there herself.

5         Q.      Did Cynthia take you over to

6    the new office and show you these things

7    before y'all actually moved up there?

8         A.      Yes, she did.

9         Q.      Okay.  Did you -- Did you

10   voice any objections to her about moving

11   from nursing administration to the fifth

12   floor when she told you that?

13        A.      No, I didn't.  The only

14   objection I had was just to make sure that

15   that door stayed open at all times because

16   of the space.

17        Q.      Which door, now, there are two

18   of them?

19        A.      The door going out from the

20   bed control office.  If I'm not mistaken,

21   the door to the shift office had a window.

22   But both doors stayed open because the shift

23   nurse would be talking to bed control, we

# FREEDOM COURT REPORTING

283

1      Q.      Which door now?

2      A.      The door to the bed control

3   office.

4      Q.      The interior door between the

5   two offices?

6      A.      No.  The exterior door that

7   goes out into the hall that was always open

8   at all times.

9      Q.      That's the door she said

10  needed to stay closed?

11     A.      It would be closed.  The door

12  didn't have a window on it.

13     Q.      Okay.

14     A.      And it would be closed from

15  now on.  And I asked her why; she would not

16  give me an answer.  And for the rest of that

17  day, I got up, and I walked in and out of

18  the bed control and the shift office so I

19  could breathe, because it was just taking my

20  breath.  And I wanted Terri to see, you

21  know, that I'm not playing, I'm really about

22  to pass out.

23              So when I got off from work

## FREEDOM COURT REPORTING

284

1    that day, I went down to my doctor's office.

2         Q.    Did you tell Terri you had

3    claustrophobia?

4         A.    Yes, I did.

5         Q.    She said what?

6         A.    She said the door still will

7    be closed.

8         Q.    She didn't give you a reason

9    why?

10        A.    She didn't.  She just said the

11   door will still be closed from here on out;

12   that this is the way it's going to be if I

13   continue to work in this area, because the

14   door will be closed.

15        Q.    She gave you no reason?

16        A.    No.

17        Q.    Did you go to your doctor that

18   very day?

19        A.    I did.  Because my pressure

20   was up.

21        Q.    At that time, did you have a

22   home monitor, a home monitor that you would

23   check your blood pressure?

## FREEDOM COURT REPORTING

361

1    that suggests that there are some other

2    things that maybe aren't so big.

3          A.      As far as my hypertension.

4    But my hypertension is stable for now.

5          Q.      Okay.  What else?

6          A.      That's all.

7          Q.      Did that --

8          A.      Me changing my job, I planned

9    to retire from Jackson.  I worked there

10   eighteen years.

11         Q.      Uh-huh.

12         A.      And all of a sudden, me being

13   at fifty years old, and I'm taking a new job

14   after I was employed at Jackson for eighteen

15   years.  I didn't plan to leave Jackson.  I

16   was trying to be promoted in other areas.

17         Q.      Did Dr. McLeod eventually

18   reduce your hypertensive medication?  You

19   said he raised it --

20         A.      He raised it and then he

21   reduced it back down, yes, he did.

22         Q.      All right.  And the only

23   medication that he started for you as a

# Exhibit B,

# Personnel Change of Request Dated January 4, 1999

*Jimmie*

**JACKSON HOSPITAL**

$BC$

Date of Request  1/4/99

**PERSONNEL CHANGE REQUEST**

Effective Date  1/11/99

| | Current Data | Change Requested |
|---|---|---|
| *Name | Dorthy Cowan | |
| Street | | |
| City | | RECEIVED BY |
| Zip Code | | JAN 1 6 1999 |
| Telephone | | PERSONNEL DEPT. |
| *SSAN | 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 | Change made to Employee Master 3/.../2000 |
| Clock # | | Date 1/18/99 By CJ |
| | | Verified by |
| *Department | Nursing | |
| Cost Center | 6000 | 6000 |
| Job Code | | 443  430 |
| Work Status | | |
| Budget Position | Bed Control Clerk | Bed Control Training Coordinator |
| Sh. | | |
| Marital Status | | |
| Tax Status: Federal State | | |
| Date of Birth | | |
| Date of Employment | | |
| Rate of Pay: Base | 8.44 | 9.48 |
| | | |
| Sub Total | | |
| Call | | |
| Shift | | |
| Total | | Review Date: 4/11/00 |
| Retirement Status | | |
| Method of Pay | | |
| Other | | |
| Exption | Promotion | |

Bec   1/4/98

Department Head   Date   Payroll/Personnel   Date   Administration   Date

REQUIRED INFORMATION

# Exhibit C,

# Memo Dated December 29, 1998



**JACKSON HOSPITAL**

TO:   Rosemary Cain,
      Assistant Administrator, Nursing

FROM: Peggy Benson,
      Director Specialty Nursing

DATE: December 29, 1998

RE:   Bed Control

We are eliminating the RN (AUM salary) position in bed control due to physicians no longer calling bed control and giving medical orders. The physicians are now calling the floors with this information. The bed control assignment process can be handled by a registration Bed Control Training Coordinator (See attached job description). This person isn't likely to be started at higher than mid point, which is 9.48 per hour as opposed to the current coordinator salary of 21.07 per hour. This would result in a cost reduction of $21,107.20 per year. The current bed control clerk position will also remain. Please let me know your thoughts on this matter and how I should proceed.

*OK ROCain 12-29-98*

*OK DPaul 1/4/98*

DEFENDANT'S EXHIBIT

JH
00132

# Exhibit D,

# Job Description for Bed Control Training Coordinator, Position No. 443

### JOB DESCRIPTION

JOB TITLE:     **Bed Control Training Coordinator**          POSITION NO: **443**

DEPARTMENT:     **Nursing Service**

---

**I.     JOB SUMMARY**

The Bed Control Coordinator (BCC) participates in the admission process to ensure the needs and desires of the patient, the physician, the hospital and the staff are addressed and met. The BCC collaborates with the nursing units, admitting offices, housekeeping and physicians on initial room assignments and in-house transfers. Considerable tact and expert communication skills are required.

**II.     JOB RELATIONS**

    **A. Supervised By:**     Director, Specialty Care

    **B. Supervises:**          Bed Control Clerk and training of Bed Control Registration personnel.

    **C. Line Of Promotion:**

      **To This Job:**          Previous bed control experience or office experience preferred.

      **From This Job:**     Another supervisory/management position related to field of knowledge.

**III.     MINIMUM QUALIFICATIONS REQUIRED**

    **A. Education:**          High School or equivalent

    **B. Experience:**     Two years office experience in healthcare preferred. One year required.

    **C. Licenses, Certifications and/or Registrations:**     None

    **D. Equipment/Tools/Work Aids:**     CRT, copying machine, fax machine, personal computer.

    **E. Specialized Skills:**     Typing 35 wpm, computer literate, good written and verbal communication skills, ability to interact with the public and multidisciplinary departments.



DEFENDANT'S EXHIBIT

**000004**          1

F.  **Physical Requirements:** Auditory and visual acuity.  Ability to communicate verbally.

BCC

IV.  **WORKING CONDITIONS**

Works inside with an office environment.  Regularly has periods of high stress.

V.  **POSITION RESPONSIBILITIES**

A.  Initiates the admission process
1.  Making appropriate room assignments of accomplishes by newly admitted patients as well as patients transferring to other departments.
- Accepts room reservations
- Assists with transfers from other hospitals
- Assists with in-house transfers
- Assigns rooms for preadmit patients
2.  Organizes and prioritizes duties throughout the shift.
3.  Provides input to the Registration Supervisor related to Bed Control issues.

B.  Maintains data/information
1.  Maintains confidentiality of patient and employee information and records.
2.  Maintains appropriate record keeping for reservations, admission log, room availability, discharges, statistics logs.

C.  Collaborates/Communicates
1.  Works with other departments such as: Physicians, Patients, Families Nursing, Utilization Management, X-ray, Housekeeping, Plant-Ops, Business Office, Physician Offices, and other Healthcare Providers.
2.  Responds to changes in the work setting and in the schedule in a collaborative and flexible manner.
3.  Utilizes appropriate communication skills and considerable tact when collaborating with health team members and in the training of new personnel

D.  Management
1.  Initiates plans to solve identified problems related to the admission process and to make improvements in that area.
2.  Plans, organizes and evaluates material resources such that utilization of available  resources is optimally effective and efficient.
3.  Supervises Bed Control personnel and the training of registration personnel for Bed Control.
4.  Evaluates Bed Control personnel and provides input for evaluation of registration personnel doing bed control.

E.  Quality Assurance
1.  Participates in Continuous Quality Improvement through active membership in relevant PIT or data gathering.
2.  Does a yearly survey of customers to receive improvement suggestions.

2

**000005**

BCC

F. **Organizational Support**
    1. Serves as a representative of the hospital when participating in community projects, progress, and activities.
    2. Performs other duties as assigned.

Written:  10/98

---

This description is intended to indicate the kinds of tasks and levels of work difficulty that will be required of positions that will be given this title and shall not be construed as declaring what the specific duties and responsibilities of any particular position shall be.  It is not intended to limit or in any way modify the right of any supervisor to assign, direct, and control the work of employees under his or her supervision.  The use of a particular expression or illustration describing duties shall not be held to exclude other duties not mentioned that are of similar kind or level of difficulty.

---

JOB ANALYST:_____    DATE:_____

REVIEWED BY: _____    DATE:_____

APPROVED BY:_____    DATE:_____

3

000006

*BED CONTROL DUTY LIST*

1. First thing you do is get a shift report from the person who has the reservation book and the house supervisor from the previous shift to see what or who is in overflow or needs a bed upon admission.

2. Go to bed control; pull up list of beds available (go under view bed to do bed control board). This is to be done at beginning of each shift.

3. Get a list of myelograms from x-ray or pre-admit, fax a copy to 4-West (Women and children). 4-West will help you with myelograms patients. Monday and Wednesday the first four of Dr. Hackman's and Dr. Ryan's patients go to x-ray. The rest of the patients are to be assigned a room if one is available on 4-West. Tuesday, Thursday, and Friday myelograms go to rooms on 4-West, outpatient, on 3-East.

4. Call surgery at 8:00 a.m. to see if you need any unit beds, total knees or total hips. If so call 6-East or 6-West for orthopedic beds.

5. Call 3-East look at surgery schedule to see what beds outpatient and 23hr patients will be assigned to. Talk with the charge nurse from outpatient.

6. Keep lists book updated and move patients out of units and off of 3-West as soon as possible.

7. Check surgery schedule to see how many women gyn surgery we have. Check how many children are on surgery schedule. Always assign children to peds unit. Unless authorized by house supervisor.

D00007

0000 7

## BED CONTROL ROOM ASSIGNMENT GUIDELINES

| | | |
|---|---|---|
| I. | Purpose: | To provide bed control with the information needed to assign rooms in a timely and efficient manner. |
| II. | Objective: | On completion of this handout the reader will be able to: |

> Gather pertinent information needed to make a room assignment.
>
> Coordinate the diagnosis, doctor's specialty, patient's preference, and financial class to place patient on appropriate floor.
>
> Distinguish difference between telemetry and remote telemetry.

### Information Needed for Room Reservations

Patient's Name
Patient's Date of Birth
Diagnosis
Doctor/Doctor Preference
Patient's Room Preference

### Medical/Surgical Floors

4 East – Private – Semi private
5 East – Private – Semi private
5 West – Private – Semi private

**Medical Doctors:**
Dr. W.D. Taylor
Dr. M. Reeves
Dr. N. Taylor
Dr. Kent
Dr. Strong
Dr. McLaughlin
Dr. Yates
Dr. Adams
Dr. Bell
Dr. Brown
Dr. Roebuck
Dr. Daugherty
Dr. Handey
Dr. Jernigan
Dr. Mancha
Dr. Marshall
Dr. McCloud
Dr. Parrish
Dr. Mukkamala

**Surgeons:**
Dr. Foxhall
Dr. Paul Shashy
Dr. Peter Shashy
Dr. Cook
Dr. Treadwell
Dr. Faulkner
Dr. I. Bhuta
Dr. Armstrong
Dr. Sedlak
Dr. Randall
Dr. Newman
Dr. Barry



*Orthopedics, Neuro Surgery, Neurology*

6 East – Private – Semi private
6 West – Private – Semi private

| *Orthopedic Surgeons* | *Neuro Surgeons* | *Neurologist* |
|---|---|---|
| Dr. G. Barnes | Dr. Hackman | Dr. Miller |
| Dr. Wells | Dr. Ryan | Dr. Epperson |
| Dr. Burton | Dr. Rigsby | Dr. Wouters |
| Dr. Thornbury | | |
| Dr. Palmer | | |
| Dr. Holt | | |

*Oncology*
3 North – Private

*Oncologist*
Dr. Cumbie
Dr. H. Barnes
Dr. Thompson
Dr. Moraes
Dr. Morrison
Dr. McNeal

*Pediatrics*
4 West – Private and Semi private Women & Children

*Pediatricians*
Dr. White
Dr. Patterson
Dr. Coggins
Dr. Holloway
Dr. Breshears

NOTE:     Myelograms go to 4 West. Monday and Wednesday the 1st 4 of Dr.
          Hackman's patients and the 1st 4 of Dr. Ryan's patients go to XRAY. The
          rest of the patients will go to the room. Tuesday, Thursday, and Friday's
          the myelogram patients go to the room prior to procedure.

*Obstetrics and Gynecology*
4 – North – Private rooms only

*Gynecologists and Obstetricians*
Dr. Ferlisi
Dr. Moore
Dr. Waller
Dr. Duggar
Dr. Johnson
Dr. Dupree
Dr. Saucer
Dr. McIntyre
Dr. Kouri
Dr. Green
Dr. Tankersley

*Cardiology*
3 – West – Private – Semi private

*Cardiologists*
Dr. Wool
Dr. Salvia
Dr. Stoudemire
Dr. Hamilton
Dr. Crossen
Dr. J. Williams
Dr. Finklea

*Intensive Care*
CCU Coronary Intensive Care
SICU Surgical Intensive Care

There is a difference between telemetry and remote telemetry. REMOTE telemetry can be done in unit. TELEMETRY is 3 West only. Bed Control supervisor or house supervisor must approve transfers from other hospitals. All renal patients for Dr. Ardon, Lopez, Broder go to 4 East, do not assign to 3 North.

Peritoneal Dialysis Patients go to 5 East otherwise indicated.

000010

DO NOT put Dr. Cook or Dr. Foxhall patients on 3 North. Place them on 5 East, or 4 East.

Assign Dr. Faulkners patients to 6 West and 3 North.

Dr. Kemp prefers 3 North for his patients.

6 North is Mental patients (remember to put the privacy code in).

Isolation rooms are 221, 305, 321, 347, 374, 405, 421, 432, 447, 505, 521, 532, 547, 647, 632, 605, and 621. Keep at least one isolation room available at all times if possible. These rooms are for patients with diagnosis of tuberculosis or suspected tuberculosis. Per Janice Smith, with infection control no other isolation cases have to go into these rooms.

Oncology patients go to 3 North, if unable to admit there due to no rooms, place on the transfer list and move as soon as possible.

Dr. Reeves patients should go to any semi private unless diagnosis indicates they need to go to the unit or 3 West Telemetry.

Any nursing home admissions notify Infection Control at 8900 and leave a message stating the patient's name and room number.

*Dorothy Cowan*
_____
**Authorized Signature**
**Dorothy Cowan**
**Bed Control Training Coordinator**

000011

# Exhibit E,

# David Jones' Personnel Change Request dated August 17, 2005

Date of Request _8/17/05_    PERSONNEL CHANGE REQUEST    Effective Date _8/14/05_

Current Data    Change Requested

*Name _DAVID JONES_ _____

Street _____ _____

City _____ _____

Zip Code _____ _____

Telephone _____ _____

*SSAN _____ _____

Clock # _____ _____

*Department _SECURITY_ _REGISTRATION 904R_

Cost Center _____ _____

Job Code _____ _____

Work Status _____ _____

Budget Position _____ _____

Shift _____ _____

Marital Status _____ _____

Tax Status:
  Federal _____ _____
  State _____ _____

Date of Birth _____ _____

Date of Employment _____ _____

Rate of Pay:
  Base _____

_____
                Sub Total
Call _____
Shift _____
                Total

Retirement Status _____ _____

Method of Pay _____ _____

Other

Explanation _Promotion to develop Centralized Shabby_
_and assume responsibility of Registration under_
_Communications_                    _El Schell_  _8/17/05_

tment Head        Date    Payroll/Personnel    Date    Administration    Date

*REQUIRED INFORMATION                                    Form # P-60

**PLAINTIFF'S EXHIBIT**

JH
000561

# Exhibit F,

# Excerpts of David Jones' Deposition

# FREEDOM COURT REPORTING

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             NORTHERN DIVISION

4

5    CIVIL ACTION NO.:  2:07-cv-779

6    DOROTHY COWAN,

7          Plaintiff,

8          vs.

9    JACKSON HOSPITAL & CLINIC, INC.,

10   a domestic corporation, conduction

11   business in the State of Alabama,

12         Defendant.

13

14         S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16   between the parties through their respective

17   counsel, that the deposition of David Jones

18   may be taken before Angela Smith McGalliard,

19   RPR, CRR, at the offices of Rushton,

20   Stakely, Johnston & Garrett, at 184 Commerce

21   Street, Montgomery, Alabama 36104, on the

22   18th day of April, 2008.

23        DEPOSITION OF DAVID JONES

COPY

## FREEDOM COURT REPORTING

171

1    Q.    Caucasian African-American?

2    A.    No.

3    Q.    African-American?

4    A.    Yes.  Pat Edwards.

5    Q.    All right.  African-American?

6    A.    Yes.  Dorothy.

7    Q.    Dorothy Cowan, who is the

8  Plaintiff in this lawsuit; right?

9    A.    Yes.

10    Q.    All right.

11    A.    Eventually, Angela Griffin.

12    Q.    She's African-American?

13    A.    Caucasian.

14    Q.    Anyone else you can remember?

15    A.    Martine Bettis.

16    Q.    All right.  Anyone else?

17    A.    Tracy -- I can't remember the

18  rest of the names.

19    Q.    Okay.

20    A.    There was approximately

21  thirty-five or forty people in that

22  department.

23    Q.    Okay.  And I believe we talked

## FREEDOM COURT REPORTING

299

1          A.          I think it would be difficult,
2     yes.
3          Q.          And before you did your
4     monkey/gorilla incident, you didn't preface
5     your remarks and say, I don't mean anything
6     racial by this, did you?
7          A.          I didn't say that because I
8     didn't draw any conclusion that it would be.
9          Q.          Well, it's not the conclusions
10    that you draw because you're not
11    African-American, are you?
12         A.          No.
13       → Q.          The terms monkey and gorilla
14    has not used to refer to Caucasians;
15    correct?
16         A.          To my best recollection, no.
17         Q.          They're used to refer to
18    African-Americans; correct?
19                     So my question is:  Don't you
20    think it would have helped if you had said
21    before the demonstration, this is my attempt
22    to convey good attitude, happy, fabulous,
23    before you did the monkey/gorilla

## FREEDOM COURT REPORTING

300

1    demonstration?  Don't you think that may

2    have helped the employees a little bit?

3         A.    I believe I made those

4    inferences, what the meeting was about that

5    I'm here to convey about what good attitudes

6    are, what we are trying to be as far as a

7    department.  And then we used those props as

8    illustrations to bring that point further

9    across.

10        Q.    Okay.  Now, when you told

11   Mr. Scholl about it, it didn't take him a

12   long time to say that you needed to

13   apologize, did it?

14        A.    No.

15        Q.    Do you know any -- Do you have

16   an opinion as to why Mr. Scholl may have

17   told you relatively quickly you needed to

18   apologize?

19             MR. WILSON:  Object to the

20   form.

21        A.    Would you mind rephrasing the

22   question again.

23        Q.    I mean, you know, you went to

# FREEDOM COURT REPORTING

301

1    see Mr. Scholl on the afternoon of June 22,

2    and you told him about the gorilla/monkey

3    incident.  He told you at that meeting that

4    you needed to apologize, didn't he?

5         A.    Yes.

6         Q.    He didn't have to give it any

7    serious consideration or thought?

8         A.    Right.

9         Q.    Okay.  And that was even after

10    you told Mr. Scholl what your subjective

11    intent was; right?

12         A.    I believe so, yes.

13         Q.    All right.  Now, at the actual

14    -- I don't think we've established who was

15    present at the gorilla/monkey demonstration,

16    and we need to get that.

17              I know Dorothy Cowan was

18    present.  Do you know anyone else who was

19    present?

20         A.    I believe Martine Bettis was

21    there.

22         Q.    All right.

23         A.    Ann Cobb was there, Charlotte

# Exhibit G,

# Excerpts of Ed Scholls' Deposition

ED SCHOLL -- 6/11/08    **ORIGINAL**

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4       DOROTHY COWAN,

5                Plaintiff,

6       vs.                        Civil Action NO.:

7                                  2:07cv779

8       JACKSON HOSPITAL,

9                Defendant.

10

11              *      *      *      *      *      *

12

13            **DEPOSITION OF ED SCHOLL,**

14       taken pursuant to notice and stipulation on

15       behalf of the Plaintiff, in the offices of

16       Ben C. Wilson, Esquire, Rushton, Stakely,

17       Johnston & Garrett, P.A., 184 Commerce

18       Street, Montgomery, Alabama, before Vila

19       Davenport, CCR, Judicial Reporter and

20       Notary Public in and for the State of

21       Alabama at Large, on Wednesday, June 11,

22       2008, commencing at approximately

23       9:40 a.m.

ED SCHOLL -- 6/11/08

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Okay.  Did you leave in good standing? |
| 3 | A. | Yes. |
| 4 | Q. | And when did you come on -- excuse me.  You |
| 5 | | came on in May of '85 as the chief |
| 6 | | financial officer? |
| 7 | A. | That's correct. |
| 8 | Q. | Okay.  And is that your current position? |
| 9 | A. | Yes. |
| 10 | Q. | What is your current salary now? |
| 11 | | MR. WILSON:  Now, you don't have |
| 12 | | to answer that.  It's not |
| 13 | | relevant to this action. |
| 14 | | MR. BROWN:  Okay.  Well, we'll -- |
| 15 | | we'll just -- I'll just certify |
| 16 | | the record. |
| 17 | | MR. WILSON:  That's fine. |
| 18 | Q. | Where did you graduate from high school? |
| 19 | A. | Excuse me? |
| 20 | Q. | Where did you graduate -- |
| 21 | A. | Monsignor Bonner High School in Drexel |
| 22 | | Hill, Pennsylvania. |
| 23 | | THE REPORTER:  Monsignor? |

ED SCHOLL -- 6/11/08

| | | |
|---|---|---|
| 1 | Q. | And just from a generic perspective, when a |
| 2 | | job description talks about, amongst other |
| 3 | | things, is some of your duties and |
| 4 | | responsibilities in that particular |
| 5 | | position? |
| 6 | A. | Yes. |
| 7 | Q. | All right.  Now, if an employee wants to |
| 8 | | apply for a posted position, there's, like, |
| 9 | | a -- is it a transfer form that they have |
| 10 | | to -- |
| 11 | A. | I assume there is.  I'm not real familiar |
| 12 | | with all the different HR forms? |
| 13 | Q. | Okay.  And I believe that that particular |
| 14 | | one -- employee's immediate supervisor has |
| 15 | | got to sign off on it as well as the |
| 16 | | employee, is that your understanding? |
| 17 | A. | I believe so. |
| 18 | Q. | All right.  Now, when did David Jones come |
| 19 | | under your supervision? |
| 20 | A. | August of '05. |
| 21 | Q. | Okay.  In August of '05, that would have |
| 22 | | been the date in which he was given the |
| 23 | | director of patient access? |

VILA DAVENPORT -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

ED SCHOLL -- 6/11/08

```
 1   Q.   Okay.  How long did this meeting take
 2        place?
 3   A.   With him and I on that?
 4   Q.   Yeah.
 5   A.   Thirty minutes.
 6   Q.   Okay.  Now, did you talk with him, again,
 7        about how the monkeys and gorillas might be
 8        offensive?
 9   A.   I think throughout the process we've had
10        conversations either formally or informally
11        about that.  I don't recall the specifics,
12        but I got my point across that that's --
13        that they could be offensive to some people
14        in certain circumstances.  Monkeys and
15        gorillas by themselves are not offensive.
16        It's how they are employed.
17   Q.   And doesn't that also depend on your
18        audience?
19   A.   And your audience.
20   Q.   For instance, if -- even though it is
21        offensive to me, but to a number of
22        African-Americans, a Swastika is not
23        offensive, would you agree with that?
```

ED SCHOLL -- 6/11/08

```
 1              said that, that would not be accurate?
 2                     MR. WILSON:  Object to the form.
 3     Q.    I'm just --
 4     A.    I don't recall saying that.
 5     Q.    Okay.  Did you mention to the staff that
 6           the way Mr. Jones sought to do this
 7           demonstration was incorrect?
 8     A.    I may have said words to that effect.
 9     Q.    Okay.  Now, the next sentence goes on to
10           say, if we continue to feel as though
11           nothing is going to be done, we're prepared
12           to move forward.  Now, after -- I'm sorry?
13     A.    Go ahead.
14     Q.    I just didn't know if you were with me, are
15           you with me?
16     A.    I'm with you.
17     Q.    But it goes on to say in the second
18           sentence, if we continue to feel as though
19           nothing is going to be dealt with, we're
20           prepared to move forward.  Now, when you
21           received Exhibit 4, and this allegation was
22           made that nothing had been done, what, if
23           any, perception did you have about that?
```

# Exhibit H,

# Excerpts of Gilbert Darrington's Deposition

GILBERT DARRINGTON -- 6/6/08    COPY

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4      DOROTHY COWAN,

5              Plaintiff,

6      vs.                        Civil Action NO.:

7                                 2:07cv779

8      JACKSON HOSPITAL,

9              Defendant.

10

11              *     *     *     *     *     *

12

13         **DEPOSITION OF GILBERT DARRINGTON,**

14      taken pursuant to notice and stipulation on

15      behalf of the Plaintiff, in the offices of

16      Rushton, Stakely, Johnston and Garrett, PA,

17      184 Commerce Street, Montgomery, Alabama,

18      before Vila Davenport, CCR, Judicial

19      Reporter and Notary Public in and for the

20      State of Alabama at Large, on Friday, June

21      6, 2008, commencing at approximately

22      9:38 a.m.

23

GILBERT DARRINGTON -- 6/6/08

| 1 | Q. | Just give me the categories.  I mean, I'm |
| 2 | | not asking for -- |
| 3 | A. | Well, recruitment, hiring, discipline, |
| 4 | | employee satisfaction, recruiting and |
| 5 | | retention. |
| 6 | Q. | Okay.  All right.  Now, I understand that |
| 7 | | you became the HR director in March of '06? |
| 8 | A. | Yes. |
| 9 | Q. | And prior to your succeeding Ms. Benson, |
| 10 | | you were in an interim position? |
| 11 | A. | Correct. |
| 12 | Q. | Okay.  Now, from the time you were in an |
| 13 | | interim position until March of '06, are |
| 14 | | you aware of any discrimination complaints |
| 15 | | that were filed against Jackson Hospital? |
| 16 | A. | No. |
| 17 | Q. | Okay.  And I just want to make sure we're |
| 18 | | clear, no racial discrimination complaints? |
| 19 | A. | Correct. |
| 20 | Q. | No sexual harassment complaints? |
| 21 | A. | Correct. |
| 22 | Q. | Okay.  No complaints based on |
| 23 | | discrimination based on religion? |

# Exhibit I,

# Excerpts of Rebecca Myrick's Deposition

REBECCA MYRICK -- 6/17/08    **ORIGINAL**

```
 1               IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4        DOROTHY COWAN,

 5                 Plaintiff,

 6        vs.                        Civil Action NO.:

 7                                   2:07cv779

 8        JACKSON HOSPITAL &
          CLINIC, INC., a
 9        domestic corporation,
          conducting business in
10        the State of Alabama,

11                 Defendant.

12

13             *     *     *     *     *     *

14            DEPOSITION OF REBECCA MYRICK,

15        taken pursuant to notice and stipulation on

16        behalf of the Plaintiff, in the offices of

17        Dwayne L. Brown, P.C., 4150-A Carmichael

18        Road, Montgomery, Alabama, before Vila

19        Davenport, CCR, Judicial Reporter and

20        Notary Public in and for the State of

21        Alabama at Large, on Tuesday, June 17,

22        2008, commencing at approximately

23        2:15 p.m.
```

REBECCA MYRICK -- 6/17/08

| | | |
|---|---|---|
| 1 | Q. | Okay. So you've not attained enough |
| 2 | | credits for your associates degree; right? |
| 3 | A. | I don't think so. |
| 4 | Q. | Okay. Have you taken any courses in which |
| 5 | | you have gotten a certificate or anything |
| 6 | | like that? Certificate of completion |
| 7 | | whether that's, you know, to be a |
| 8 | | specialized telephone operator or anything |
| 9 | | like that? |
| 10 | A. | I'm not sure, you know, because it's been a |
| 11 | | while. |
| 12 | Q. | I understand. You are currently employed |
| 13 | | at Jackson; right? |
| 14 | A. | That's right. |
| 15 | Q. | When did you first start at Jackson? |
| 16 | A. | 1987. |
| 17 | Q. | And what was your position in 1987 when you |
| 18 | | came on board? |
| 19 | A. | PBX switchboard operator. Hospital |
| 20 | | switchboard operator. |
| 21 | Q. | And without being too simple, I assume that |
| 22 | | all of the incoming calls that would come |
| 23 | | into Jackson, you would be one of the |

```
 1           of --

 2   Q.   Communications and security?

 3   A.   Right.

 4   Q.   Okay.  I knew he was security, but I didn't

 5        want to assume it was communications as

 6        well.  Do you know around what time David

 7        Jones became director of communications and

 8        security departments?

 9   A.   Around 2002 or three.

10   Q.   Okay.  Okay.  Now, from the time you were

11        hired -- and I know this is trying to speed

12        up your deposition, but from the time you

13        were hired in '87 until David Jones came on

14        as director of the communications and

15        security department, did your job title

16        change from a PBX switchboard operator?

17   A.   No.

18   Q.   Okay.  So you had been doing that -- and

19        when I say that, I'm talking about being a

20        PBX operator -- from '87 all the way up to

21        sometime around 2001/2002; is that correct?

22   A.   Right.  I was PB -- switchboard operator at

23        Jackson from 1987 to 2005.
```

REBECCA MYRICK -- 6/17/08

```
  1              times, this is the case so I'm trying to

  2              find out if this sentence only applies to

  3              you, or are you seeking to say that there

  4              have been others?

  5                       MR. WILSON:  Object to the form.

  6                       Go ahead.

  7    A.         Only thing I know that it applied to me,

  8              and that's what --

  9    Q.         Okay.  And that's all I'm trying to figure

 10              out.

 11    A.         Right.

 12    Q.         All right.  Now, did there come a time

 13              after you filed your grievance that you

 14              were discharged from Jackson?

 15    A.         I was fired; right.

 16    Q.         Okay.  When were you fired?

 17    A.         I believe it was July 8, 2005.

 18    Q.         Okay.  Did you receive a termination letter

 19              from Jackson?

 20    A.         Right.  I was called in.

 21    Q.         Okay.  Let's start with the call-in and

 22              then we'll deal with the termination

 23              letter.  Who actually called you in?
```

| 1 | | ran out and then -- |
|---|---|---|
| 2 | Q. | She who, Ms. Tolbert? |
| 3 | A. | Right. |
| 4 | Q. | Okay. |
| 5 | A. | Like, running to the bathroom or whatever. |
| 6 | | And I was called to come to personnel. |
| 7 | Q. | Okay. Did you go to personnel? |
| 8 | A. | I did. |
| 9 | Q. | Now, is personnel and HR the same thing? |
| 10 | A. | Right. |
| 11 | Q. | Okay. And at that time, was Peggy Benson |
| 12 | | still the director of HR? |
| 13 | A. | Yes. |
| 14 | Q. | Okay. Now, when you were called to go to |
| 15 | | personnel, did you talk with Peggy? |
| 16 | A. | I don't believe I did. |
| 17 | Q. | Who -- do you remember who you talked with? |
| 18 | A. | I believe David Jones read the letter, the |
| 19 | | termination letter, and Brandy was present. |
| 20 | Q. | And who -- and Peggy did -- |
| 21 | A. | Brandy -- Brandy was present. |
| 22 | Q. | Who was Brandy? |
| 23 | A. | Her title -- Brandy -- I forgot what her |

REBECCA MYRICK -- 6/17/08

```
 1          title --

 2    Q.    Okay.

 3    A.    -- but maybe she was assistant.

 4    Q.    Okay.  So it was David Jones and Brandy.

 5          Was Regenia present?

 6    A.    No.

 7    Q.    Okay.  And you said David Jones proceeded

 8          to read the termination letter?

 9    A.    Right.

10    Q.    What did the letter say?

11    A.    For insubordination.

12    Q.    Said you were fired for that?

13    A.    For insub -- and a combination of -- it was

14          like it was a combination of everything

15          that -- whatever.

16    Q.    Okay.

17    A.    I'm sure I may could find the termination

18          letter maybe.

19    Q.    Okay.  But you had to sign the termina --

20          did you sign the termination letter?

21    A.    I don't think I did.

22    Q.    Okay.  And did you respond to that

23          particular termination meeting with
```

| | | |
|---|---|---|
| 1 | Q. | Okay.  And did you tell Mr. Helmer or |
| 2 | | someone else at Jackson Hospital that there |
| 3 | | were some positions that were posted on the |
| 4 | | board that you were interested in? |
| 5 | A. | That's right.  In fact, I think I talked to |
| 6 | | him, because he was standing there with me, |
| 7 | | probably, looking at the board, and I said, |
| 8 | | well, I, kind of, like that, because it was |
| 9 | | Monday through Friday.  And I was going to |
| 10 | | be glad not to have -- have to work |
| 11 | | weekends so. |
| 12 | Q. | All right.  So how did you come to get |
| 13 | | the -- strike that.  When you came back to |
| 14 | | work for Jackson in August of '05, what |
| 15 | | position were you placed in? |
| 16 | A. | ED -- emergency room department |
| 17 | | registration clerk. |
| 18 | Q. | Okay.  All right.  Now, other than telling |
| 19 | | Mr. Helmer that you were interested in this |
| 20 | | position, is there anything else that you |
| 21 | | had to do to get the position as ER |
| 22 | | registration clerk? |
| 23 | A. | I'm not sure. |

# Exhibit J,

# Record of Employee Counseling for Rebecca Myrick Dated November 12, 2004


PLAINTIFF'S EXHIBIT

RECEIVED
NOV 1 2 2004

## RECORD OF EMPLOYEE COUNSELING

◻ Verbal Counseling
◻ Verbal Warning
◻ Written Warning
☑ Disciplinary Probation/Suspension
◻ Decision Day
◻ Termination

Present   David Jones
          Jay Hefner
          Rebecca Myrick
          Regenia Tolbert

EMPLOYEE NAME: Rebecca Myrick      DEPT/UNIT: Communications      DATE: 11/12/04

POLICY INFRACTION (Required for warnings): #770.09 Chain of Command

PURPOSE OF COUNSELING: To correct employee behavior.

COMMENTS: Ian Glaze, office manager for Dr. John Williams contacted me on November 8, 2004 regarding a problem Dr. Williams had with two PBX operators. Ms. Glaze stated she first discussed the problem with Rebecca Myrick. Rebecca took it upon herself to solve the problem instead of suggesting that Ms. Glaze contact Regenia Tolbert or myself. Furthermore, she never mentioned the problem to me. She contacted both PBX operators involved in the incident at their homes.

She embarrassed one of the operators in front of several employees by stating she was not going to repeat the ugly name Dr. John Williams had called the aforementioned operator.

She confronted another of the operators involved in the incident when she entered the switchboard to begin her shift. This was done in front of a new employee.

Rebecca was counseled previously about not following the chain of command. A memo to the PBX operators was written by me in February, 2004 addressing policies and the chain of command. It was clearly stated in the memo that communications between the operators and the PBX supervisor is the key to a successful and productive workplace.

EXPECTATIONS/RECOMMENDATIONS:

1.   Expected to follow the policy of chain of command.
2.   Placed on probation for the next six months ending on May 12, 2005. Further violation of policy will result in possible suspension or termination of employment.

Department Head/Supervisor expects immediate and lasting improvement in regards to above
mentioned counseling. Failure to meet these expectations will result in further disciplinary action up to
and including termination.

DEPARTMENT HEAD/SUPERVISOR: _____

I acknowledge that this interview did take place on this date and the subjects recorded on this
document were discussed. I have been advised of the Hospital grievance procedure. If I do not agree
with the facts as stated above, my statement is as follows:

_____
_____
_____
_____
_____

_____
Employee Signature
c- attached letter

_____
Witness (if necessary)

# Exhibit K,

# Rebecca Myrick's Formal Grievance Dated November 17, 2004

November 17, 2004

TO:     Regina Tolbert

FROM:   Rebecca Myrick

RE:     Formal Grievance

I am submitting this formal grievance in accordance with the established Jackson Hospital Grievance Procedure Policy. This grievance centers around the disciplinary action of November 12, 2004, when I signed a document stating that I was being "placed on probation for the next six months ending on May 12, 2005" and that "further violation of policy will result in possible suspension or termination of employment" (attached).

The Record of Employee Counseling indicated that the basis for the action centered around two things:
1) embarrassing another employee
2) not following the chain of command

It was also stated in this document that this employee "was counseled previously about not following the chain of command."

I would like to submit that the only time I was counseled previously regarding the chain of command was in April of 2002 when no written policy existed regarding this issue. That counseling centered around a letter that was sent to Mr. Larry Pugh, Director of Security/ Communications (attached). The only thing said at that time was that a copy of the letter should not have been sent to Mr. Ball, Administrator. At that time I thought it was appropriate to do so. I further submit that I am not in agreement that I embarrassed another employee.

The Chain of Command Policy was established and distributed to employees on November 6, 2002 (attached). Another memorandum regarding the chain of command was distributed on February 2, 2004 (attached). The point I am making is that, since the Chain of Command Policy was established, the only incidence of not being in compliance with this policy occurred as documented in the Record of Employee Counseling document dated November 12, 2004.

In the Record of Employee Counseling, the steps of verbal counseling, verbal warning, and written warning were passed over and this employee has been placed on disciplinary probation. In light of the fact that this is my first offense since the written policy was established, and the things documented in my letter dated November 13, 2004 (attached), I feel that the disciplinary action is harsh and unfair. I appeal that the step of verbal warning would be more appropriate.

In keeping with the grievance procedure, it is my hope that this issue can be resolved at this level. However, if this is not possible, I respectfully request that we proceed to the next level. It is requested that your response be given in writing.

Respectfully,



PLAINTIFF'S EXHIBIT

# Exhibit L,

# Rebecca Myrick's Response Meeting dated November 13, 2004

NOVEMBER 13, 2004

To:  Mr. Jay Helmer
     Mr. David Jones
     Ms. Regenia Tolbert

Re:  Response To Meeting

Words cannot express my disappointment resulting from the meeting we had on Friday, November 12, 2004. I have been a dedicated and loyal employee to Jackson Hospital for now seventeen (17) years. I have always put forth my very best to do my job professionally and efficiently. It has always been my goal as an operator to interact with doctors, patients, co-workers, and the public in a courteous, kind, and helpful manner. My job means a lot and is very important to me. In two years I have not taken one day off sick. There have been very few, if any, complaints about my work. To the contrary, I have received many compliments from doctors, nurses, secretaries, other departments, etc. whom I come in contact with on a daily basis. In seventeen years I have seen many operators come and go, and I take great pride in being one of the stable employees of our department.

In respect to the above, I have not received one letter of recognition or word of praise from my immediate supervisors. I would think that these would be characteristics that the leadership of Jackson Hospital would look for in every employee. It is very disheartening when the only time this employee is called into conference, is to be written up for what is perceived as "not following the chain of command" (sounds like something you hear in the military). I strongly disagree with that perception. I was only doing my job the best I knew how. It has always been the practice of operators to provide doctors with information they request. In the instance you described in the write-up you required me to sign, there was no deliberate attempt on my part to circumvent any line of supervision (which is a better phrase than "chain of command"). For future purposes, it would be best served, if all operators would be provided written procedures outlining various actions to be taken in situations such as the one which resulted in me being written up.



It is my sincere hope that I will not be retaliated against as a result of expressing my feelings in writing. Often times this is the case. My personal pledge is to continue to perform my job duties in the way as previously described and be the type of employee that the leadership of Jackson Hospital would be proud of.

Respectfully,

*Rebecca Myrick*

Rebecca Myrick
Switchboard Operator

Cc: Personnel File

# Exhibit M,

# Records from Dr. Joel McCloud

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

DOROTHY COWAN,                          §
                                        §
     Plaintiff,                        §
                                        §
vs.                                     §    CASE NO.: 2:07-cv-00779-MHT-TFM
                                        §
JACKSON HOSPITAL & CLINIC, INC.,§
a domestic corporation, conducting      §
business in the State of Alabama,       §
                                        §
     Defendant.                        §

## CERTIFICATION OF RECORDS

STATE OF ALABAMA        )
                     :

MONTGOMERY COUNTY )

I hereby certify that the attached records are true and complete copies of the records regarding **Dorothy Cowan**, which are kept in the offices of Mulberry Clinic in my custody, and I am the legal custodian and keeper of the records. I further certify that these records were made in the regular course of business, and that it was in the regular course of this office for such records to be made at the time of the events, transactions, or occurrences to which they refer or within a reasonable time thereafter.

SIGNED this the 26 day of NOV , 2007.

_____
RECORDS CUSTODIAN
C.o.T.

Sworn to and subscribed before me on this the 26 day of November , 2007.

_____
Notary Public
My commission expires: _____

APRIL W. TAYLOR
NOTARY PUBLIC
ALABAMA STATE AT LARGE
MY COMMISSION EXPIRES SEPT. 20, 2011

4

Mulberry
00001



**Mulberry Medical**
Associates, P.C.
1301 Mulberry Street
Montgomery, AL 36106
(334) 265-6153

**Internal Medicine
and Endocrinology**

John A. Jernigan, M.D.
Joel McCloud, Jr., M.D.
Norman L. Taylor, M.D.

```
*******************************************************************
Reprinted from Electronic Medical Record - Created on 04/06/07 11:53:13
Patient: COWAN, DOROTHY              MR No.: 17370  DOB: 12/25/1957
*******************************************************************

PATIENT: COWAN, DOROTHY                    DOB: 12/25/1957
Medical Record Number: 17370               AGE: 49 yrs.
------------------------------------------------------------------
* * * * * * *  P R O G R E S S   N O T E  * * * * * * * * *
```

**S:** Dorothy is seen back for follow up assessment. She states she is feeling 100% better. She has recently been under a significant amount of job related stress. This has aggravated her blood pressure, headaches and had some anxiety. We were forced to titrate her meds upwards and give her some time off from work for recovery. She has since changed job positions and title and is feeling 100% better. She did have a recent rhinosinusitis infection and was treated at PriMed. She is still having some degree of post nasal drainage and cough. No productivity of significance, fever/chills or headache.

**PHYSICAL EXAM:** Shows her to be in no acute distress. Her blood pressure, pulse and temperature are improved today.
LAB: Show normal electrolytes and renal function.

**IMPRESSION:**
1.       Hypertension : Much improved. Will decrease her Benicar HCT back to 20/12.5 daily. Continue dietary sodium restriction and weight reduction.
2.       Rhinosinusitis: Improved. Will treat symptomatically now with some Singulair 10 mgs daily and some Zyrtec. I believe her infectious symptoms have resolved. Will have her return should it recur.
3.       Headaches: Also improved with treatment of her anxiety and elevated blood pressure.
4.       Anxiety: As above stable. Will see her back in about 4-6 months.


_____
Joel McCloud, M.D.
JM/mkt

Mulberry
00038



**Mulberry Medical**
*A s s o c i a t e s ,  P . C .*
*1301 Mulberry Street*
*Montgomery, AL  36106*
*(334) 265-6153*

*Internal Medicine*
*and Endocrinology*

*John A. Jernigan, M.D.*
*Joel McCloud, Jr., M.D.*
*Norman L. Taylor, M.D.*

January 17,2 007

RE: Dorothy Cowan

To Whom It May Concern:

Ms. Cowan is a patient in my care. Recent developments resulting in a change in her work environment have led to exacerbations of underlying claustrophobia. The accompanying physical symptoms with this disorder are quite debilitating and can prohibit her from being productive. Please ensure that her workplace remains open and non–enclosed, thereby compromising her job performance and well-being.

Sincerely,

Joel McCloud, M.D.
JM/mkt

**Mulberry Medical**
*Associates, P.C.*
*1301 Mulberry Street*
*Montgomery, AL 36106*
*(334) 265-6153*



*Internal Medicine*
*and Endocrinology*

*John A. Jernigan, M.D.*
*Joel McCloud, Jr., M.D.*
*Norman L. Taylor, M.D.*

PATIENT: COWAN, DOROTHY                    DOB: 12/25/1957
Medical Record Number: 17370               AGE: 49 yrs.
--------------------------------------------------------------------
* * * * * * * P R O G R E S S   N O T E * * * * * * * * *

**SUBJECTIVE:**
The patient is seen acutely. She states that she recently had some changes in her workplace environment. She states that she had informed her supervisors of a preexisting condition of claustrophobia. She states that today, her workplace was enclosed and she subsequently developed chest tightness, difficulty breathing associated with diaphoresis and anxiety. She states she was having a headache most of the day due being forced in this enclosed space. She presents today, concerned with her preexisting history of hypertension.

**PHYSICAL EXAM:** Her exam does show her to be mildly anxious appearing. She is hypertensive compared to her usual blood pressure readings.
NECK: Supple.
LUNGS: Clear, bilateral breath sounds.
CARDIAC: Cardiac exam is regular.
ABDOMEN: Soft.
EXTREMITIES: Nonedematous.
NEUROLOGIC: Neuro exam is nonfocal.

**IMPRESSION/PLAN:**
1.      Increased anxiety, probably worsened by exacerbation of her
claustrophobia.  We will ask that her workplace be modified so that this
problem will be minimized.  We will go ahead and give her some short-term
treatment with some benzodiazepines. Also, note the elevated blood
pressure and we will hold her off from work for the next 2 or 3 days.
2.      Hypertension, we will go ahead and increase her Benicar HCT 40/12.5
once a day and monitor.  We will see her back for followup here in a
couple of months or earlier if her symptoms fail to resolve.
3.

_____
Joel McCloud, Jr., M.D.

JM:cbs/gs

Mulberry
00039

## APPLICATION FOR FAMILY AND MEDICAL LEAVE

Name _Dorothy Cowan_     Position _Bed Control Supversior_

Department _Bed Control Nursing Adms._     Location __Jackson Hospital__

Date of Hire: _1988_     **(To be eligible, you must have been employed for 12 months and have worked a minimum of 1250 hours during that 12 months.)**

Reason for Requested Leave: (Please check as applicable)

- ❑ For birth of a son or daughter and to care for the newborn child.

- ❑ For placement with the employee of a son or daughter for adoption or foster care.

- ❑ To care for the employee's

    - ❑ Spouse

    - ❑ Son * _____

    - ❑ Daughter* _____

    - ❑ Parent _____

    - * Son or daughter must be 18 yrs. of age or younger

- ☒ Because of a serious health condition that makes the employee unable to perform the functions of his or her job.

    ___X___ Continuous Leave     _____ Intermittent Leave

Applicable date(s) from _1-22-07_ to _2-20-07_

Reason for Leave: _uncontrol Hypertension and Stress_

_____

_____

In making this request for family and medical leave, I agree to provide all documentation requested to verify the leave, including completion of the 'Certification of Physician or Practitioner' for any leave involving a serious health

1

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



---

*(When completed, this form goes to the employee, **Not to the Department of Labor**.)*

OMB No.: 1215-0181
Expires: 08-31-2007

---

1. Employee's Name

   *Dorothy Cowan*

2. Patient's Name *(If different from employee)*

---

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

   (1) _____ (2) _____ (3) _____ (4) ✓ (5) _____ (6) _____ , or None of the above _____

---

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

   *Pt c Insomnia, recently worsened Headaches, Poorly controlled Hypertension 2° Post-Traumatic stress*

---

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

   *Commenced 6/21/06 and is ongoing*

   b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

   *yes*

   If yes, give the probable duration: *4-5 weeks*

   c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

   *Pt is incapacitated for the next 4-5 weeks*

---

[1] Here and elsewhere on this form, the information sought relates **only** to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

N/A

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

Joel McCloud, Jr MD.

Signature of Health Care Provider

1301 Mulberry St.

Address

Montgomery, AL 36106

Int. Medicine

Type of Practice

(334) 265-6153

Telephone Number

1/24/07

Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

Dorothy Cowan

Employee Signature

1-24-07

Date



**JACKSON HOSPITAL**

To:        Dorothy Cowan

From:      Gilbert Darrington
           Human Resources Director

Date:      January 26, 2007

**RE:      Family and Medical Leave (FML) – Intermittent**

| | |
|---|---|
| **Start Date of FML** | **1/22/2007** |
| **Ending Date of FML** | **2/20/2007** |

**Your absence for the above period has been approved as Family & Medical Leave. The reason for your absence from work is one of the qualifying events for a Family & Medical Leave designation. You will need to maintain weekly contact with your supervisor regarding your status and intent to return to work.**

The Family and Medical Leave Act of 1993 entitles eligible employees up to 12 weeks of job-protected leave for certain family and medical reasons within a 12 month period. The 12-month period is measured backward from the date any family and medical leave is used. Should you still not be able to return to work at the end of 12 weeks total Family & Medical Leave, you will need to apply for a personal leave of absence. (Please refer to JH policy on Leave of absence.)

If you have any questions, please give Brandi Kelsey or myself a call at 293-8834.

Cc:    Terri Lowery

# Exhibit N,

# Excerpts of Terry Herring's Deposition

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF ALABAMA

 3                    NORTHERN DIVISION

 4      DOROTHY COWAN,

 5                  Plaintiff,

 6      vs.                      Civil Action NO.:

 7                               2:07cv779

 8      JACKSON HOSPITAL,

 9                  Defendant.

10

11              *      *      *      *      *      *

12

13             DEPOSITION OF TERRI HERRING,

14      taken pursuant to notice and stipulation on

15      behalf of the Plaintiff, in the offices of

16      Dwayne L. Brown, P.C., 4150-A Carmichael

17      Road, Montgomery, Alabama, before Vila

18      Davenport, CCR, Judicial Reporter and

19      Notary Public in and for the State of

20      Alabama at Large, on Tuesday, June 10,

21      2008, commencing at approximately

22      10:25 a.m.

23
```

TERRI HERRING -- 6/10/08

| 1 | | of, kind of, made me feel better. |
| 2 | Q. | I understand.  Okay.  So when Mr. Scholl |
| 3 | | apologized, do you recall -- other than |
| 4 | | what you've said -- do you recall what else |
| 5 | | he may have said, specifically, regarding |
| 6 | | the apology? |
| 7 | A. | I don't know.  I can't say what he says, |
| 8 | | specifically, but he did make the -- he |
| 9 | | indicated to us that he thought that |
| 10 | | Mr. Jones had crossed the line. |
| 11 | Q. | Okay. |
| 12 | A. | I can't say what he said, specifically, but |
| 13 | | that's how we felt like, you know, how he |
| 14 | | was talking and some of the things he was |
| 15 | | saying that he felt like that that |
| 16 | | shouldn't have happened. |
| 17 | Q. | Okay.  Did he ever indicate to you guys as |
| 18 | | a group that he counseled Mr. Jones about |
| 19 | | this? |
| 20 | A. | Yes. |
| 21 | Q. | Did he say he counseled? |
| 22 | A. | Yes. |
| 23 | Q. | Okay.  Did he specifically say what that |